IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| LONNIE BILLARD,<br><br>*Plaintiff*,<br><br>v.<br><br>CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE<br><br>*Defendants*. | Civil Action No. 3:17-cv-0011 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, through counsel, respectfully submits this memorandum of law and the in support of his motion for partial summary judgment.

**INTRODUCTION**

Plaintiff Lonnie Billard taught drama at Charlotte Catholic High School for more than a decade and continued to work as a substitute teacher after retirement. He was a beloved figure who was widely recognized as a gifted and caring teacher. But after he decided to marry his long-time partner, Richard Donham, Defendants told him he could no longer work as a substitute teacher because his relationship with Mr. Donham was contrary to the moral teachings of the Catholic faith, which limit marriage to one man and one woman. In doing so, Defendants violated Title VII of the Civil Rights Act of 1964, which prohibits covered employers from "fail[ing] or refus[ing] to hire or to discharge any individual . . . because of such individual's . . . sex…" 42 U.S.C. § 2000e-2(a)(1).

1

Because the material facts are not in dispute and this case turns entirely on pure questions of law, the Court should grant Mr. Billard's motion for partial summary judgment as to Defendants' liability under Title VII and set this case for trial as to Plaintiff's damages.

## STATEMENT OF FACTS

### Defendants' Prohibition on Employees Marrying a Same-Sex Partner

The Roman Catholic Diocese of Charlotte (the "Diocese") has "thousands" of employees. Exhibit 4, Jugis Dep. 6:20. They include secretaries, information technology specialists, food service workers, and building maintenance crews. *Id.* 7:15-20, 11:7-25. The Diocese also operates a network of schools, including Charlotte Catholic High School ("CCHS"), with secretaries, librarians, and teachers. Exhibit 3, Carpenter Dep. 80: 9-13, 81:4-21.[1]

The Diocese prohibits all of its "thousands" of employees—whether or not they are Catholic—from publicly engaging in or advocating for conduct contrary to the moral tenets of the Catholic faith. Jugis Dep. 16:1-10. According to the Diocese, this policy prohibits employees from being in a romantic relationship with—or marrying—a same-sex partner because sexual activity should be limited to marriage between "one man and one woman." Exhibit 6, Def.'s Response to Plaintiff's Interrogatory No. 5; Jugis Dep. 25:2-7. The Diocese's prohibition on being in a romantic relationship, or marrying, a same-sex partner is not limited to employees performing religious functions. Exhibit 6, Def.'s Response to Plaintiff's Interrogatory No. 1. It is not limited to employees who interact with the public. Jugis Dep. 18:17-20. And it is not limited to employees who speak publicly about their relationship. *Id.* 19:1-5, 55:1-56:5, 57:2-22.

---

[1] Students do not have to be Catholic or religiously observant to attend CCHS, and students who are openly gay and sexually active may attend school. Carpenter Dep. 14:4-6, 83:1-6; Exhibit 5, Telford Dep. 28:16-29:18.

## Mr. Billard's Work at CCHS

Mr. Billard is a current resident of Charlotte, North Carolina, where he has lived for approximately 20 years. Exhibit 2, Billard Decl. ¶ 1. Mr. Billard graduated from what was then called Central Missouri State College, now Missouri State University, and received a lifetime teaching certification from the State of Missouri. *Id.* ¶¶ 3-4. After graduating college, Mr. Billard began his career as a public school teacher and speech therapist. *Id.* ¶ 5. He left teaching after ten years to pursue a career as a human resources professional. *Id.* ¶ 6. After working for nearly 20 years in human resources, Mr. Billard decided to return to teaching, which was his original passion. *Id.* ¶ 7.

Mr. Billard applied to work as a substitute teacher at Charlotte Catholic High School ("CCHS") in January 2001. *Id.* ¶ 8. He was called in for an interview for the position of substitute teacher at CCHS with Steve Carpenter, the Vice Principal of CCHS ("Carpenter"), and Gladys Howell, who was then-chair of the CCHS English department. *Id.* ¶ 9. During the interview with Vice Principal Carpenter and Ms. Howell, Mr. Billard was asked about his knowledge of grammar, vocabulary, and literature. *Id.* Neither Catholicism nor the Catholic identity of CCHS was discussed during the interview. *Id.* Shortly after the interview, CCHS hired Mr. Billard to serve a substitute teacher at CCHS. *Id.* ¶ 10. He began working in the spring of 2001. *Id.*

