Plaintiff's Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:17-cv-0011

LONNIE BILLARD,                      )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )
                                     )
CHARLOTTE CATHOLIC HIGH SCHOOL, )
MECKLENBURG AREA CATHOLIC             )
SCHOOLS, and ROMAN CATHOLIC          )
DIOCESE OF CHARLOTTE,                )
                                     )
          Defendants.                )
_____)

Tuesday, August 15, 2017
Charlotte, North Carolina

          Deposition of W. KURT TELFORD, a witness herein,
called for examination by counsel for Plaintiff in the
above-entitled matter, pursuant to notice, before
Dayna H. Lowe, Court Reporter and Notary Public in and
for the State of North Carolina, at McGuireWoods, LLP,
201 North Tryon Street, Suite 3000, Charlotte, North
Carolina, commencing at the hour of 9:00 a.m.

```
 1    APPEARANCES:

 2

 3         On behalf of the Plaintiff:

 4              JOSHUA A. BLOCK, ESQUIRE
                American Civil Liberties Union Foundation
 5              125 Broad Street, 18th Floor
                New York, New York 10004
 6

 7         On behalf of the Defendants:

 8              JOHN G. McDONALD, ESQUIRE
                JOSHUA D. DAVEY, ESQUIRE
 9              McGuireWoods, LLP
                201 North Tryon Street, Suite 3000
10              Charlotte, North Carolina 28202

11

12

13

14                        *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

1               C O N T E N T S

2

3  Examination by Mr. Block:                          4

4

5

6

7            (No exhibits were identified.)

8

9

10

11

12

13                    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

Whereupon,

W. KURT TELFORD

was called as a witness and, having first been duly
sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLOCK:

Q.   Good morning, Mr. Telford.

A.   Good morning.

Q.   My name is Josh Block.  I'm representing
Mr. Billard, and I'll be taking the deposition.  I just
want to go over a few ground rules to make sure that the
court transcript is clear.

The first is that since the court reporter is
writing down everything we say, it's important to give
answers verbally, like a yes or a no instead of a nod or
a uh-huh, just so she has a good transcript.

The second is it's very easy to talk over each
other, but it's important to make sure to wait until I
finish the whole question before answering just so she
can write down what I say and what you say.

A.   Okay.

Q.   And then the third is I want to make sure that
if anything I say is unclear that you ask me to clarify.
It's my job to ask you questions that you understand and

1  can answer, so if there's any ambiguity or if you don't

2  understand anything, please let me know and I'll

3  rephrase it.  Is that okay?

4       A.   Yes, sir.

5       Q.   Okay.  Have you ever had a deposition before?

6       A.   I don't know if it was a deposition, but

7  20 years ago it was an unemployment benefits hearing, so

8  it might have been with labor relations.

9       Q.   All right.

10      A.   I'm not really sure, it was so long ago.

11      Q.   Well, if you have a one-every-20-years ratio,

12  that's good.  So I just have a few questions.  Can you

13  say what your name is?

14      A.   Yes.  It's Walter Kurt Telford.

15      Q.   And what is your position at CCHS?

16      A.   Principal at Charlotte Catholic.

17      Q.   And how long have you had that position?

18      A.   Since July of 2014.

19      Q.   And what was your position before then?

20      A.   I was the principal at Our Lady of Grace in

21  Greensboro.

22      Q.   And was there a time at Charlotte Catholic

23  where you were serving in an interim or acting capacity?

24      A.   I was.  I was the interim from July until

25  December of 2014.

1    Q.   When is the first time you met Lonnie Billard?

2    A.   I don't recall the exact date.  I met him in

3  the fall but passing through.  He was a substitute

4  teacher.

5    Q.   Did you know him before you arrived at

6  Charlotte Catholic?

7    A.   No, I did not.

8    Q.   And so by the time you met him, he had already

9  retired as a full-time teacher, is that right?

10   A.   Yes, sir.

11   Q.   Do you recall any conversations you had with

12  him while passing in the hall?

