# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

### Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

      **Plaintiff,**

**v.**


CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic

Schools ("MACS"), and the Roman Catholic Diocese of Charlotte ("Diocese") (collectively

"Defendants"), submit this memorandum in support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Lonnie Billard is a former substitute teacher at CCHS, which is part of MACS.

Deposition of Lonnie Billard ("Billard Dep.")[1] 13; Declaration of Janice Ritter ("Ritter Decl.")[2] ¶

20.  Billard claims that Defendants violated Title VII's sex discrimination prohibition when they

released him from employment in December 2014 after he announced on Facebook his plans to

marry his same-sex partner.  *Id.*

---

[1] Billard's deposition transcript is included as exhibit 1 to the Appendix filed herewith.
[2] Ritter's declaration is included as exhibit 2 to the Appendix filed herewith.

Billard's Title VII claim fails for many reasons. First, Title VII's exemptions for religious organizations apply because Defendants' decision was based on their religious preference – specifically, the moral teachings of the Catholic Church, which recognizes marriage only between one man and one woman. *See* 42 U.S.C. §§2000e-1(a) & (e)(2); *see also Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991).

Second, there is no evidence that sex or sexual orientation was a motivating factor in Defendants' decision, because the evidence demonstrates that Defendants released Billard because of his conduct, which advocated in favor of same-sex marriage in violation of the Church's beliefs and moral teaching on marriage ***and*** that Defendants would have taken the same action against a female or heterosexual employee. *Hill v. Lockheed Martin Logs., Mgmt.*, 354 F.3d 277 (4th Cir. 2004). In addition, Billard admitted that his claim is one for sexual orientation discrimination, which is not actionable under Title VII, nor can Billard state a gender non-conformity claim. *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996).

Third, Billard's claim is barred by the First Amendment, because enforcing Title VII in the manner Billard seeks would violate Defendants' rights to associational freedom and church autonomy. *Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000); *Bryce v. Episcopal Church in the Diocese of Colorado* 289 F.3d 648, 657 (10th Cir. 2002). Finally, Billard's claim is barred by the Religious Freedom Restoration Act (RFRA) because a finding of Title VII liability against Defendants would substantially burden Defendants' exercise of religion and there is no record evidence that would satisfy RFRA's "least restrictive means" test. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d 837, 855 (E.D. Mich. 2016). Accordingly, Defendants are entitled to summary judgment.

# FACTS

*Defendants' Religious and Educational Mission*

MACS is a system of Catholic schools in the Charlotte area affiliated with the Diocese. Declaration of Roger Arnsparger ("Arnsparger Decl.")[3] ¶9. Defendants, in keeping with centuries of Church teaching, regard Catholic education as essential to the Church's mission of spreading the Gospel of Jesus Christ. *Id*. ¶7. In keeping with that mission, MACS seeks to proclaim the Good News of the Gospel and develop students spiritually, intellectually, physically and socially. *Id.* ¶10. These aspirations are reflected in the motto of CCHS, which appears at the entrance to the school building: "the soul of education is the education of the soul." *Id.* ¶13.

The success of MACS's mission depends on its teachers. *Id.* ¶14. All teachers, including substitutes, and regardless of their membership in the Catholic Church, serve as role models in the context of this mission and must conduct themselves in their professional and personal public lives in a way consistent with that. *Id.* ¶15. Therefore, MACS teachers may not publicly engage in conduct or publicly advocate for positions opposed to the fundamental moral tenets of the Roman Catholic faith, including those concerning marriage. *Id.* ¶15; Ritter Decl. ¶¶ 8-14, 20.

Defendants communicate this expectation in a variety of ways, including through the Diocese's Code of Ethics, the Diocese's Personnel Policies Handbook, the CCHS Faculty Handbook, MACS' employment contracts, and training sessions conducted by Vicar for Education Fr. Roger Arnsparger. *Id*. ¶16; Ritter Decl. ¶¶ 8-15.

---

[3] Arnsparger's declaration is included as exhibit 3 to the Appendix filed herewith.

*The Catholic Church's Fundamental Beliefs Regarding Marriage*

The Catholic Church teaches that "sexuality is ordered to the conjugal love of man and woman" and that human sexual relations should occur exclusively within the context of marriage between a man and a woman. Declaration of Peter Jugis ("Jugis Decl.")[4] ¶21.

