| | |
|---|---|
| LONNIE BILLARD,<br><br>　　*Plaintiff*,<br><br>　　v.<br><br>CHARLOTTE CATHOLIC HIGH SCHOOL,<br>MECKLENBURG AREA CATHOLIC<br>SCHOOLS, and ROMAN CATHOLIC<br>DIOCESE OF CHARLOTTE<br><br>　　*Defendants*. | **Civil Action No. 3:17-cv-0011** |

# MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Defendants' motion for summary judgment confirms that there are no disputed facts in this case, just pure questions of law. The parties agree that Mr. Billard was fired "because he is a man who intended to, and did, marry another man," Compl. ¶ 32; Answer ¶ 32; that the Diocese's decision to fire Mr. Billard was motivated by its sincere religious beliefs; and (as a result of the Diocese's stipulation) that Mr. Billard's job duties do not fall within the scope of the "ministerial exception" to Title VII. The parties disagree only about what conclusions flow from those facts as a matter of law.

As a matter of law, firing a person because of their marriage to a same-sex partner discriminates on the basis of sex under Title VII. As a matter of law, Section 702 does not authorize religious employers to discriminate on the basis of sex even when that discrimination is motivated by sincere religious beliefs. And, as a matter of law, neither the First Amendment nor the Religious Freedom Restoration Act ("RFRA"), provides a defense to employment discrimination against an employee that does not fall within the scope of the "ministerial exception."

Thus, as a matter a matter of law, the Diocese's motion for summary judgment must be denied.

# ARGUMENT

**I.  The Diocese Discriminated Against Mr. Billard Because of "Sex" Under Title VII.**

**A. The Diocese Discriminated Against Mr. Billard Because He Was a Man Who Announced His Engagement to Another Man.**

As explained in Mr. Billard's motion for partial summary judgment, the Diocese's policy that only women may marry men (and only men may marry women) facially discriminates on the basis of sex. Pl.'s Mem. 8-12. If Mr. Billard were a woman, he would not have been

1

terminated for marrying Mr. Donham. He was, therefore, treated in a manner that, "but for [his] sex, would be different." *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978); *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 284 (1989) (Kennedy, J., dissenting) ("[S]ex is a cause for the employment decision whenever, either by itself or in combination with other factors, it made a difference to the decision.").

In its motion for summary judgment , the Diocese asserts that Mr. Billard did not experience sex discrimination because "Defendants would have taken the same action against Billard if he were a ***female*** or ***heterosexual*** and had advocated on Facebook for same-sex marriage in contradiction to Catholic teaching." Defs.' Mem.11 (emphasis in original). But that is not the right comparator. Mr. Billard's so-called "advocacy" was his Facebook announcement of his engagement to Mr. Donham. As the Diocese stated in response to Plaintiff's Request for Admission No. 3: "Plaintiff's continuing public engagement in and advocacy for conduct opposed to the fundamental moral tenets of the Roman Catholic faith—***specifically, persisting in a same-sex civil marriage***—renders him ineligible for any substitute teaching assignments." Defs.' Resp. to Pl.'s Req. for Admis. No. 3 (emphasis added); *see also* Defs.' Resp. to Pl.'s Interrog. No. 6 ("CCHS Chaplain Father Matthew Kauth learned that Plaintiff had announced on his Facebook page that he intended to marry his same-sex partner. Father Kauth notified Principal Kurt Telford of this information."). Moreover, the Diocese made clear it would have terminated Mr. Billard simply for marrying Mr. Donham—regardless of whether he had announced his engagement on Facebook. *See* Telford Dep. 21:5-11.[1]

---

[1] Principal Telford also specifically testified that he would ***not*** have fired someone for simply posting a positive Facebook message about a same-sex couple's marriage. When asked what he would do if an employee made positive comments about a same-sex couple's marriage on Facebook, Principal Telford testified that he "would probably ask them to talk to a priest." Telford Dep. 23:24.