Mr. Billard loved teaching at CCHS. *Id.* ¶ 11. He felt that he was able to connect with his students and be relevant to them and their lives. *Id.* Mr. Billard therefore applied for a full-time teaching position at the school and was hired to serve as a full-time English teacher at CCHS, starting in the fall of 2001. *Id.* ¶¶ 11–12, 18. In the fall of 2002, Mr. Billard transitioned to teaching Drama. *Id.* ¶ 20. Mr. Billard served as a drama teacher until his retirement from full-

time teaching in the spring of 2012. *Id.* As a full-time drama teacher, Mr. Billard taught classes in film, acting, technical theater, and other drama-related subjects. *Id.* ¶ 21. He was also responsible for putting on the school plays and musicals every semester. *Id.*

Mr. Billard "was beloved in the school." Carpenter Dep. 56:3; *see generally,* Exhibit 7, Wilson Decl.; Exhibit 8, Hedrick Decl. In the spring of 2011, he received the Inspirational Educator Award from North Carolina State University. Billard Decl.¶ 22. In the spring of 2012, he was selected as Teacher of the Year for CCHS, which came with a $10,000 cash prize. *Id.* ¶ 23. Teachers are nominated for the award by their students. *Id.* Jerry Healy, who was then-principal of CCHS, told Mr. Billard that he was the only teacher who had been nominated for the award every year since its inception in 2005. *Id.*

Mr. Billard retired from full-time teaching in the spring of 2012. *Id.* ¶ 24. Before his retirement, Mr. Billard received assurances from the school administration that he could continue to work at CCHS as a substitute teacher. *Id.* Over the next couple years, Mr. Billard continued to work as a substitute teacher at CCHS. *Id.* ¶ 25. He was not required to sign a contract for employment with CCHS as a substitute teacher. *Id.* ¶ 26. He primarily served as a substitute teacher for English courses because he has expertise on that subject. *Id.* ¶ 27.

At CCHS, teachers of secular subjects do not have to undergo any religious training, and they do not even have to be Catholic. Carpenter Dep. 58:6-17. Although all classes began with a short prayer, the content of the prayer was not specified, the prayer could be ecumenical without referencing any particular religion, and the prayer could be led by students instead of the teacher. Carpenter Dep. 63:22-64:14, 64:24-65:2; Exhibit 5, Telford Dep. 26:3-6. In their lesson plans, teachers of secular subjects did not have to reference Catholic principles at all. Carpenter Dep.

74:2-17. Indeed, the administration prefers that secular teachers avoid discussing Catholic doctrine and leave those discussions to the teachers of religious subjects. Telford Dep. 28:2-15.[2]

### Mr. Billard's Relationship with His Husband

Mr. Billard came out as gay to his family and close friends in 1995. Billard Decl. ¶ 33. He met his husband Richard Donham in the year 2000. *Id.* ¶ 34. Mr. Billard began a romantic relationship with Mr. Donham roughly a year after they first met. *Id.* They became a couple and began living together in 2002. *Id.* Throughout his tenure at CCHS, Mr. Billard was open about his relationship with Mr. Donham. *Id.* ¶ 36. Mr. Donham customarily accompanied Mr. Billard to a variety of CCHS functions, including faculty parties, school plays, and other CCHS events. *Id.* ¶ 37. At these gatherings, the two of them acted like any other couple. *Id.* [3]

Mr. Billard and Mr. Donham began discussing marriage after the Supreme Court's decision in *United States v. Windsor*. *Id.* ¶ 43. They made the decision to get married in October 2014, after marriage for same-sex couples was legalized in North Carolina. *Id.* Mr. Billiard announced their marriage plans in a Facebook post on October 25, 2014 ("October 25 Facebook post"). *Id.* ¶ 44. A number of his Facebook friends responded to the post to congratulate Plaintiff on his upcoming marriage. *Id.* He anticipated that his marriage might upset some officials at the Diocese, but he did not expect to be fired as he was a secular employee and had been open about his relationship with Mr. Donham during his tenure at CCHS. *Id.* ¶ 45.

---

[2] When CCHS held an all-school Mass, which occurred approximately once a month, teachers had to monitor students the same way they would monitor students at any other assembly, but teachers did not have to participate in the religious services. Carpenter Dep. 76:9-10, 79:5-18. Mr. Billard did not perform any religious duties or functions during the Mass, nor did he direct or lead any of the religious elements of the Mass. Billard Decl. ¶¶ 31–32.

[3] The parties dispute whether the Principal and Vice Principal were aware of the romantic nature of Mr. Billard and Mr. Donham's relationship, but that dispute is not material to Plaintiff's motion for summary judgment.