13   A.   I don't recall any conversations.

14   Q.   Do you recall any conversations you've had

15  with other people pre-dating September 2014 in which

16  Mr. Billard came up?

17   A.   No.

18   Q.   Were you aware before September 2014 that

19  Mr. Billard is gay?

20   A.   No, I was not aware.

21   Q.   Before September 2014, had you ever met

22  Mr. Donham?

23   A.   No, I had not.  Had not.

24   Q.   When is the first time that you learned that

25  Mr. Billard is gay?

1      A.   December, the week that we were getting out

2   for Christmas break.  First time.

3      Q.   And how did you learn?

4      A.   Father Kauth came to me, and he's the

5   chaplain, and told me Mr. Billard had posted that he

6   was -- on Facebook that he was getting married to his

7   partner.

8      Q.   And you said this is the week before Christmas

9   break?

10     A.   The week we were going to get out for

11  Christmas break.  Mr. Billard was subbing for somebody,

12  I'm not sure who, but for that week.

13     Q.   He was subbing for someone that week that you

14  found out?  He was subbing?

15     A.   Yes.

16     Q.   Now, before Father Kauth told you, had

17  Mr. Carpenter spoken to you about Mr. Billard at all?

18     A.   Not that I'm aware of.

19     Q.   Had you heard any -- before Father Kauth spoke

20  to you, had you overheard anyone talking about

21  Mr. Billard being engaged?

22     A.   No.

23     Q.   So when Father Kauth spoke to you, what

24  exactly did he say?

25     A.   He said that Mr. Billard had posted on

1  Facebook that he was going to marry his partner, and I

2  think he was telling me because as principal I have to

3  make decisions as far as employment, things of that

4  nature, and make recommendations.

5      Q.   Did Father Kauth indicate what decision you

6  should make based on that information?

7      A.   I wouldn't say he indicated or asked, but

8  Lonnie posting goes against the tenets of the church,

9  and you can't oppose the tenets of the church, so I

10  thought we wouldn't be calling Lonnie anymore.

11      Q.   Did you feel that you had discretion to have

12  Lonnie continue as a substitute if that's what you

13  wanted to do?

14      A.   I don't think I had discretion in that.  I did

15  call my boss, the superintendent, and I think she talked

16  to HR just to make sure that I was making the right

17  decision not calling him.

18      Q.   So what did you -- when did you call the

19  superintendent?

20      A.   That day.

21      Q.   And the superintendent is Janice Ritter?

22      A.   Yes.

23      Q.   And what did you tell her?

24      A.   I said Lonnie has -- Lonnie Billard -- well, I

25  think she knew who he was -- has posted that he's

1  marrying his partner, and I'm not going to call Lonnie

2  anymore.  She said -- as I recall it was -- she called

3  personnel, and I didn't hear any more because, again, I

4  don't think she saw it as I was making the wrong

5  decision.

6      Q.  And your understanding is she called personnel

7  because why?  Why do you have that understanding?

8      A.  Well, any time you're going to not use someone

9  as a sub, they could call HR, and it's almost a

10  heads-up.

11      Q.  So your understanding is she was notifying

12  them of a decision that had already been made not to

13  continue calling Mr. Billard, is that correct?

14          MR. DAVEY:  Objection.

15      A.  I'd be speculating, but possibly.

16          BY MR. BLOCK:

17      Q.  And just to be clear, did she tell you she was

18  about to call HR?

19      A.  No.  No.

20      Q.  When you informed the superintendent, did she

21  express any surprise that Mr. Billard was gay or was

22  getting engaged?

23      A.  I can't recall.

24      Q.  You said that she knew who Lonnie was.  How do

25  you know that?

1    A.   Her kids went to Charlotte Catholic.  He was I
2  believe a drama teacher, and Janice as -- Dr. Ritter, as
3  superintendent and as assistant superintendent, I
4  believe went to a lot of the plays.  She has since I've
5  been at Catholic.
6    Q.   At any time in talking with Dr. Ritter has
7  she -- has she -- let me start at the beginning.
8         At any time subsequent to this conversation
9  have you spoke with Dr. Ritter about Lonnie?
10    A.   I've talked to her about, for example, doing a
11  deposition, and that's how I know she spoke to HR.  I
12  found that out a few years later.