The Church teaches that ***persons*** who experience homosexual tendencies or inclination are children of God and are to be "accepted with respect, compassion, and sensitivity." Jugis Decl. ¶24. Consistent with its view of marriage and the meaning of human sexuality, the Church teaches that homosexual ***acts*** are contrary to God's design for human sexuality. Jugis Decl. ¶¶25-26.

*Billard's Employment*

Billard began work as a substitute teacher at CCHS in January 2001. Billard Dep. 12. Billard was later hired as a full-time teacher and, after one year teaching English, taught drama until he retired in 2012. *Id.* 13 & 64-65, 73-74, 165.

Billard was aware of CCHS's Catholic identity and mission. He signed the CCHS employment contract each year. Billard Dep. 122-23 & Ex. 6. He received and was bound by the CCHS Faculty Handbook. *Id*. 127-28 & 132, Ex. 7. He received and was bound by the Code of Ethics, which required him to "conduct [himself] . . . in a manner that is consistent with the teachings and precepts" of the Catholic Church. *Id.* 134-41 & Ex. 9 & 11. Billard also received and was required to comply with the Personnel Policies Handbook. *Id.* 140-42, 144-45, Ex. 10 & 11. Billard attended Fr. Arnsparger's training sessions, but walked out on at least two occasions. *Id.* 112-20.

---

[4] Jugis's declaration is included as exhibit 4 to the Appendix filed herewith.

Billard is an Episcopalian, but came to regard himself as a practicing Catholic while teaching at CCHS. *Id*. 52-54 & 56. All CCHS classes begin with prayer, which Billard sometimes led and other times invited students to lead. *Id*. 106-07. Billard was responsible for accompanying his students to school Masses, where he regularly received communion, a sacrament reserved only for practicing Catholics. *Id.* 110-12. Billard has always known that the Church teaches that marriage exists exclusively between a man and a woman and that sexual relations outside marriage, as the Church understands it, are immoral. *Id.* 120-21.

After voluntarily retiring from full-time teaching, Billard served as a substitute in the 2012-13 and 2013-14 school years. *Id.* 165, 167-68. Substitute teachers at CCHS do not have a regular schedule and are not guaranteed any assignments, but instead serve at the discretion of Assistant Principal Steve Carpenter. *Id.* 59-60; Deposition of Kurt Telford ("Telford Dep.")[5] 11-12. Carpenter maintains a list of eligible substitutes and calls the substitute of his choosing to ask them to work when the need arises. *Id.* 59; Deposition of Steve Carpenter ("Carpenter Dep.")[6] 10.

### *Billard's Removal*

Billard was previously married to a woman; they divorced in 2002. Billard Dep. 87-88. In 2002, Billard began a same-sex romantic relationship with Richard Donham and they began living together. *Id.* 102-04.

While a full-time teacher, Billard brought Donham to select CCHS events, including plays he directed as drama teacher. *Id.* 260 & 265-66. Donham briefly served as a substitute and on some occasions Billard and Donham would sit together in the faculty breakroom. *Id.* 258-59 & 262-63. However, Billard did not openly reveal that he was in a sexual relationship with

---

[5] Telford's deposition transcript is included as exhibit 5 to the Appendix filed herewith.
[6] Carpenter's deposition transcript is included as exhibit 6 to the Appendix filed herewith.

Donham for many years.  *Id.* 260-61.  On required school contact forms, Billard took steps to obscure the nature of their relationship, listing Donham as a "friend" or "friend/housemate" and sometimes listing fictitious addresses for Donham, even though they lived together.  *Id.* 88-90, 99-102 & Ex. 2.  Billard testified that he believes the CCHS administration should have assumed he was gay, and also that he once used the term "partner" to describe Donham to former CCHS Principal Jerry Healy.  *Id.* 253-55.

In the fall of 2014, Billard and Donham decided to get married.  Billard Dep. 184-85.  On October 25, 2014, Billard posted the following message on Facebook:

> Everyone sing along . . . 'Goin' to the chapel and we're gonna get ma-a-aried.  Goin' to the chapel and we're gonna get maa-aa-ried.'  Yes, I'm finally going to make an honest (at least legal) man out of Rich.  We will be married on May 2, 2015 . . . details to follow, I cannot believe that I am saying this or that it is even possible.  I thank all the courageous people who had more guts than I who refused to back down and accept anything but "equal."  Ps. If you don't agree with this . . . keep it to yourself.  You never asked my opinion about your personal life and I am not asking yours.