2

If Mr. Billard had been a woman who announced her intention to marry Mr. Donham, and persisted in that marriage, her announcement would not have violated the Diocese's policy, and she would have been allowed to continue teaching. As the Diocese conceded in its Answer, when it admitted to paragraph 32 of the Complaint: "Defendants terminated Plaintiff because he is a man who intended to, and did, marry another man." Compl. ¶ 32; Answer ¶ 32. On its face, that is sex discrimination under Title VII. *See Hall v. BNSF Ry. Co.*, No. C13-2160, 2014 WL 4719007, at *3 (W.D. Wash. Sept. 22, 2014) (plaintiff stated claim for sex discrimination because "he (as a male who married a male) was treated differently in comparison to his female coworkers who also married males").

### B. Title VII Prohibits Sex Discrimination Even When the Discrimination Is Also Based on Sexual Orientation.

In arguing that Mr. Billard's "claim is actually based on his *sexual orientation*," not sex (Defs.' Mem. 11 (emphasis in original)), the Diocese repeats precisely the same argument that the Fourth Circuit rejected in *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138 (4th Cir. 1996). In that case, the employer asserted that the plaintiff's "claim actually is not that he was harassed because of his sex, but, rather, that he was harassed because of his sexual orientation as a heterosexual." *Id.* at 143. The Fourth Circuit rejected that argument in an opinion by Judge Luttig, explaining that even if the plaintiff was discriminated against because he was (a) a man who (b) is heterosexual, the discrimination would still violate Title VII: "[A] Title VII cause of action lies even though the discrimination against the employee is not 'solely' because of the employee's sex, as long as the employee's sex was a cause of the discrimination." *Id.* at 144. Judge Luttig acknowledged that "such an expanded interpretation of Title VII will result in a significant increase in litigation under this antidiscrimination provision," but explained that "where Congress has unmistakably provided a cause of action, as it has through the plain

3

language of Title VII, we are without authority in the guise of interpretation to deny that such exists, whatever the practical consequences." *Id.*

Instead of following *Wrightson* and the plain text of the statute, the Diocese cites out-of-circuit cases that improperly limited the scope of the statutory text based on the assumption that the legislators who passed Title VII did not envision how it would apply to discrimination against gay people. Defs.' Mem. 11-12.[2] But the Supreme Court, like the Fourth Circuit in *Wrightson*, has rejected that approach to statutory interpretation. As Justice Scalia explained on behalf of a unanimous Court in *Oncale v. Sundowner Offshore Services, Inc.*: "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." 523 U.S. 75, 79 (1998). "It is not for [the courts] to rewrite the statute so that it covers only what [they] think is necessary to achieve what [they] think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010).[3]

The Supreme Court has repeatedly applied Title VII to forms of sex discrimination that members of Congress probably did not envision in 1964. The statute protects employees from sexual harassment even though, when Congress enacted the statute, "the concept of 'sexual harassment' as gender discrimination had not been recognized or considered by the courts." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 664 (1999) (Kennedy, J., dissenting). The

---

[2] The only Fourth Circuit decision cited by the Diocese is dicta from Judge Niemeyer's opinion in *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996), that was not joined by the other two judges on the panel.

[3] Indeed some of the cases cited by the Diocese have been explicitly disavowed or overruled following *Oncale*. See *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) (recognizing that *Holloway v. Arthur Anderson & Co.*, 566 F.2d 659, 662 (9th Cir. 1977), has been abrogated); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) (recognizing that *DeSantis v. Pac. Tel. & Tel. Co.*, 608 F.2d 327, 332 (9th Cir. 1979) has been abrogated).

4

statute also extends to harassment between members of the same sex even though many judges have stated they "cannot believe that Congress … could have intended it to reach such situations." *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996), abrogated by *Oncale*, 523 U.S. 75. "It is quite possible that these interpretations may also have surprised some who served in the 88th Congress. Nevertheless, experience with the law has led the Supreme Court to recognize that each of these examples is a covered form of sex discrimination." *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc).

The Diocese also contends that sex discrimination against gay people is implicitly excluded from Title VII because Congress passed unrelated statutes that explicitly protect individuals based on "sexual orientation" several decades after passing Title VII. *See* Defs.'Mem. 12. This "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Congress's use of the term "sexual orientation" in 2009 and 2013 says little about the meaning of a statute adopted by Congress in 1972. "When a later statute is offered as an expression of how the Congress interpreted a statute passed by another Congress a half century before, such interpretation has very little, if any, significance." *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (internal quotation marks and ellipses omitted).