A few days later, Mr. Billard informed Vice Principal Carpenter about his marriage plans and the October 25 Facebook post. *Id.* ¶ 46. Vice Principal Carpenter congratulated Mr. Billard on his impending marriage. *Id.* Vice Principal Carpenter agreed that the Diocese would probably not be pleased about the marriage, but he assured Mr. Billard that the Diocese would not hear about the marriage from him. *Id.* ¶ 48.[4]

### Defendants' Termination of Mr. Billard as Substitute Teacher

Despite Mr. Billard's meeting with Vice Principal Carpenter, no action was taken against Mr. Billard until several weeks later when the school's chaplain, Father Kauth, informed Principal Telford (who replaced Healy as principal earlier that year) about Mr. Billard's Facebook post. Exhibit 6, Def.'s Response to Plaintiff's Interrogatory No. 6. Principal Telford and Father Kauth determined that Mr. Billard could no longer work as a substitute teacher because of his relationship with Mr. Donham violated the Diocese's policy against engaging in conduct that was contrary to moral teachings of the Catholic faith, which limited marriage to one man and one woman. *Id.*

Mr. Billard did not hear anything further about his employment situation until Christmas Day. Billard Decl. ¶ 50. On December 25, 2014, Mr. Billard and Mr. Donham visited the home of Joan Stretch, another teacher at CCHS, for Christmas dinner with some CCHS alumni and employees. *Id.* ¶ 51. Mr. Billard mentioned to Ms. Stretch that he had not yet heard from CCHS about a substitute teaching assignment that he routinely performed after the Christmas break. *Id.* ¶ 52. Ms. Stretch told Mr. Billard that, when she spoke with Vice Principal Carpenter shortly before winter break to confirm that Mr. Billard would handle the substitute teaching assignment, Vice Principal Carpenter informed her that Mr. Billard could no longer serve as a substitute

---

[4] The parties dispute what was said during this conversation, but that dispute is not material to Plaintiff's motion for summary judgment.

teacher at CCHS. *Id.* A few days later, Mr. Billard texted Vice Principal Carpenter to ask about his employment status. *Id.* ¶ 54. Vice Principal Carpenter called and informed Mr. Billard that he would no longer be allowed to work as a substitute teacher at CCHS. *Id.* ¶¶ 54–55.

Mr. Billard was emotionally devastated by his termination. *Id.* ¶ 56. He loved the opportunity to interact with students and parents, and he was frequently commended on the difference he made to children's lives. *Id.* The CCHS administration frequently told Mr. Billard that he was a "blessing" and an "asset" to the school. *Id.* The loss of his position deprived him of his sense of identity and self-worth. *Id.* These wounds were deepened by the fact that Mr. Billard lost his position simply because he decided to commit his life to his long-term partner. *Id.* ¶ 57.

## SUMMARY OF THE ARGUMENT

This case turns entirely on one undisputed fact: The Diocese disqualified Mr. Billard from continuing to work as a substitute teacher because he is a man who was engaged to be married to another man. That undisputed fact establishes, as a matter of law, that the Diocese took an adverse employment action because of Mr. Billard's sex, in violation of Title VII. Although Section 702 of Title VII shields religious organizations from liability for claims of religious discrimination, it does not shield them from liability for sex discrimination—even when that sex discrimination is motivated by sincere religious beliefs.

The Diocese's affirmative defenses also fail as a matter of law. The Diocese has stipulated that it will not assert that Mr. Billard is a minister for purposes of the "ministerial exception" to Title VII, *see* Stipulation dated August 11, 2017, and the First Amendment does not provide any affirmative defense to Title VII for non-ministerial employees. Moreover, the Religious Freedom Restoration Act ("RFRA") provides no defense because the statute applies only to litigation in which the government is a party. Even if RFRA did apply, the Diocese's

7

affirmative defense would still fail as a matter of law because, under Fourth Circuit precedent, statutes prohibiting sex discrimination against non-ministerial employees are narrowly tailored to serve compelling governmental interests.

Because the Diocese discriminated against Mr. Billard on the basis of sex and because all the Diocese's asserted defenses are foreclosed by binding precedent, Mr. Billard's motion for partial summary judgment as to liability should be granted.

## ARGUMENT

### I. Legal Standard

Under Federal Rule of Civil Procedure 56, a party may move for partial summary judgement on a claim. Here, Plaintiff moves for partial summary judgment as to Defendants' liability under Title VII. This Court may grant a summary judgment motion "only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'"*Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citation omitted). Plaintiff's motion meets that standard.