13    Q.   A few years later?
14    A.   Yeah.
15    Q.   So I'm not -- I don't want you to tell me any
16  information that involves attorney-client privilege at
17  all, but to the best of your recollection how many times
18  do you think you've spoken with Dr. Ritter about
19  Mr. Billard since December 2014?
20    A.   How many times has it been in the newspaper or
21  on TV?  That's usually the conversation, because it's
22  not something we want to be in the newspaper for.  It's
23  just not positive publicity for the school, so if it's
24  been in the newspaper or on TV generally.
25         And I talk to her three, four times a week,

1    sometimes three times a day, so some of the phone calls

2    were a check-in, how is it at Charlotte Catholic, or I

3    would say well, you saw today's paper or you saw

4    something on the news, so any time it was in the

5    newspaper is probably when I talked to her.

6         Q.   Why isn't it positive publicity?

7         A.   Well, I think the way it was presented, that

8    he was fired, and I didn't think we fired him.

9         Q.   How would you characterize it?

10        A.   He was a substitute teacher.  We chose not to

11   use him.

12        Q.   So besides that distinction between choosing

13   not to use him as a substitute and firing him, is there

14   any other aspect of the news stories that you perceive

15   to not be positive publicity?

16        A.   Well, again, probably not, other than the

17   firing.

18        Q.   So do you -- do you think that the fact that

19   Charlotte Catholic will not use substitute teachers who

20   are marrying someone of the same sex is a fact that is

21   going to generate positive publicity or negative

22   publicity or any other type of -- I don't want to -- let

23   me rephrase that question.

24             What type of publicity do you think would be

25   generated by the fact that Charlotte Catholic will not

1   use substitute teachers who have married someone of the

2   same sex?

3       A.   I'm not sure.

4       Q.   So in any of these subsequent conversations

5   with the superintendent, did she discuss her knowledge

6   of Mr. Billard's sexual orientation?

7       A.   No, she did not.

8       Q.   Did she ever indicate meeting Mr. Donham?

9       A.   She did not.

10      Q.   Have you talked with Jerry Healy about

11  Mr. Billard?

12      A.   I have not.

13      Q.   So backing up to when Father Kauth presented

14  you with this information, after Father Kauth told you

15  this, can you walk me through what you did next?

16      A.   I talked to Steve Carpenter, who is the

17  assistant principal who's in charge of substitutes, and

18  said Lonnie has posted -- Mr. Billard has posted.  I

19  said we can't use him anymore.  And then somewhere

20  during the day I called Dr. Ritter because I remember,

21  as I recall, Father Kauth spoke to me fairly early in

22  the day.

23      Q.   And what did Mr. Carpenter say in response?

24      A.   I can't recall.  I don't think it was

25  surprise.  I said let's let him finish out the week, and

1  that's why I don't know the exact date but it was

2  midweek, and I said we won't call him anymore.

3      Q.   Did Mr. Carpenter indicate whether he already

4  knew that Mr. Billard was getting married?

5      A.   While we talked that day?

6      Q.   Yeah.

7      A.   No.

8      Q.   While you talked that day, did he indicate

9  that he already knew that Mr. Billard was gay?

10      A.   I can't recall.  Subsequently, yes, he said he

11  knew he was gay.

12      Q.   When was that?

13      A.   Sometime after.  Just -- again, we didn't have

14  a lot of conversations.  I said Lonnie Billard has

15  posted, we can't use him.

16      Q.   And so what did Mr. Carpenter say to you when

17  he indicated that he knew that Lonnie was gay?

18      A.   I can't -- I really can't remember in the

19  conversation, but I think he was aware.

20      Q.   Did he say whether he was aware before the

21  engagement announcement or -- did he say whether he was

22  aware before the engagement announcement?

23      A.   He did not.

24      Q.   He didn't say one way or the other?

25      A.   No.

1    Q.    Did you ask him why he didn't inform you

2  earlier that Mr. Billard is gay?

3    A.    No, I didn't ask him.

4    Q.    Why not?

5    A.    I don't think it makes a difference whether

6  you're gay or straight or your sexual orientation.