*Id.* 185-86, 188, Ex. 16.  At the time Billard made this announcement, he was "Facebook friends" with up to twenty parents of his current students at CCHS.  *Id.* 284.  Prior to posting this announcement, Billard had not told anyone in CCHS administration of his marriage plans.  *Id.* 186 & 188.

After being notified of the Facebook post, CCHS Chaplain Fr. Matthew Kauth met with Principal Kurt Telford to discuss the issue in December 2014.  Telford Dep. 6-7; Deposition of Matthew Kauth 6-8[7].  Telford recognized that Billard's post expressed opposition to the moral teachings of the Church and concluded that Billard could no longer serve as a substitute at CCHS.  Telford Dep. 7-9.  Telford communicated this decision to Carpenter.  *Id.* 12.

---

[7] Kauth's deposition transcript is included as exhibit 7 to the Appendix filed herewith.

In December, Carpenter informed Billard of the decision. Billard Dep. 200. Billard and Donham married on May 3, 2015. Deposition of Richard Donham[8] 32. Billard filed a charge of discrimination with the EEOC in May 2015. Compl. ¶8. At Billard's request, the EEOC issued a right-to-sue letter dated November 30, 2016; this lawsuit followed. *Id*; Ex. A-C.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

As the party opposing summary judgment, Billard may not rest on mere allegations or denials. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Rather, Billard must produce "significantly probative evidence tending to support the complaint" or provide "specific facts showing that there is a genuine issue for trial." *Id*. at 248-49 (*citing First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 290 (1968)).

## ARGUMENT

**I.      Billard's Title VII Claim Fails as a Matter of Law.**

Title VII's exemptions for religious organizations apply and defeat Billard's claims. Even if they did not, Billard's claim, which is for sexual orientation discrimination, is not actionable under Title VII. But in any case, Billard cannot show that his sexual orientation *or* sex was a motivating factor in Defendants' decision, nor can Billard state a gender-nonconformity claim.

---

[8] Donham's deposition transcript is included as exhibit 8 to the Appendix filed herewith.

**A.      Defendants Are Exempt from Title VII.**

Defendants' decision is protected by Sections 702 and 703 of Title VII, which expressly exempt religious organizations from Title VII's anti-discrimination provisions where the employment decision at issue is based on religious preference.  *See* 42 U.S.C. § 2000 e-1(a) & (e)(2).

The undisputed evidence demonstrates that the Diocese and MACS qualify as religious entities entitled to these exemptions.  *See, e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011)(nursing-care facility operated under direction of a Catholic religious order exempt); Arnsparger Decl. ¶¶6-13; Ritter Decl. ¶¶ 4-5.  Indeed, courts have routinely held that Catholic parochial schools like CCHS are covered by Sections 702 & 703.  *See, e.g.*, *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 142 (3d Cir. 2006).

Courts apply these religious exemptions to religious organizations like Defendants where the ***reason*** for the ***employment decision*** is based upon religious preference.  *See Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *Hall v. Baptist Memorial Health Care Corp*., 215 F.3d 618 (6th Cir. 2000); *Kennedy,* 657 F.3d at 192 (4th Cir. 2011); *see also Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985).  In applying these exemptions to religious organizations, courts emphasize that the exemptions permit religious organizations to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts.  *Little v. Wuerl*, 929 F.2d at 951.

In *Little*, for example, the Third Circuit affirmed summary judgment for a parochial school, holding that these exemptions barred discrimination claims brought by a divorced Protestant teacher whose contract was not renewed after she married a Catholic without pursuing

validation of her second marriage through the proper Church procedures. *Little*, 929 F.2d at 951. The court emphasized that Congress intended the exemptions to enable religious organizations to create and maintain communities composed of individuals faithful to their doctrinal practices. *Id.* at 950.

Similarly, in *Hall*, the Sixth Circuit held that Section 702 precluded Title VII claims brought by a lesbian administrative employee of a Baptist college who was asked to resign after expressing views on homosexuality inconsistent with those of the Southern Baptist Convention, and affirmed summary judgment to the employer. *Hall*, 215 F.3d at 622-23.