Failed proposals to add explicit protection for "sexual orientation" are even less probative of legislative intent. *See United States v. Craft*, 535 U.S. 274, 287 (2002) *cf. Massachusetts v. EPA*, 549 U.S. 497, 529-30 (2007) ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant . . . in 1970 and 1977."). "A bill can be proposed for any number of reasons, and it can be

5

rejected for just as many others." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). "Those failures can mean almost anything, ranging from the lack of necessity for a proposed change because the law already accomplishes the desired goal, to the undesirability of the change because a majority of the legislature is happy with the way the courts are currently interpreting the law, to the irrelevance of the non-enactment, when it is attributable to nothing more than legislative logrolling or gridlock that had nothing to do with its merits." *Hively*, 853 F.3d at 343-44.

### C. Discrimination Against a Person for Marrying a Same-Sex Partner Is a Form of Discrimination Based on Sex Stereotyping and Gender Nonconformity.

As explained in Mr. Billard's memorandum in support of partial summary judgment, the Diocese discriminated against Mr. Billard based on sex stereotyping and gender nonconformity when it disqualified him from continuing as a substitute teacher because he intended to marry another man. Pl.'s Mem. 10-11. Indeed, failing to conform to the stereotype that men should marry men and women should marry women is the ultimate example of gender nonconformity. Although some courts have attempted to draw a distinction between gender nonconforming behavior and gender nonconforming sexual orientation, more recent cases have recognized that such a distinction is illogical and unworkable. *See Philpott v. New York*, No. 16 CIV. 6778 (AKH), 2017 WL 1750398, at *2 (S.D.N.Y. May 3, 2017) (declining "to embrace an 'illogical' and artificial distinction between gender stereotyping discrimination and sexual orientation discrimination"); *U.S. EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp. 3d 834, 841 (W.D. Pa. 2016) ("[D]iscrimination on the basis of sexual orientation is, at its very core, sex stereotyping plain and simple; there is no line separating the two."); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1159 (C.D. Cal. 2015) ("[T]he line between sex discrimination and

sexual orientation discrimination is 'difficult to draw' because that line does not exist, save as a lingering and faulty judicial construct.").

Moreover, even if the Diocese were correct that a person's status as gay or lesbian is not a form of sex stereotyping under Title VII (Defs.' Mem. 13-14), the Diocese admits that it took disciplinary action against Mr. Billard not merely because of his internal orientation, but also because of his gender nonconforming actions in marrying another man. According to the Diocese, the policy does not discriminate based on sexual orientation because gay people can work for the Diocese so long as they are celibate. Jugis Decl. ¶¶ 21-27. Thus, according to the Diocese, all men (whether gay or straight) are prohibited from marrying or having a sexual relationship with men, and all women (whether gay or straight) are prohibited from marrying or having a sexual relationship with women. Jugis Dep. 27:9-28:5; Jugis Decl. ¶ 21. If the Diocese contends that its policy of firing someone for marrying a same-sex partner is based on a person's conduct, not their sexual orientation, then it must be equally true that Mr. Billard's challenge to that policy is also based on his gender-nonconforming conduct, not merely his sexual orientation.

## II. The Diocese Is Not "Exempt" From Title VII's Prohibition on Sex Discrimination.

The Fourth Circuit has flatly rejected the Diocese's assertion that it is "exempt" from Title VII. "The language and the legislative history of Title VII both indicate that the statute exempts religious institutions only to a narrow extent." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985). "Such organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin." *Id.* at 1167 (citation omitted); *accord Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) ("Section [702] does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin.").