### II. The Diocese Discriminated Against Mr. Billard "Because of Sex"

It is undisputed that the Diocese removed Mr. Billard from the list of eligible substitute teachers because he was a man who announced his engagement to another man, which conflicts with Catholic teaching that marriage is limited to "one man and one woman." Exhibit 6, Def.'s Response to Plaintiff's Interrogatory No. 5. On its face, that action is discrimination explicitly "because of sex." As federal courts recognized when striking down laws that prohibited same-sex couples from marrying, those laws facially discriminated on the basis of sex by declaring that "[o]nly women may marry men, and only men may marry women." *Latta v. Otter*, 771 F.3d 456,

480 (9th Cir. 2014) (Berzon, J., concurring); *accord Jernigan v. Crane*, 64 F. Supp. 3d 1260, 1286-87 (E.D. Ark. 2014); *Rosenbrahn v. Daugaard*, 61 F. Supp. 3d 845, 859-60 (D.S.D. 2014); *Lawson v. Kelly*, 58 F. Supp. 3d 923, 934 (W.D. Mo. 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1206 (D. Utah 2013); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010); *cf. Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n.4 (N.D. Cal. 2012). These principles apply with equal force to Title VII. *See Hall v. BNSF Ry. Co.*, No. C13-2160, 2014 WL 4719007, at *3 (W.D. Wash. Sept. 22, 2014) (plaintiff stated claim for sex discrimination because "he (as a male who married a male) was treated differently in comparison to his female coworkers who also married males"); *Baldwin v. Foxx*, EEOC DOC 0120133080, 2015 WL 4397641, at *6 (July 16, 2015).

The Fourth Circuit has employed the same reasoning in the analogous context of discrimination against an employee because of a romantic relationship with someone of a different race. If white employees are allowed only to marry people who are white, and if black employees are allowed only to marry people who are black, then a Title VII plaintiff who alleges employment discrimination based on his interracial marriage "is alleging by definition, that he has been discriminated against because of his race." *Collin v. Rectors & Visitors of Univ. of Va.*, 163 F.3d 598, 598 (4th Cir. 1998) (per curiam); *see also Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258 (4th Cir. 2001) (same result under 42 U.S.C. § 1981). That is because discrimination against "a white person based on his or her relationship with a member of a different race . . . would not occur if the victim were not white." *Verrinder v. Rite Aid Corp.*, No. 3:06CV00024, 2007 WL 4357595, at *5 (W.D. Va. Dec. 11, 2007); *accord Autrey v. Maryland*, No. GLR-14-3064, 2016 WL 362502, at *3 (D. Md. Jan. 29, 2016); *Erwin v. Mister Omelet of Am., Inc.*, 1991 WL 32248 at *3 (M.D.N.C. Jan. 15, 1991).

The same is true when an employee is fired for marrying a same-sex partner. "The logic is inescapable: If interracial association discrimination is held to be 'because of the employee's own race,' so ought sexual orientation discrimination be held to be because of the employee's own sex." *Boutillier v. Hartford Pub. Sch.*, 221 F.Supp.3d 255, 268 (D. Conn. 2016). "No matter which category is involved, the essence of the claim is that the plaintiff would not be suffering the adverse action had his or her sex, race, color, national origin, or religion been different." *Hively v. Ivy Tech. Cmty. Coll.*, 853 F.3d 339, 346 (7th Cir. 2017) (en banc); *Baldwin*, 2015 WL 4397641, at *6.

In addition to explicitly classifying someone on the basis of sex, discrimination based on an employee's marriage to a person of the same sex also impermissibly discriminates based a person's gender nonconformity. As the Supreme Court recognized in *Price Waterhouse v. Hopkins*, "assuming or insisting that [individual men and women] match[] the stereotype associated with their group" is discrimination because of sex. 490 U.S. 228, 251 (1989) (plurality). And, "there is no more obvious form of sex stereotyping than making a determination that a person should conform to heterosexuality." *EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp. 3d 834, 841 (W.D. Pa. 2016); *see Hively*, 853 F.3d at 346; *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014); *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1224 (D. Or. 2002). "Any discomfort, disapproval, or job decision based on the fact that the complainant—woman or man—dresses differently, speaks differently, or dates or marries a same-sex partner, is a reaction purely and simply based on sex." *Hively*, 853 F.3d at 347; *Baldwin*, 2015 WL 4397641, at *7.