7    Q.    Why is that?

8    A.    Why doesn't it make a difference?

9    Q.    Yeah.

10    A.    Well, again, the teachings of the church are

11  not -- we love all, so I don't think it matters whether

12  you're gay or straight.

13    Q.    But if a teacher is -- if a teacher at

14  Charlotte Catholic or a substitute teacher at Charlotte

15  Catholic is gay, is it your understanding that they must

16  be celibate in order to continue being a teacher or

17  substitute teacher?

18    A.    All teachers should be celibate, doesn't

19  matter whether you're straight or gay, if you're not

20  married.

21    Q.    So that answer is yes, then, right?  That if

22  you're gay and a teacher at Charlotte Catholic, in order

23  to continue working, you should be celibate?

24    A.    I don't think it's a simple yes-no.  I think

25  it's any teacher, gay or straight.  We're trying to

1  model behaviors we want all kids to have.

2      Q.   But you also think that -- it is also your

3  understanding that there is no context in which a

4  teacher at Charlotte Catholic who is gay could have

5  sexual activity with another person of the same sex.  Is

6  that right?

7          MR. DAVEY:  Objection.

8      A.   Can you restate the question?

9          MR. DAVEY:  It was just because I think it got

10 confusing.

11         MR. BLOCK:  Yeah, yeah.

12         BY MR. BLOCK:

13     Q.   So it's your -- your understanding is that

14 there's no -- that it is impossible for -- let me start

15 over.

16         Your understanding is that a teacher at

17 Charlotte Catholic cannot marry someone of the same sex

18 and continue working at Charlotte Catholic.  Is that

19 right?

20     A.   Yes.  That's correct.

21     Q.   And it's also your understanding that the only

22 context in which a teacher at Charlotte Catholic should

23 be having -- may have sexual activity is in the context

24 of marriage.  Is that right?

25     A.   Marriage between a man and a woman, yes.

1      Q.   So, therefore, it's your understanding that

2   there is no context in which a teacher at Charlotte

3   Catholic may have sexual activity with a person of the

4   same sex.

5           MR. DAVEY:  Objection.  You can answer.

6      A.   They should not.

7           BY MR. BLOCK:

8      Q.   So when Mr. Carpenter indicated to you that he

9   knew that Mr. Billard was gay, did he indicate whether

10   he had met Mr. Donham at all?

11      A.   He did not.

12      Q.   Did he indicate whether he knew that

13   Mr. Billard was sexually active?

14      A.   He did not.

15      Q.   Have you ever met someone who identified to

16   you as being gay but not being sexually active?

17      A.   They have not identified themselves that way

18   to me, but I don't ask the question.

19      Q.   Whose job is it at Charlotte Catholic to

20   enforce the prohibition on teachers publicly engaging in

21   conduct or advocating for conduct contrary to the moral

22   tenets of the Catholic faith?

23           MR. DAVEY:  Objection.

24      A.   I would be one of the persons.

25           BY MR. BLOCK:

1    Q.   Who else?

2    A.   Are you talking in a formal way or --

3    Q.   Well, let's start with formal and then I'll

4 ask informal.

5    A.   Okay.  Well, formal it would be the principal.

6 It probably would come to me.  And, again, I probably

7 would talk to HR, and that would be the formal.  And I'd

8 go through the superintendent to HR.

9    Q.   And informally who's responsible?

10    A.   Well, I think we all are, so I think what

11 sometimes happens, somebody could send me information

12 and say, again, if somebody's doing something that's --

13 I don't want to say immoral, but maybe objectionable,

14 that could be anybody, because we're all role models.

15    Q.   Has there been any other time in which someone

16 has sent you that sort of information?

17    A.   I was sent something this past year.  A

18 teacher used profane language in a Facebook post.  It

19 was uncalled for.