Courts around the country have dismissed analogous cases based on these exemptions. *See Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wis. 1986)(*affirmed in part and vacated in part on other grounds*, 814 F.2d 1213, 1216 (7th Cir. 1987)(dismissing claims and finding that Section 703 barred an associate professor's sex discrimination claim against Jesuit Marquette University, which declined to hire her after she expressed views on abortion inconsistent with the teachings of the Catholic Church); *Curay-Cramer,* 450 F.3d at 142 (3d Cir. 2006)(affirming 12(b)(6) dismissal of claims by Catholic high school teacher who lent her name to an advertisement in support of abortion rights).

As in *Little*, *Hall*, *Maguire*, and *Curay-Cramer*, the undisputed evidence shows that Defendants released Billard because of his public conduct, which advocated for a position contrary to the beliefs of the Catholic Church – in other words, because of religious preference. Billard's Facebook announcement of his engagement to Donham directly contradicted Catholic teaching concerning marriage, and Billard knew this.  Billard Dep. 120-21, 188-89, Ex. 16. Billard knew that as an employee of MACS assigned at CCHS, he was prohibited from taking a public position or advocating in any way at odds with the teachings of the Catholic faith.  *Id.*

122-23, 127, 134-46, Ex. 6-11.  Billard's public opposition to and conduct which advocated against Church teaching – not his sex or sexual orientation – is the reason that Defendants released him.  Telford Dep. 7-8.  In light of Section 702 & 703's exemptions, Billard's claim fails.

**B.  Billard Cannot Satisfy the Elements of Title VII.**

**1.  Billard Cannot Show That Sex or Sexual Orientation Was A Motivating Factor.**

In order to state a claim for discrimination under Title VII, Billard must show that he is a member of a group protected by Title VII and demonstrate that the asserted protected characteristic – here, sex or sexual orientation – was a motivating factor in the decision to release him from employment.  *Williams v. Giant Food Inc*., 370 F.3d 423, 430 (4th Cir. 2004); *Wilson v. Circuit City Stores*, No. 94-2249, 1996 U.S. App. LEXIS 6080 (4th Cir. 1996).  Billard cannot make this showing.

There is no evidence that Defendants released Billard from his employment because he is a male or is gay.  Indeed, Billard contends that members of CCHS's administration, including Healy and Carpenter, were aware of his sexual orientation (and of course his sex) years before he announced his engagement, yet took no action in response.  *Id.* 253.  Assuming these facts are true, they demonstrate Billard's sex or sexual orientation was not a reason Billard was released.

Rather, it is undisputed that Defendants released Billard because of his public opposition to the Church's teachings concerning marriage.  Telford Dep. 7-8; Carpenter Dep. 32.  Defendants' actions here are consistent with similar personnel actions taken against other employees in the past in response to their conduct which advocated in opposition to Catholicism's fundamental moral tenets.  Ritter Decl. ¶ 23.  These other situations have involved

both male and female, as well as heterosexual, employees. *Id.* ¶ 23.[9]  Indeed, it is undisputed that Defendants would have taken the same action against Billard if he were a ***female*** or ***heterosexual*** and had advocated on Facebook for same-sex marriage in contradiction to Catholic teaching.  *Id.* ¶¶ 23-24.  There is no evidence that either Billard's sex or his sexual orientation was a motivating factor in the decision to release him, and his claim therefore fails.  *See e.g., Maguire*, 814 F.2d at 1217-18 (where Catholic-affiliated university would have terminated male employee for advocacy for abortion, terminated female professor's claim failed).

### 2. Billard's Claim Is For Sexual Orientation Discrimination, Which Is Not Actionable Under Title VII.

Although the Complaint pleads "sex" discrimination, Billard testified that his claim is actually based on his ***sexual orientation***.  Billard Dep. 176 ("I was treated differently ***because I'm gay***.").  Billard cannot sustain a Title VII claim on this basis.

Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin."  42 U.S.C. 2000e-2(a)(1).  Sexual orientation is not on this list of protected classifications.  *Id.*

Courts in the Fourth Circuit and every other circuit with the sole exception of the Seventh, have repeatedly and consistently held that Title VII does not preclude discrimination based on sexual orientation.  Therefore, decisions based on a person's sexual orientation do not classify people on the basis of sex and are not covered by Title VII's prohibition of discrimination "because of sex."  *See e.g., Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996)("Title VII does not prohibit conduct based on an employee's sexual

---

[9] The identities of these other former employees were disclosed to Billard during discovery but are not including in the briefing or Ritter Declaration for privacy reasons.

orientation."); *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 814-15 (E.D. Va. 2016); *see*

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Dawson v.*

*Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005); *Kay v. Independence Blue Cross*, 142 Fed.

App'x. 48, 50 (3d Cir. 2005); *Brandon v. Sage Corp.*, 808 F.3d 266, 270, n2 (5th Cir. 2015);

*Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006)*; Klein v. McGowan*, 198 F.3d

705, 710 (8th Cir. 1999); *DeSantis v. Pac. Tel. & Tel. Co.*, 608 F.2d 327, 332 (9th Cir. 1989);

*Larson v. United Air Lines*, 482 Fed. App'x. 344 (10th Cir. 2012)(claim that plaintiff was

furloughed because he was a gay male not cognizable); *Evans v. Ga. Reg'l Hosp.*, 850 F.3d

1248, 1257 (11th Cir. 2017). This Court, too, has dismissed Title VII claims based on sexual

orientation. *Thomas v. North Carolina*, No. 3:12-cv-00038-FDW-DCK, 2013 U.S. Dist. LEXIS

19392 (W.D.N.C. Feb. 13, 2013).

Courts reaching this conclusion have repeatedly emphasized that Congress evidenced no

intent to prohibit "sexual orientation" discrimination – nor any intent other than to restrict the

term "sex" to its traditional meaning (*i.e*., male and female) – when it outlawed sex-based

discrimination. *See Holloway v. Arthur Anderson & Co*., 566 F.2d 659, 662 (9th Cir. 1997).

Indeed, Congress has prohibited discrimination or violence based on sexual orientation in other

legislation (the Violence Against Women Act and the federal Hate Crimes Act), but declined to

include "sexual orientation" in Title VII and has rejected multiple bills that would have extended

Title VII to cover such claims. *Hinton,* 185 F. Supp. 3d at 814-15; *Kiley v. American Society for*

*the Prevention of Cruelty to Animals*, 296 F. App'x. 107, 109 (2d Cir. 2008); 34 U.S.C. § 12361;

18 U.S.C. § 249.  Respectfully, it is not for this Court to amend Title VII in a manner explicitly

rejected by Congress.

Further, these decisions accord with the position of the Department of Justice. *See* Brief of the Department of Justice as Amicus Curiae, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, et al.*, 137 S. Ct. 2290 (2017).

Because Billard's claim is not cognizable under Title VII, Defendants are entitled to summary judgment.

### 3. Billard Cannot State a Gender-Nonconformity and/or Sex Stereotyping Claim.

Billard includes a "gender stereotyping" claim in his Complaint. But, this is merely a claim for sexual orientation discrimination not actionable under Title VII.

Gender-nonconformity and/or sex stereotyping theories originated with *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989). There, the plaintiff asserted that she had been denied partnership on the basis of her sex because she did not fit the partners' ideas of how a female employee should look and act, as she was viewed as "macho," and could have improved her chances for partnership if she would "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235. The Court found that these types of comments constituted "sex stereotyping" sufficient to state a sex discrimination claim under Title VII. *Id.*

Not only are there are no facts similar to *Hopkins* here, courts have repeatedly held that *Hopkins*-type claims cannot be used to bootstrap protection for sexual orientation into Title VII where it does not exist, and the Fourth Circuit has never permitted this type of gamesmanship. *See Dawson,* 398 F.3d at 218 (2d Cir. 2005); *Gilbert v. Country Music Ass'n, Inc.*, 432 F. App'x. 516 (6th Cir. 2011); *Vickers*, 453 F.3d at 764 (6th Cir. 2006).