7

None of the cases cited by the Diocese supports its argument that Section 702 exempts religious employers from Title VII's prohibition on sex discrimination if the sex discrimination is motivated by religious beliefs. Indeed, none of the Diocese's cases involved sex discrimination at all; they were religious-discrimination claims. *See Kennedy*, 657 F.3d at 191 (employee fired for wearing clothing "inappropriate for a Catholic facility" could not sue for *religious* discrimination); *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000) (employee fired for joining church that accepted gay people could not sue for *religious* discrimination); *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (employee fired for remarrying without obtaining annulment cannot sue for *religious* discrimination).[4]

The Diocese's prohibition on employees engaging in a romantic relationship or marrying a same-sex partner facially discriminates on the basis of sex. No one disputes that the Diocese was motivated by its sincere religious beliefs. But "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but

---

[4] The Diocese also cites two cases in which plaintiffs filed sex discrimination claims after they were fired (or not hired) for supporting abortion. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 142 (3d Cir. 2006); *Maguire v. Marquette Univ.*, 814 F.2d 1213, 1216 (7th Cir. 1987). But those cases are inapposite. In *Maguire*, the Seventh Circuit held simply that the plaintiff's supplemental pleading showed that her stance on abortion motivated the university's decision not to hire her *regardless of her gender*; the court did not reach the question whether Section 702 applied to the university's conduct. *See* 814 F.2d at 1217. In *Curay-Cramer*, on the other hand, the plaintiff alleged that she was punished more harshly than men who opposed religious teachings on different issues (such as the Iraq war). 450 F.3d at 139. The court held that the comparability analysis required to adjudicate the plaintiffs' sex discrimination claims would have required the court to balance the relative importance of different religious doctrines, raising substantial constitutional issues. *Id.* at 141. Here, no such comparability analysis is required because Mr. Billard alleges facial discrimination.

8

rather on the explicit terms of the discrimination." *Id.* Title VII prohibits all sex discrimination, regardless of a religious employer's motives.

For example, in the 1980s and 1990s many religious employers argued that their sincere religious beliefs required that they pay married women less than married men. These employers argued that the unequal-pay policy was not based on sex because it was motivated by their religious belief that men should be head of the household. But the courts rejected that argument, explaining that "[s]ince the Church's head of household allowance policy is based on sex—albeit as a means of observing a religious belief that men and women occupy different roles within the family—any argument that the policy is based on a factor 'other than sex' . . . must fail." *EEOC v. First Baptist Church*, No. S91-179M, 1992 WL 247584, at *5 (N.D. Ind. June 8, 1992); *accord Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1400-01 (4th Cir. 1990); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1367 (9th Cir. 1986); *EEOC v. Tree of Life Christian Sch.*, 751 F. Supp. 700, 709 (S.D. Ohio 1990). The same reasoning applies here. The religious motivation for the Diocese's actions does not change the fact that the Diocese facially discriminated against Mr. Billard on the basis of sex.

**III.**     **The Diocese's Affirmative Defenses Fail as a Matter of Law.**

    **A. The Right to Expressive Association Does Not Apply to the Hiring and Firing of Employees.**

The Diocese argues that enforcing Title VII would violate its right to expressive association. Defs.' Mem. 14-16. To be sure, the religion clauses of the First Amendment provide special protections for religious organizations' hiring and firing of employees if the employee qualifies for the "ministerial exception." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). For purposes of this case, however, the Diocese has stipulated

9

that Mr. Billard's employment does *not* fall within the scope of the "ministerial exception." *See* Stipulation dated August 11, 2017.

Because the Diocese has stipulated away any defense based on the "ministerial exception," it must rely exclusively on a distinct "right to freedom of association," which "is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor*, 565 U.S. at 189. A religious employer's rights under the freedom of association are the same as the rights of a secular employer, *id.*, and it is settled law that a secular employer does *not* have a freedom of association right to engage in employment discrimination. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights.").

Employers—whether secular or religious—do not have a right under freedom of association to engage in employment discrimination.

### B. Mr. Billard's Claims Do Not Violate Church Autonomy or Raise Any Ecclesiastical Question.

Relying on a single case from the Tenth Circuit, *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657 (10th Cir. 2002), the Diocese argues that Mr. Billard's claims are barred by the church autonomy doctrine's prohibition on courts resolving ecclesiastical questions. Defs.' Mem. 16-18. The Fourth Circuit, however, has made clear that, in the employment context, defenses under the church autonomy doctrine are limited to employees who perform spiritual functions that qualify for the ministerial exception. "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *EEOC v. Roman Catholic Diocese of Raleigh, N.C.* 213 F.3d 795, 801 (4th Cir. 2000).