To be sure, some district courts in this Circuit have erroneously cited *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138 (4th Cir. 1996), for the proposition that "Title VII does not

protect against discrimination based on sexual orientation." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 814 (E.D. Va. 2016); *accord Barr v. Va. Alcohol Beverage Control*, No. 3:17-CV-326-HEH, 2017 WL 3222541, at *5 (E.D. Va. July 28, 2017). That statement from *Wrightson*, however, was unrelated to the outcome of the case and thus is non-binding dicta. *See Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999) ("Dictum is [a] statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding).

But even if the quoted language from *Wrightson* were binding, the actual holding of the case is that discrimination based on sex violates Title VII even when that discrimination could also be characterized as based on sexual orientation. The plaintiff in *Wrightson* was a heterosexual employee who was sexually harassed by a gay supervisor. The employer argued that, because the employee would not have been harassed if he were not heterosexual, the "claim actually is not that he was harassed because of his sex, but, rather, that he was harassed because of his sexual orientation as a heterosexual." *Wrightson*, 99 F.3d at 143. The Fourth Circuit rejected that argument, explaining that "[w]hile it is true Title VII does not afford a cause of action for discrimination based upon sexual orientation, Wrightson does not allege that he was discriminated against because he is heterosexual. He specifically alleges in his complaint that he was discriminated against 'because of his sex, male.'" *Id.* (citations omitted). Even if sexual orientation was also a but-for cause of the discrimination, "a Title VII cause of action lies even though the discrimination against the employee is not 'solely' because of the employee's sex, as long as the employee's sex was a cause of the discrimination." *Id.* at 144. In other words, if an employee is discriminated against "because she is (A) a woman who is (B) sexually attracted to women, then it is motivated, in part, by an enumerated trait: the employee's sex. That is all an

11

employee must show to successfully allege a Title VII claim." *Hively*, 853 F.3d at 358 (Flaum, J., concurring).

When it discriminated against Mr. Billard for marring another man, the Diocese discriminated against him because he is (a) a man who (b) married another man. The Diocese thus discriminated against him because of sex.

## III. Section 702 Does Not Authorize the Diocese to Discriminate Based on Sex.

Title VII prohibits covered employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Section 703 of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e-2). Against the backdrop of that general prohibition, section 702 of the statute carves out a limited exception providing that "[t]his subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." Section 702 of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e-2) ("Section 702").

Section 702 thus "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 329 (1987). It "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *accord McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (section 702 allows "a religious organization to employ persons of a particular faith . . . *without otherwise violating the provisions of Title VII*") (emphasis added). The exemption "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged

with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination." *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996).[5]

Title VII prohibits religious organizations from engaging in sex discrimination, even when that discrimination is motivated by the organization's sincere religious beliefs. "Thus, church organizations have been held liable under Title VII for benefit and employment decisions which they contended were based upon religious grounds but which also discriminated against women based upon sex." *Vigars v. Valley Christian Ctr. of Dublin, Cal.*, 805 F. Supp. 802, 807 (N.D. Cal. 1992); *see, e.g.*, *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1363 (9th Cir.1986); *EEOC v. Pac. Press Publishing Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982); *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1175-76 (N.D. Ind. 2014); *see also Rayburn v. Seventh–Day Adventists*, 772 F.2d 1164, 1166 (4th Cir.1985) (citing approvingly to decision in *Pacific Press*).

Section 702 thus protects the Diocese from a claim for religious discrimination, but the Diocese is still prohibited from engaging in sex discrimination even if it has a religious motivation for doing so. Because the Diocese discriminated against Mr. Billard on the basis of sex, Section 702 does not shield it from liability.

**IV.     The Free Exercise Clause and the Religious Freedom Restoration Act Do Not Provide the Diocese with an Affirmative Defense to Mr. Billard's Title VII Claim.**

The parties have entered into a stipulation agreeing that the Diocese will not claim that Mr. Billard is a "minister" for purposes of the "ministerial exception" to Title VII. *See*

---

[5] Indeed, while debating Title VII and its subsequent amendments, Congress specifically rejected proposals to immunize religious organizations from liability for claims of discrimination on the basis of race, sex, or national origin. *See Rayburn v. Gen. Conf. of Seventh–Day Adventists*, 772 F.2d 1164, 1167 (4th Cir.1985) (summarizing legislative history).