20    Q.   Has there been any other time?

21    MR. DAVEY:  Just for clarification, are you

22 referring to just at Charlotte Catholic or when he was

23 at Our Lady of Grace as well?  I just want to make sure

24 I understood the time frame.

25    MR. BLOCK:  Any time frame actually.

1      A.    Sure.  At Our Lady of Grace it happened also.

2            BY MR. BLOCK:

3      Q.    And how many times at Our Lady of Grace?

4      A.    Once.

5      Q.    And what was that about?

6      A.    It was a staff member who was reported to be

7   spending nights with his fiancee, and that was one

8   where -- again, a parish school is a little different.

9   Their superintendent is not directly over the school,

10  the priest is, so I went to the pastor and the pastor

11  dealt with it.

12     Q.    How did he deal with it?

13     A.    He told the gentleman that -- I think he

14  did -- he said he had been there.  The priest said you

15  could lose your job if I hear about it again, you will

16  no longer work for us, and that was how it was dealt

17  with.

18     Q.    In this incident we were just talking about --

19     A.    Yep.

20     Q.    -- how did a third party learn that the

21  teacher was spending nights at his fiancee's?

22     A.    I think he talked about it.

23     Q.    So do you think that when Mr. Carpenter first

24  learned that Mr. Billard was gay and not celibate that

25  he should have reported it to you?

1          MR. DAVEY:  Objection.  Just what's the time?

2    Because I think there was confusion on the prior

3    testimony.  When Mr. Carpenter told him this was after

4    the fact, so I just want to make sure I understand the

5    time.

6          BY MR. BLOCK:

7      Q.   Yeah.  So, I mean, having learned that

8    Mr. Carpenter had previously known, do you think that he

9    should have told you right away?

10          MR. DAVEY:  Again, objection, because my

11    understanding of the testimony is that Mr. Carpenter

12    never told Mr. Telford whether or not or knew whether or

13    not Mr. Billard was celibate or not.  I think your

14    question premised -- the first question said when he

15    told you that he wasn't celibate, so I think it's in

16    reference to --

17          MR. BLOCK:  It's well taken.

18          BY MR. BLOCK:

19      Q.   Did Mr. Carpenter, when he said that he

20    previously had heard that Lonnie was gay, did he

21    indicate whether he had previously heard that Lonnie was

22    getting engaged?

23      A.   He did not.

24      Q.   So if Mr. Carpenter had previously been aware

25    that Lonnie was engaged, should he have told you about

1    it?

2        A.   I'm not sure because of the context, because

3    he's known Lonnie for a long time.  So did he say it in

4    confidence?  I'm not sure.  That's hard for me to answer

5    that.

6        Q.   So if Lonnie had said it in confidence, in

7    this hypothetical situation, it would have been okay for

8    Mr. Carpenter not to tell you about it?

9        MR. DAVEY:  Objection.  You can answer.

10       A.   You know, again, it could be, look, you need

11   to go and talk to the priest.  It depends how he was

12   going to direct him.  I think -- again, I wasn't there

13   so I can't -- I'm speculating already.

14       BY MR. BLOCK:

15       Q.   Have you spoken with anyone else at Charlotte

16   Catholic who has indicated that they previously knew

17   that Lonnie was in a relationship with Mr. Donham?

18       A.   I have not.

19       Q.   At any time?

20       A.   Correct.

21       Q.   If another teacher at Charlotte Catholic had

22   known that Mr. Billard and Mr. Donham were in a romantic

23   relationship, what obligations would that teacher have

24   had to report it?

25       A.   That's a difficult question.  I don't know if

1  they're obligated to report it.

2      Q.   Why not?

3      A.   I think it's a matter of conscience, what you

4  feel you should report or not report.

5      Q.   You referenced Mr. Billard having made a

6  posting on Facebook.  If Mr. Billard had married

7  Mr. Donham but not posted about it on Facebook, would he

8  have been permitted to continue working as a substitute

9  teacher?

10         MR. DAVEY:  Objection.

11     A.   When I found out, no.

12         BY MR. BLOCK:

13     Q.   Are teachers at Charlotte Catholic allowed to

14 take contraception?

15     A.   Are you asking whether I -- I don't discuss

16 that so -- again, whether they're following the tenets,

17 I don't have that discussion with teachers.

18     Q.   But if you learned that a teacher was taking

19 contraception, what would the response be?