This is precisely what Billard tries to do here. Billard testified that the basis for his sex-stereotyping theory is that "I do not conform to the typical heterosexual relationship." Billard

Dep. 279. In other words, his claim is based on his sexual orientation. As noted above, Title VII does not recognize this type of claim. Further, there is no evidence that Defendants released Billard from his employment due to his sexual orientation or non-conformance with sex stereotypes. Billard himself conceded that he does not even necessarily fit any stereotypes typically associated with homosexual men. Billard Dep. 83 & 244-45. Indeed, the undisputed evidence before the Court is that Billard was removed from the substitute teaching list because of his public conduct which advocated for same-sex marriage in violation of Church teaching. Telford Dep. 7-9; Carpenter Dep. 30-32; Ritter Decl, ¶¶ 19-20. Accordingly, Billard's sex-stereotyping claim fails as a matter of law.

## II. Billard's Claim is Barred by the First Amendment and by the Religious Freedom Restoration Act.

### A. Enforcing Title VII On These Facts Would Violate Defendants' Associational Freedom.

Billard's claim also fails because enforcement of Title VII against Defendants on these facts would violate Defendants' First Amendment rights to freedom of association. Defendants are Catholic organizations who follow the Church's teaching concerning marriage as a sacred union between one man and one woman. Construing Title VII to force Defendants to retain Billard as a substitute teacher and associate with him after his public endorsement of same-sex marriage would amount to unconstitutional compelled expressive association.

"[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Because forcing a group to include individuals that the group does not desire impairs the ability of a group to express its views, "freedom of association plainly presupposes a

freedom not to associate." *Boy Scouts of America v. Dale*, 530 U.S. 640, 48 (2000) (citation omitted).

The government unconstitutionally burdens a group right to freedom of association if it adopts a law that forces inclusion of an unwanted person whose presence "affects in a significant way the group's ability to advocate public and private viewpoints." *Id.* at 648. Such a law may be enforced only if it serves a compelling state interest that cannot be achieved through less restrictive means. *Id.*

In *Dale*, a former assistant scoutmaster sued the Boy Scouts for violating a New Jersey antidiscrimination statute when the Scouts rescinded his adult membership after he began advocating for LGBT rights. 530 U.S. at 644-45. This directly contradicted the values of the Scouts which precluded homosexual conduct "as a legitimate form of behavior." *Id.* at 651. The Supreme Court held that enforcement of New Jersey's statute would impair the Scouts' ability to express these views, noting that the plaintiff's "presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* at 653. New Jersey's interest in eliminating discrimination in places of public accommodation did not justify the very serious intrusion on the Scouts' freedom of expressive association that would result from its application. *Id*. at 659.

The same result follows here. As in *Dale*, Defendants are engaged in expressive activities as they actively seek to follow and instill Catholic values and teachings in their students. Arnsparger Decl. ¶¶7-13. The message Defendants seek to communicate includes the Catholic belief that marriage exists only between a man and a woman. Jugis Decl. ¶21; Arnsparger Decl. ¶¶6-11; Billard Dep. 120-21. Application of Title VII here would force

Defendants to associate with Billard and permit his public repudiation of Catholic doctrine to undermine the message they seek to convey.

Certainly, the government has an interest in ending certain forms of employment discrimination prohibited by Title VII. Those interests to do not apply to Billard's claim of sexual orientation discrimination, which falls outside Title VII's prohibitions. *See supra*. 10-13. But even assuming that the government had compelling interests at stake here, they do not justify the intrusion into Defendants' associational freedom rights that would result from requiring them to employ an individual engaged in public conduct advocating against their fundamental beliefs concerning marriage, nor is there any evidence that the government has no less restrictive means of accomplishing this goal. *See Dale*, 530 U.S. at 659.

**B.      Enforcing Title VII Would Violate Defendants' Right to Church Autonomy.**

Enforcing Title VII under the facts of this case would also violate the Constitutional guarantee of church autonomy, which is rooted in the First Amendment's Establishment and Free Exercise clauses. The Supreme Court has repeatedly held that churches must have the autonomy or the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

Courts follow a two-step analysis in applying the church autonomy doctrine. The threshold question is whether "the alleged misconduct is rooted in religious belief." *See Bryce v. Episcopal Church in the Diocese of Colorado* 289 F.3d 648, 657 (10th Cir. 2002) (citation omitted). If this threshold requirement is satisfied, courts then examine whether the dispute "is

an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law," and not a "purely secular dispute" with a third party. *Id.*[10]