10

Even assuming that the Fourth Circuit would follow *Bryce*, the ecclesiastical questions in *Bryce* are not implicated here. In *Bryce* an employee working for an episcopal church brought a sexual harassment claim based on "remarks made in written correspondence between [a Reverend] and other church leaders," that included "offensive and harassing statements about homosexuals." *Bryce*, 289 F.3d at 657. The Court held that because the comments were made in the course of discussing ecclesiastical questions and maters of church governance, the discussions as a whole were protected by the church autonomy doctrine, and the comments could not serve as the basis for Title VII liability. *Id.* at 658-59.

Here, Mr. Billard's claims are not based on the Diocese's discussions about him, his marriage, or his sexual orientation. He is suing because of the *actions* the Diocese took in denying him employment on the basis of sex. Because the Diocese has stipulated that Mr. Billard is not a ministerial employee, the church autonomy doctrine does not shield those discriminatory acts from Title VII.

### C. Even If RFRA Applied to Mr. Billard's Claims, Enforcing Title VII Satisfies RFRA's Strict-Scrutiny Test.

As explained in Mr. Billard's motion for partial summary judgement, RFRA does not apply to lawsuits between private parties. Pl.'s Mem. 14-15. Moreover, even if RFRA did apply, the Fourth Circuit has already held in *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990), that laws prohibiting religious employers from discriminating against non-ministerial employees on the basis of sex satisfy strict scrutiny. Such laws advance state "interests of the highest order," and "a less restrictive means of attaining its aims is not available." *Id.*

Unlike *Dole*, the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014), depended on the availability of a more narrowly tailored alternative that fully

11

served the government's interest. Because the government already had developed an alternative method of providing the same contraceptive coverage to employees, the Supreme Court concluded that the negative impact on Hobby Lobby's employees "would be precisely zero." *Id.* at 2760.[5] By contrast, Defendants do not offer a more narrowly tailored alternative that protects the government's interest in prohibiting sex discrimination in employment, nor do they propose a more narrowly tailored alternative that protects Mr. Billard's statutory rights. *See United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (holding that the government is required only to rebut less restrictive alternatives proposed by the RFRA claimant). They simply argue that Title VII should not apply to them. That is not a sufficient alternative because *every* instance of sex discrimination "causes grave harm to its victims," *United States v. Burke*, 504 U.S. 229, 231 (1992), and denies society the benefit of their participation in political, economic, and cultural life, *Roberts v. U.S. Jaycees*, 469 U.S. 609, 635 (1984).

---

[5] Similarly, in the only other case cited by the Diocese, a district court concluded that the EEOC could have fully protected the rights of a transgender employee by proposing that an employer adopt a gender-neutral dress code. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d 837, 861-63 (E.D. Mich. 2016), *appeal filed*, No. 16-2424 (6th Cir.). At the same time, the court emphasized that its decision was narrow because the RFRA defense would not apply to Title VII suits between private parties. *Id.* at 863-64.

## CONCLUSION

For all these reasons, the Diocese's motion for summary judgment should be denied.

Dated: October 5, 2017

Respectfully submitted

*/s/ S. Luke Largess*
S. Luke Largess (NC Bar # 17486)
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, NC 28202
Telephone: (704) 338-1220
Facsimile: (704) 338-1312

Christopher Brook (NC Bar #33838)
American Civil Liberties Union
 of North Carolina Legal Foundation
PO Box 28004
Raleigh, NC 27611
Telephone: (919) 834-3466
Facsimile: (866) 511-1344

Joshua A. Block (*pro hac vice*)
Brian Hauss (*pro hac vice*)
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2604
Facsimile: (212) 549-2652

Elizabeth O. Gill (*pro hac vice*)
American Civil Liberties Union
 Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Counsel for Plaintiff*

13

**CERTIFICATE OF SERVICE**

  I hereby certify that on this date, I electronically filed a copy of forgoing document with the Clerk of Court using the CM/ECF system. All participants in the case are registered CM/ECF users and are hereby served through the CM/ECF system.


Dated: October 5, 2017

                      **/s/ S. Luke Largess**
                      S. Luke Largess