13

Stipulation dated August 11, 2017. That stipulation is consistent with settled precedent, which uniformly recognizes that the ministerial exception does not apply to employees of religious schools who teach only secular subjects. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 204 (2012) (Alito, J., concurring) ("[A] purely secular teacher would not qualify for the 'ministerial' exception."); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396 (4th Cir. 1990) (ministerial exception does not apply to secular "lay teachers in a church-operated private school"); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166–67 (4th Cir. 1985) ("Title VII properly applie[s] to . . . a secular teacher in a church-approved school."); *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) ("That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.").

The Diocese nevertheless contends that applying Title VII to Mr. Billard would violate its free exercise of religion under the First Amendment. But the Fourth Circuit has made clear that a religious employer's defenses under the First Amendment are limited to employees who perform spiritual functions that qualify for the ministerial exception. "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *EEOC v. Roman Catholic Diocese of Raleigh, N.C.* 213 F.3d 795, 801 (4th Cir. 2000); *accord Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 947 (9th Cir. 1999) ("[T]he scope of the ministerial exception to Title VII is limited to what is necessary to comply with the First Amendment.").

The Diocese also attempts to invoke the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, as an affirmative defense, but "[t]he text of the statute makes quite clear

14

that Congress intended RFRA to apply only to suits in which the government is a party." *Gen. Conf. Corp. of Seventh–Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir.2010). The statute states that "*[g]overnment* shall not substantially burden a person's exercise of religion," 42 U.S.C. § 2000bb-1(a) (emphasis added); it requires the "*[g]overnment*" to demonstrate that any substantial burden is narrowly tailored to a compelling governmental interest, *id.* § 2000bb-1(b) (emphasis added); and it authorizes "appropriate relief against *a government*," *id.* § 2000bb-1(c) (emphasis added). In light of the plain statutory text, the Sixth, Seventh, and Ninth Circuits have all held that RFRA does not apply to lawsuits where the government is not a party to the proceeding. *See Gen. Conf. Corp. of Seventh–Day Adventists*; 617 F.3d at 110-12; *Tomic v. Catholic Diocese*, 442 F.3d 1036, 1042 (7th Cir. 2006); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43 (9th Cir.1999). Because the government is not a party in this case, RFRA does not apply.[6]

Moreover, even if RFRA did apply to this case, RFRA does not prohibit burdens on religion if they satisfy strict scrutiny. Under binding Fourth Circuit precedent, laws prohibiting religious employers from discriminating against non-ministerial employees on the basis of sex satisfy the strict-scrutiny test. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396 (4th Cir. 1990). Such laws advance "state interests of the highest order," and "a less restrictive means of attaining its aims is not available." *Id.*; *see also Roberts v. U.S. Jaycees*, 469 U.S. 609, 635 (1984) (laws prohibiting sex discrimination in public accommodations are narrowly tailored to

---

[6] The Second Circuit is the only Court of Appeals that has applied RFRA to suits between private parties. *See Hankins v. Lyght*, 441 F.3d 96 (2d Cir.2006); *but see id.* at 114-15 (Sotomayor, J., dissenting). That 2-1 decision has been called into question by a subsequent panel of the Second Circuit, *see Rweyemamu v. Cote*, 520 F.3d 198, 203 n. 2 (2d Cir.2008), and has been rejected by every other Court of Appeals to consider the question, *see Gen. Conference Corp. of Seventh–Day Adventists*; 617 F.3d at 110-12; *Tomic*, 442 F.3d at 1042.

15

serve compelling government interests). In light of circuit precedent, the Diocese's RFRA defense would fail as a matter of law.

## CONCLUSION

For all these reasons, Mr. Billard's motion for summary judgment should be granted.

Dated: September 21, 2017

Respectfully submitted

*/s/* **S. Luke Largess**
S. Luke Largess (NC Bar # 17486)
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, NC 28202
Telephone: (704) 338-1220
Facsimile: (704) 338-1312

Christopher Brook (NC Bar #33838)
American Civil Liberties Union
 of North Carolina Legal Foundation
PO Box 28004
Raleigh, NC 27611
Telephone: (919) 834-3466
Facsimile: (866) 511-1344

Joshua A. Block (*pro hac vice*)
Brian Hauss (*pro hac vice*)
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2604
Facsimile: (212) 549-2652

Elizabeth O. Gill (*pro hac vice*)
American Civil Liberties Union
   Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed a copy of Plaintiff's Motion for Partial Summary Judgment with the Clerk of Court using the CM/ECF system. All participants in the case are registered CM/ECF users and are hereby served through the CM/ECF system.

Dated: September 21, 2017

**/s/ S. Luke Largess**
S. Luke Largess