20     A.   I don't know that I'd ever learn that.  I've

21 been in this -- I've been a principal at different

22 levels for over 20 years.  That has never come across my

23 desk.

24     Q.   Do you think that -- if a teacher is engaging

25 in conduct that's contrary to the tenets of the church

1    but no one at CCHS finds out about it, are they

2    complying with the policy?

3        A.   Is it a teacher who's engaging in conduct

4    they're not supposed to?

5        Q.   Yeah.  So let me -- a teacher -- in the

6    contracts that teachers sign, is there a provision that

7    says teachers shall not publicly engage in or advocate

8    for conduct contrary to the tenets of the church?

9        A.   Teachings of the church, yes, there is.

10       Q.   If a teacher does engage in that contact but

11   does so in a manner that no one in the CCHS community

12   learns about it, do you think they're in breach of that

13   part of their contract?

14       A.   Yes.

15       Q.   So teachers shouldn't be engaging in that

16   conduct regardless of whether you end up finding out

17   about it, is that right?

18       A.   Correct.

19       Q.   So why don't you affirmatively ask teachers

20   whether they're engaging in that conduct?

21       A.   I don't think -- again, I'm not trying to be

22   the morality police, so it's just -- I don't think

23   that's -- I don't think it's my place to ask those

24   questions.  That's for -- if a priest were to ask -- and

25   I don't think a priest would ask that question.  I think

1   that would be you go to confession, you talk to a priest

2   if you have those questions about that.

3            Again, we're all sinners and sometimes it's,

4   you know, the Catholic Church, confession, things of

5   that nature.

6       Q.   When Father Kauth brought to your attention

7   the Facebook post, did he say how he had learned about

8   it?

9       A.   He said some people had sent information to

10  him.  He didn't say who.  I didn't ask.

11      Q.   So we've been talking about people engaging in

12  conduct.  Have you ever encountered a situation where

13  someone was advocating for conduct that ran afoul of the

14  school's policy?

15      A.   Can you give me an example?

16      Q.   Well, I'll give you a couple examples, with

17  the understanding that this is hypothetical.  Someone

18  announces that they support the legality of marriage for

19  same-sex couples.

20      A.   Were they advocating it?  By how?  Are they

21  going to a protest rally or --

22      Q.   How about they -- how about they attend a

23  relative's wedding and talk positively about it.

24      A.   I would probably ask them to talk to a priest.

25           MR. DAVEY:  And you noted it was hypothetical.

1  I'm just going to, just for clarity, object to the

2  hypothetical, but you may ask the question and use it

3  however is appropriate.

4      BY MR. BLOCK:

5      Q.  And has there ever been an actual situation in

6  any context, so not limited to the context of gay

7  people, in which someone was advocating for something

8  that you thought ran afoul of the school's policy?

9      A.  No.  But I think sometimes in my role people

10  aren't going to come to me and tell me.

11      Q.  Do you recall an assembly in the spring of

12  2014 in which I think her name was Sister Dominic spoke?

13      A.  Jane Dominic.  I wasn't there so --

14      Q.  Were you principal at Charlotte Catholic at

15  the time the assembly occurred?

16      A.  No.

17      Q.  Do you know how long after the assembly

18  occurred that you arrived at Charlotte Catholic?

19      A.  Four months, five months.

20      Q.  Have you spoken with anyone at Charlotte

21  Catholic about the assembly?

22      A.  Not about what exactly happened but just said

23  it was not good for anybody, and that's from I think

24  staff, parents, kids.

25      Q.  And why wasn't it good for anyone?

1      A.   I think some hot topics were pressed in the

2  meeting, and I think it didn't matter what side of the

3  spectrum you were on, it was just I think a difficult

4  assembly.

5      Q.   Do you think that it's okay for -- let me take

6  that back.  Sorry.

7           Do you think it's okay for employees at

8  Charlotte Catholic to say publicly that they disagree

9  with the decision to not allow Lonnie to continue as a

10  substitute?

11      A.   How do you mean public?  What do you mean

12  public?

13      Q.   Well, how about a teacher saying so to, you

14  know, another teacher in the break room?