In *Bryce*, the Tenth Circuit held that the church autonomy doctrine barred a Title VII sexual harassment claim because the suit required the "court to insert itself into a theological discussion about the church's doctrine and policy toward homosexuals." 289 F.3d at 651. The plaintiff in *Bryce* was an Episcopal youth minister who had been terminated after a commitment ceremony with her same-sex partner which violated church teaching. *Id.* at 652. The plaintiff claimed that statements made by church leaders and others during meetings to discuss the plaintiff's termination and the issue of homosexuality and the church in general amounted to sexual harassment. *Id.* at 653. The Court upheld summary judgment for defendants, concluding that the statements "fall squarely within the areas of church governance and doctrine protected by the First Amendment" and that "[a]t the time the offensive statements were made, [plaintiff] was an employee of the church subject to its internal governance procedures." *Id.* at 658. Accordingly, the dispute was not "purely secular," but rather ecclesiastical in nature. *Id.* at 659.

The church autonomy doctrine applies here. The evidence is undisputed that Billard challenges conduct "rooted in religious belief" – specifically, Defendants' effort to protect their ability to faithfully convey their distinctively Catholic message. Telford Dep. 7-8; Jugis Decl., ¶¶15-26; Ritter Decl. ¶ 25. Further, at the time Billard was released from his employment, he was an employee of MACS and subject to its policies and procedures, including policies that he knew prohibited public conduct which advocated for or expressed positions contrary to the Catholic faith. Billard Dep. 122-23, 127, 134-42, Ex. 6-7, 9-11. This is not a "purely secular"

---

[10] Although the "ministerial exception" – which guarantees to churches the right to choose their ministers – is one application of the church autonomy doctrine, the church autonomy doctrine itself is broader and "extends beyond the selection of clergy to other internal church matters." *See id.* at 656-58 & n.2.

dispute, but rather one that implicates the institutional integrity of CCHS, MACS and the

Diocese, all Catholic institutions participating in the Church's mission. Adjudication of Billard's

claim would therefore entangle the Court "in essentially religious controversies" violating the

Diocese's church autonomy. *See Serbian E. Orthodox Diocese for U. S. of Am. & Canada v.*

*Milivojevich*, 426 U.S. 696, 709 (1976).

## III.    Billard's Claim is Barred by RFRA.

Defendants' decision to release Billard is further protected by RFRA because imposition

of Title VII liability would substantially burden Defendants' exercise of religion and RFRA's

demanding "least restrictive means" requirement is not satisfied in this case.

RFRA was enacted "to provide very broad protection for religious liberty." *Burwell v.*

*Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014). In order to achieve that aim, RFRA

provides that "Government shall not substantially burden a person's exercise of religion even if

the burden results from a rule of general applicability," such as Title VII. *Id.* at 2761 (citing 42

U.S.C. § 2000bb–1(a)). Under RFRA, a person whose religious exercise is substantially

burdened by a law is entitled to an exemption unless the Government "demonstrates that

*application of the burden to the person* – (1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental

interest." *Id.* (citing 42 U.S.C. § 2000bb–1(b)) (emphasis added).[11] This is an "exceptionally

demanding" standard and requires the Court to "look beyond broadly formulated interests and to

---

[11] RFRA applies not only in suits to which the government is a party, but also to suits between between private litigants. *See Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) (applying RFRA to only to claims where the government is a party would strip RFRA of its protections and lead to inconsistent holdings in cases involving identical facts). This is particularly true in cases, like this one, where a government agency such as the EEOC could have brought the lawsuit and is, even now, permitted to intervene.

scrutinize the asserted harm of granting specific exemptions to particular religious claimants."
*Hobby Lobby*, 134 S. Ct. at 2779-80.

In *Hobby Lobby*, the Supreme Court held that Department of Health and Human Services ("HHS") regulations requiring employers' health plans to provide coverage for certain forms of contraception violated RFRA and could not be enforced against the plaintiffs – for-profit, closely held corporations whose owners had sincere religious objection to certain forms of contraception. *Id.* at 2759-60. The Court concluded that the HHS mandate substantially burdened the plaintiffs' exercise of religion because it required them to engage in conduct that violated their sincere religious beliefs, or face severe economic consequences. *Id.* 2776-77. The Court assumed that the government had a compelling interest in guaranteeing no-cost access to the contraception at issue. *Id.* 2780. But, the Court concluded that HHS could not satisfy RFRA's least-restrictive-means standard, because it failed to show that it lacked other means of achieving its desired goal without imposing a substantial burden on the plaintiffs' exercise of religion. *Id.* at 2781-82.