15      A.   Conversations happen.  People are going to

16  have those.  I consider that private.  Now, public if

17  you meant in the newspaper, that's different.

18           MR. BLOCK:  If we can take a two-minute break,

19  I might actually be done with questions.

20           MR. DAVEY:  Certainly.

21           (Recess from 9:40 a.m. to 9:41 a.m.)

22           BY MR. BLOCK:

23      Q.   Just a few more.  I want to ask about the

24  policy at Charlotte Catholic to begin classes with a

25  prayer.  Was that policy in place before you came to

1    Charlotte Catholic?

2         A.    Yes.

3         Q.    And is it your understanding that a teacher

4    can choose to have a student lead the prayer instead of

5    leading it themselves?

6         A.    They can.  Yes.

7         Q.    And I want to ask about a teacher's

8    obligations to escort students to Mass when it's during

9    their class time.  Was that policy already in place when

10   you arrived?

11        A.    Yes.

12        Q.    Does a teacher in that position have any job

13   duties with respect to participating in the Mass?

14        A.    Well, we would ask to stand and sit and help

15   as kids go to communion.  They can go to communion.

16   They can't receive if they're not Catholic, but ask for

17   a blessing.  So we would ask that they participate in

18   some.

19              Again, teachers are coming back, and I have a

20   group of teachers who -- teachers are going to be

21   assigned areas during Mass because -- so you not only

22   participate but make sure the kids go in an orderly

23   fashion.  They're very good at Mass, but people

24   generally don't want to go up at the top of the

25   bleachers, so that's an administrative that I had some

1  teachers say we'll put together a committee, because it
2  used to be voluntary.
3      Q.   And just to be clear, the people going up and
4  receiving blessings, are they students or teachers that
5  you're referring to?
6      A.   Anybody who's in attendance.
7      Q.   Can a teacher choose not to go up and receive
8  a blessing?
9      A.   Yes.  And so can students.
10     Q.   So it's optional?
11     A.   Yes.
12     Q.   Besides standing up and sitting down, are
13  teachers required to speak or participate in prayers as
14  part of a Mass?
15     A.   They're not.
16     Q.   Do you in your role as principal supervise --
17  sorry.  I want to start that question over.
18          Do you in your role as principal sit in and
19  evaluate teachers' classes at all?
20     A.   Yes.  Yes, I do.
21     Q.   And do you do that for teachers who are
22  teaching secular subjects?
23     A.   Yes.
24     Q.   In those classes, is there a requirement for
25  teachers to discuss Catholic doctrine at all?

1      A.    No.  There's no requirement.

2      Q.    If teachers wish to discuss Catholic doctrine

3  as part of their secular class, are they permitted to?

4      A.    I would prefer that they not.  And, again, it

5  depends -- let me rephrase.  It depends what they're

6  discussing.  If it's a feast day, a holy day, and you're

7  going to give information, but as far as opinions, no.

8  My preference would be no.

9      Q.    Your preference would be for the teachers

10  teaching religion classes --

11      A.    Religion.

12      Q.    -- to do that?

13      A.    And I've had kids come to me and ask me

14  religious questions and I'll say you need to speak to

15  Father or Sister, Sister Agnes, our department chairman.

16      Q.    Are you aware of whether there are any

17  students at Charlotte Catholic who are gay?

18      A.    I am.

19      Q.    And are you aware of whether there are

20  students who are gay and sexually active?

21      A.    I'm unaware.

22      Q.    Are students who are gay and sexually active

23  allowed to attend Charlotte Catholic?

24      A.    Yes.  And can I clarify?  The reason I know

25  they're gay is their parents have told me.

1    Q.   And why have the parents told you?

2    A.   Just letting me know.  I'm not -- quite

3   frankly, it happened this summer.  I would have said no

4   until three or four weeks ago.  Parents just told me.

5    Q.   And did the parents ask you to -- in this

6   situation ask you to do anything based on that

7   knowledge?

8    A.   No.

9        (Mr. Davey entered the proceedings.)

10       BY MR. BLOCK:

11   Q.   Were they concerned at all that the student

12  wouldn't be treated in a sensitive manner?