RFRA applies to Title VII claims. For example in *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, the court held that RFRA barred the Title VII claim of a transgender employee who had been terminated for refusal to comply with the defendant's male dress code. 201 F. Supp. 3d 837, 840-42 (E.D. Mich. 2016). Relying on *Hobby Lobby*, the court determined that Title VII burdened the funeral home owner's exercise of religion because it affected his ability to conduct business in accordance with his religious beliefs, which included the belief that God called him to serve the grieving through his work and that he "would be violating God's commands if he were to permit an employee who was born a biological male to dress in a traditionally female

skirt-suit at one of his funeral homes because doing so would support the idea that sex is a changeable social construct rather than an immutable God-given gift." *Id.* at 854, 856.

Moving to the least-restrictive-means analysis, the court assumed that the EEOC could demonstrate that "eliminating workplace discrimination" was a compelling interest, but concluded that no showing had been made that forcing the funeral home to permit a biological male to wear female clothing was the least restrictive means of achieving that goal. *Id.* Accordingly, the court concluded that the enforcement of Title VII violated RFRA. *Id.*

RFRA bars Billard's Title VII claim in this case. Billard seeks an injunction reinstating him and an order that would prohibit Defendants from enforcing their policy against conduct advocating for positions contrary to the Catholic faith and requiring them to employ individuals who oppose their message, and asks the Court to impose financial penalties on Defendants for their efforts to preserve the integrity of their Catholic message. Compl. at ¶8. An order of this Court granting such relief would plainly burden Defendants' sincere religious exercise, forcing them to employ persons who publicly undermine the Catholic Church's teaching which Defendants seek to advance. *See* Jugis Decl. ¶¶19-26; Ritter Decl. ¶ 25; Deposition of Peter Jugis,[12] 62-63.

Just as in *Hobby Lobby* and in *Harris*, RFRA precludes enforcement of Title VII on these facts. Even assuming that Title VII serves a compelling governmental interest in ending workplace discrimination, the question before the court is whether it has a compelling interest in forcing **these** Defendants – the Diocese, CCHS, and MACS – to employ someone who publicly opposes core tenets of Catholic teaching and imposing financial penalties on them for refusing to do so. There is no evidence in the record on this point. Nor is there any evidence that

---

[12] Jugis's deposition transcript is included as exhibit 9 to the Appendix filed herewith.

substantially burdening Defendants' religious exercise is the only means of achieving any such interest. Absent such a showing, RFRA bars application Billard's claim.

## CONCLUSION

Defendants request that the Court enter summary judgment in favor of the Defendants on all of the Plaintiff's claims.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certify that the foregoing memorandum does not exceed 6,000 words.

This the 21 day of September 2017.

Respectfully submitted,


/s/ Meredith A. Pinson
John G. McDonald (N.C. Bar No. 23848)
jmcdonald@mcguirewoods.com
Joshua D. Davey (N.C. Bar No. 35246)
jdavey@mcguirewoods.com
Meredith A. Pinson (N.C. Bar No. 39990)
mpinson@mcguirewoods.com
MCGUIREWOODS LLP
201 North Tryon Street, Ste. 3000
Charlotte, North Carolina  28202
704.343.2276
704.444.8753 (Facsimile)

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the court using

the CM/ECF system, which will send electronic notice to counsel for Plaintiff at the addresses as

follows:

Joshua Block
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone:  212-549-2627
Facsimile:  212-549-2650
Email:  jblock@aclu.org

S. Luke Largess
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, North Carolina 28202
Telephone: 704-338-1220
Facsimile:  704-338-1312
Email:  llargess@tinfulton.com

Christopher Brooke
American Civil Liberties Union of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, North Carolina 27611
Telephone:  919-834-3466
Facsimile:  866-511-1344
Email:  cbrook@acluofnc.org

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Telephone:  212-549-2604
Facsimile:  212-549-2652
Email:  bhauss@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA  94111

Telephone:  415-621-2493
Facsimile:  415-255-8437
Email:  egill@aclunc.org


This the 21st day of September 2017.
.

/s/ Meredith A. Pinson
Meredith A. Pinson (N.C. Bar No. 39990)