13   A.   Well, I'm not really sure, and when the one

14  parent talked he said I'm not really sure why I'm

15  telling you this.  He didn't come in specifically for

16  that.  I happened to see him.  He has multiple kids who

17  have gone through Catholic, and he said this one's gay,

18  which doesn't really matter.

19   Q.   Have you spoken with Mr. Billard at all?

20   A.   I have not.

21   Q.   And have you spoken with anyone at the Diocese

22  about Mr. Billard?

23   A.   No.

24       MR. BLOCK:  Okay.  I think that's all the

25  questions I have.

1          MR. McDONALD:  Can I just take one second?

2          MR. BLOCK:  Sure.

3          (Recess from 9:47 a.m. to 9:49 a.m.)

4          MR. McDONALD:  I have no questions.

5          (Whereupon, at 9:49 a.m. the deposition was

6  concluded.  Signature was reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            E R R A T A    S H E E T        (1 of 3)

2

3   DEPOSITION OF:  W. KURT TELFORD, 8/15/17

4   Re:        Billard v. Charlotte Catholic High School,

5           et al., 3:17-cv-0011

6

  Please read the foregoing transcript with care, and if

7   you find any corrections or changes you wish to be made,
  list them by page and line number below.

8

  PLEASE DO NOT WRITE IN THE TRANSCRIPT ITSELF!

9

  You may return these ORIGINAL errata sheet pages within

10   the 30-DAY REQUIRED timeframe to:

11            Knowles Court Reporting
            2646 Bay Street

12        Charlotte, North Carolina 28205
            (704) 338-5438

13

  To assist in making any such corrections, please use the

14   forms provided below.  If additional pages are
  necessary, please furnish same and attach hereto.

15

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19

  Page _____ Line _____ Change _____

20

  _____

21

  Reason for change _____

22

23   Page _____ Line _____ Change _____

24   _____

25   Reason for change _____

1        E R R A T A   S H E E T      (2 of 3)
2
3   Page _____ Line _____ Change _____
4   _____
5   Reason for change _____
6
    Page _____ Line _____ Change _____
7

8   _____

    Reason for change _____
9
10  Page _____ Line _____ Change _____
11  _____
12  Reason for change _____
13
    Page _____ Line _____ Change _____
14

    _____
15
    Reason for change _____
16
17  Page _____ Line _____ Change _____
18  _____
19  Reason for change _____
20
    Page _____ Line _____ Change _____
21

22  _____

    Reason for change _____
23
24
                    Thank You!
25

1    WITNESS CERTIFICATE          (3 of 3)

2

3        I, W. KURT TELFORD, do hereby certify that I have

4    read and understand the foregoing transcript and believe

5    it to be a true, accurate, and complete transcript of my

6    testimony, subject to the attached list of changes, if

7    any.

8

9                          _____

10                          W. KURT TELFORD

11

12

13

14   *  This deposition was signed in my presence by

15   W. KURT TELFORD on (day) _____, this

16   (date) _____ day of (month) _____,

17   20__ .

18

19                          _____

20                          Notary Public

21

22   My Commission Expires:

23

24

25

1       CERTIFICATE OF NOTARY PUBLIC & REPORTER

2

3   STATE OF NORTH CAROLINA          )

4   COUNTY OF CABARRUS               )

5

6        I, Dayna H. Lowe, the officer before whom the

7   foregoing deposition was taken, do hereby certify that

8   the witness whose testimony appears in the foregoing

9   deposition was duly sworn by me; that the testimony of

10  said witness was taken in stenotype and thereafter

11  reduced to typewriting by me or under my direction; that

12  said deposition is a true record of the testimony given

13  by said witness; that I am neither counsel for, related

14  to, nor employed by any of the parties to the action in

15  which this deposition was taken; and, further, that I am

16  not a relative or employee of any attorney or counsel

17  employed by the parties thereto, nor financially or

18  otherwise interested in the outcome of the action.

19       This the 22nd day of August, 2017.

20

21                   _____

22                   DAYNA H. LOWE

23                   Notary Public #19971830009

24

25