# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

LONNIE BILLARD,

        **Plaintiff,**

   v.

**CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

        **Defendants.**

**Civil Action No. 3:17-cv-0011**

---

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.     Billard's Title VII Claim Fails Under *Bostock* Because The Undisputed Evidence Shows That Charlotte Catholic Released Billard For Publicly Opposing Its Catholic Message And Mission. ................................. 3

II.    Title VII's Exemptions For Religious Organizations Apply, And Charlotte Catholic Is Protected By RFRA And The First Amendment. ................................... 7

    A.    Title VII's Exemptions For Religious Organizations Apply Because Billard's Public Opposition Contravened Charlotte Catholic's Mission And Message. ................................. 7

    B.    RFRA Protects Charlotte Catholic From Title VII Liability For Releasing An Employee Who Publicly Opposes Its Catholic Mission And Message. ................................. 10

        1.    RFRA Applies In This Case ................................. 10

        2.    RFRA's "Exceptionally Demanding" "To The Person" Standard ................................. 13

        3.    RFRA Precludes Title VII Liability Here ................................. 14

    C.    The Church Autonomy Doctrine Protects Charlotte Catholic's Decision To Employ Persons Aligned With Its Catholic Mission And Message. ................................. 16

    D.    The First Amendment Right Of Free Association Bars Billard's Claim ...... 18

CONCLUSION ................................................................................................... 20

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bostock v. Clayton County, Ga.*,
   140 S. Ct. 1731 (2020) ................................................................................ *passim*

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) .............................................................................2, 18, 19

*Boyd v. Harding Acad. of Memphis, Inc.*,
   88 F.3d 410 (6th Cir. 1996) ......................................................................5, 6

*Broussard v. First Tower Loan, LLC*,
   No. 2:15-cv-01161-CJB-SS, Doc. No. 70 (E.D. La. Sept. 16, 2015) .....................................12

*Bryce v. Episcopal Church in the Diocese of Colo.*,
   289 F.3d 648 (10th Cir. 2002) ......................................................................17, 18

*Burwell v. Hobby Lobby*,
   573 U.S. 682 (2014) ................................................................................ *passim*

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U.S. 520 (1993) ................................................................................16

*Cline v. Cath. Diocese of Toledo*,
   206 F.3d 651 (6th Cir. 2000) ......................................................................5

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*,
   483 U.S. 327 (1987) ................................................................................20

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
   450 F.3d 130 (3d Cir. 2006) ......................................................................9, 20

*Dolter v. Wahlert High Sch.*,
   483 F. Supp. 266 (N.D. Iowa 1980) ......................................................................5

*EEOC v. Cath. Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996) ......................................................................11

*EEOC v. Roman Cath. Diocese of Raleigh, N.C.*,
   213 F.3d 795 (4th Cir. 2000) ......................................................................18

*Frew v. Hawkins*,
   540 U.S. 431 (2004) ................................................................................10

ii

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*,
2020 WL 1536565 (D. Utah Mar. 31, 2020) ........................................................17

*Ganzy v. Allen Christian Sch.*,
995 F. Supp. 340 (E.D.N.Y. 1998) ........................................................................5

*Garcia v. Salvation Army*,
No. CV-14-02225-PHX-DGC, 2016 WL 4732845 (D. Ariz. Sept. 12, 2016),
*aff'd*, 918 F.3d 997 (9th Cir. 2019) ........................................................................7

*Garrick v. Moody Bible Inst.*,
412 F. Supp. 3d 859 (N.D. Ill. 2019) ..............................................................17, 18

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010) ..............................................................................12

*Goodman v. Archbishop Curley High Sch.*,
149 F. Supp. 3d 577 (D. Md. 2016) .....................................................................12

*Hall v. Baptist Mem'l Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) ...........................................................................8, 19

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) .....................................................................11, 12, 13

*Harvey v. Young Women's Christian Ass'n*,
533 F. Supp. 949 (W.D.N.C. 1982) .......................................................................5

*Hosanna Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*,
565 U.S. 171 (2012) .........................................................................................17, 19

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) ..............................................................................................12

*Jones v. Holy Cross Hosp. Silver Spring, Inc.*,
64 F.R.D. 586 (D. Md. 1974) ...............................................................................12

*Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*,
344 U.S. 94 (1952) ..............................................................................................16

*Kelley v. Decatur Baptist Church*,
2019 WL 8014314 (N.D. Ala. Mar. 27, 2019) ......................................................5

iii

*Kennedy v. St. Joseph's Ministries, Inc.*,
  657 F.3d 189 (4th Cir. 2011) ...........................................................7, 8, 9

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020)................................................................10, 14, 15

*Little v. Wuerl*,
  929 F.2d 944 (3d Cir. 1991)........................................................... *passim*

*Lovelace v. Lee*,
  472 F.3d 174 (4th Cir. 2006) ...................................................................9

*Maguire v. Marquette Univ.*,
  814 F.2d 1213 (7th Cir. 1987) ..............................................................5, 6

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018).........................................................................2, 18

*Missouri v. Fiske*,
  290 U.S. 18 (1933)..................................................................................10

*N.L.R.B. v. Cath. Bishop of Chi.*,
  440 U.S. 490 (1979)...........................................................................19, 20

*New York Times v. Sullivan*,
  376 U.S. 254 (1964)...........................................................................12, 13

*O'Connor v. Roman Cath. Church of the Diocese of Phoenix*,
  No. CV 05-1309, 2007 WL 1526736 (D. Ariz. May 23, 2007) ................8

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015).........................................................................2, 18

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian
  Church*,
  393 U.S. 440 (1969)..................................................................................6

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985) ..............................................................1, 8

*Rweyemamu v. Cote*,
  520 F.3d 198 (2d Cir. 2008)...................................................................12

Case 3:17-cv-00011-MOC-DCK   Document 63   Filed 08/07/20   Page 5 of 28

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................................................................................................12

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ...................................................................................12

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
450 U.S. 707 (1981) ...................................................................................................6

*Tomic v. Cath. Diocese of Peoria*,
442 F.3d 1036 (7th Cir. 2006) .................................................................................12

*United States v. Jass*,
569 F.3d 47 (2d Cir. 2009) ......................................................................................13

*United States v. Wilgus*,
638 F.3d 1274 (10th Cir. 2011) ...............................................................................15

*Watson v. Jones*,
80 U.S. 679 (1871) ...................................................................................................18

*Wheaton Coll. v. Sebelius*,
No. 12-01169 (D.D.C. Aug. 20, 2012) ..............................................................11, 12

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011) .................................................................................................12

*In re Young*,
82 F.3d 1407 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated*, 141
F.3d 854 (8th Cir.), *cert. denied*, 525 U.S. 811 (1998) ....................................10, 11

**Statutes**

42 U.S.C. § 2000bb-1 ....................................................................................10, 13, 15

42 U.S.C. § 2000bb-2 ........................................................................................................10

42 U.S.C. § 2000e-1 ..............................................................................................1, 7, 9

42 U.S.C. § 2000e-2 ...............................................................................................1, 3, 7

42 U.S.C. §§ 2000e-4, 2000e-5 ................................................................................12

Affordable Care Act .............................................................................................13, 14

v

Age Discrimination in Employment Act ........................................................................................11

Religious Freedom Restoration Act.................................................................................. *passim*

**Other Authorities**

First Amendment ............................................................................................. *passim*

CATECHISM OF THE CATHOLIC CHURCH ¶¶ 2358, 2357, *available at*
http://www.vatican.va/ archive/ccc_css/archive/catechism/ccc_toc.htm. (last
visited Aug. 6, 2020)...........................................................................................................6

Case 3:17-cv-00011-MOC-DCK   Document 63   Filed 08/07/20   Page 7 of 28

## INTRODUCTION

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).

Plaintiff Lonnie Billard asks the Court to force the Defendants—a Catholic high school, Catholic school system, and Catholic diocese[1]—to employ him as a teacher despite his public opposition to the religious message that they seek to convey—the "very reason" for Charlotte Catholic's existence. The law does not permit this result.

First, under *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020), Billard's Title VII claim fails. *Bostock* holds that if an employer would have taken the same employment action against someone of the opposite sex as the employee, then the action was not "because of sex." Here, the undisputed evidence shows that Billard was released not because of his sex or his sexual orientation, but because of his public conduct in opposition to the Catholic teaching on marriage. The undisputed evidence also demonstrates that if Billard were female or heterosexual, the result would have been the same: Billard was released for his public opposition to the religious mission of his employer, not because of his sex or his sexual orientation.

Second, Title VII's exemptions for religious organizations bar Billard's claim. The record shows that Charlotte Catholic's decision to release him was based on religious preference—specifically, adherence to the teachings of the Catholic Church on marriage. 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2); *see Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166-67 (4th Cir. 1985).

Third, the Religious Freedom Restoration Act ("RFRA") bars Billard's claim. RFRA applies broadly and prohibits substantial burdens on religious exercise, unless the law satisfies

---

[1] Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic Schools ("MACS"), and the Roman Catholic Diocese of Charlotte ("Diocese") (collectively "Charlotte Catholic").

the "exceptionally demanding," "least restrictive means" strict-scrutiny test described in *Burwell v. Hobby Lobby*, 573 U.S. 682, 728, 730–31 (2014). Billard has not, and cannot, demonstrate either that the government has a compelling interesting in forcing Charlotte Catholic to employ him despite his opposition to its religious message, or that penalizing Charlotte Catholic as he requests is the least restrictive means of satisfying that interest.

Finally, the First Amendment bars Billard's claim. Forcing Charlotte Catholic to employ Billard would violate its constitutional right to church autonomy, which, as the Supreme Court made clear in *Guadalupe*, broadly guarantees "independence in matters of faith and doctrine and in closely linked matters of internal government"—a protection that is not "exclusively concerned with the selection or supervision of clergy." 140 S. Ct. at 2061. It would also violate Charlotte Catholic's right to associational freedom by forcing a Catholic school—under penalty of law—to employ someone who advocates for a position contrary to the Catholic faith. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). Indeed, the Supreme Court has repeatedly emphasized that a religious organization's millennia-old view that marriage is "by its nature a gender-differentiated union of man and woman"—a view that is "held in good faith" by millions of "reasonable and sincere people here and throughout the world"—must receive "proper protection." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594, 2607 (2015); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." (quoting *Obergefell*, 135 S. Ct. at 2607)); *Bostock*, 140 S. Ct. at 1754 ("We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society.").

For these reasons, the Court should grant summary judgment in favor of Charlotte Catholic and deny Billard's motion for partial summary judgment.

I. **Billard's Title VII Claim Fails Under *Bostock* Because The Undisputed Evidence Shows That Charlotte Catholic Released Billard For Publicly Opposing Its Catholic Message And Mission.**

Title VII makes it "unlawful . . . for an employer to . . . discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Billard claims that Charlotte Catholic discriminated against him because he is gay. Billard Dep. 176, Doc. 31-1; Compl. at 7. In *Bostock*, 140 S. Ct. at 1747, the Supreme Court held that Title VII covers claims for "discrimination based on homosexuality" and explained how courts are to determine if an employment action was taken "because of sex":

> If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.

*Id.* at 1741. By contrast, when an employer would have released an employee even if the sex of the employee were different, the employer's action would not violate Title VII: "Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII remains silent." *Id.* at 1742. Thus, a Title VII plaintiff cannot survive summary judgment when the undisputed evidence shows that the employment decision was not made "because of" a protected characteristic like sex.

Billard cannot satisfy *Bostock*'s test for Title VII liability. The undisputed evidence shows that Charlotte Catholic released Billard not because of his sex or sexual orientation, but because of his public opposition to the Church's teachings on marriage. Telford Dep. 7–9, Doc. 28-5; Carpenter Dep. 32, 45, 47, Doc. 28-3; Billard Dep. 200. In fact, Billard alleged in his complaint and testified at his deposition that members of CCHS's administration were aware of his sexual orientation and his relationship with his partner (and, of course, of his sex) years

---

[2] Charlotte Catholic incorporates by reference the fact statement set forth in its Memorandum in Support of its Motion for Summary Judgment (Doc. 30).

before he expressed his public opposition to the Church's teachings on marriage in his Facebook post, yet they took no action against him. Billard Dep. 253; Compl. ¶ 22. This alone demonstrates that Charlotte Catholic's decision to release Billard was not based on his sex or sexual orientation, even as understood in *Bostock*. These facts also make this case quite different from *Bostock*, in which there was no dispute that the employees were discharged for being homosexual or transgender. 140 S. Ct. at 1744.

Further, the undisputed evidence shows that Charlotte Catholic would have taken the same action against Billard even if he were female or heterosexual, but had publicly advocated on Facebook for views opposed to the Church's teaching on marriage. Ritter Decl. ¶¶ 20–21, Doc. 31-3. Indeed, the undisputed evidence shows that MACS *has* taken similar action against other employees in response to their public opposition to the moral teachings of the Catholic Church. *Id.* ¶ 22–24. These other situations involved male, female, and heterosexual employees, including:

- A male physical education teacher engaged in an extramarital affair, in violation of Catholic teaching. *Id.* ¶¶ 3, 23.

- A male teacher in the process of adopting a child with his unmarried same-sex partner, in violation of Catholic teaching. *Id.* ¶ 23.

- A female teacher who announced her plans to marry a divorced Catholic man who did not have an annulment, in violation of Catholic teaching. *Id.*

Billard was aware of Charlotte Catholic's expectations in this regard. During his employment at CCHS, he received the following:

- The Diocese's ***Personnel Policies Handbook*** (all employees "share in the mission which Christ entrusted to the Church . . . [and] must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church both in word and example"). Doc. 31-3 at 36; Billard Dep. 141–42.

- The Diocese's ***Code of Ethics*** (all employees, including teachers at MACS schools, must "conduct themselves at all times in a manner that is consistent with the teachings and the precepts of the Roman Catholic Church"). Doc. 31-4 at 3; Billard Dep. 134-41.

- The CCHS *Faculty Handbook* ("individuals should model and integrate teachings of Jesus in all areas of conduct in order to nurture faith and inspire action, especially in the areas of service and volunteerism"). Doc. 31-4 at 38; Billard Dep. 133.

- An *employment contract* with MACS ("regardless of membership in the Catholic Church," all teachers must be "consistent at all times, in example and expression, with the tenets and morals of the Catholic faith"). Doc. 31-4 at 66.

Many courts have held that "if the school's purported 'discrimination' is based on a policy . . . which emanates from the religious and moral precepts of the school, and if that policy is applied equally to its male and female employees, then the school has not discriminated . . . in violation of Title VII." *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (citing *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 414–15 (6th Cir. 1996)); *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 344 (E.D.N.Y. 1998); *Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 270 (N.D. Iowa 1980); *see Maguire v. Marquette Univ.*, 814 F.2d 1213, 1217 (7th Cir. 1987) (where Catholic-affiliated university would have terminated male employee for abortion advocacy, terminated female professor's claim failed); *see Kelley v. Decatur Baptist Church*, 2019 WL 8014314, at *10-12 (N.D. Ala. Mar. 27, 2019) (dismissing sex-discrimination claim because uncontroverted evidence showed plaintiff was discharged for violating defendant-church's moral standards); *see also Harvey v. Young Women's Christian Ass'n*, 533 F. Supp. 949, 955–56 (W.D.N.C. 1982) (dismissing sex-discrimination claim because plaintiff was discharged for publicly advocating for "an alternative lifestyle," contrary to defendant-YWCA's moral principles).

In *Boyd*, the court dismissed the plaintiff's sex-discrimination claim based on pregnancy because the plaintiff failed to provide any evidence that the defendant discriminatorily applied its policy against extramarital sex. 88 F.3d at 414. Specifically, the court observed that the plaintiff violated the school's code of conduct and that the defendant "presented uncontroverted evidence" that it had discharged "at least four individuals, both male and female, who had engaged in extramarital sexual relationships that did not result in pregnancy." *Id.* Likewise, in *Maguire*, the court rejected the plaintiff's sex-discrimination claim where the plaintiff

acknowledged that she was not hired for a position because her views on abortion went against the defendant's mission and religious standards. 814 F.2d at 1217.

Here, like those plaintiffs, Billard violated policies that he had agreed to follow during his employment at CCHS. Billard Dep. 122–23, 127, 134–46; Telford Dep. 7–8; Ritter Decl. ¶ 19. Billard has always known that the Catholic Church recognizes marriage as exclusively between one man and one woman. Billard Dep. 120-21.[3] And Billard acknowledged that he was released by Charlotte Catholic because of his Facebook post that publicly advocated for same-sex marriage. Billard Dep. 176–77, 200. Further, Charlotte Catholic has presented uncontroverted evidence that it applied its policies in a gender-neutral (and sexual-orientation-neutral) manner and has taken similar actions, as described above, against other employees—male, female, and heterosexual—for conduct opposed to Church teaching.[4]

Following *Bostock*, the Court must ask whether Charlotte Catholic would have released Billard if he were a woman who had opposed Catholic teaching on marriage on Facebook. The evidence is clear: Charlotte Catholic would have. The undisputed evidence shows that Charlotte Catholic released Billard because of his conduct—a Facebook post that publicly opposed Charlotte Catholic's religious message—not because of his sex or sexual orientation, and that it has applied a gender-neutral (and sexual-orientation-neutral) policy of disciplining employees who publicly engage in similar conduct in opposition to Church teaching. Therefore, under *Bostock*, Billard's claim fails.

---

[3] *See also* CATECHISM OF THE CATHOLIC CHURCH ¶¶ 2358, 2357, *available at* http://www.vatican.va/ archive/ccc_css/archive/catechism/ccc_toc.htm. (last visited Aug. 6, 2020); Code of Canon Law, Canon 1055 § 1.

[4] Billard speculates that Charlotte Catholic would have fired him simply for marrying his husband, regardless of whether he had announced his engagement on Facebook. Billard's Opp. to Defs.' Mot. for Summ. J. ("Billard's Opp."), Doc. 32 at 3 & n.1. But that is not what happened—Billard posted on Facebook, which led to his dismissal. Likewise, Billard's citation of speculation in Telford's deposition about what might happen if someone posted on Facebook about attending a same-sex wedding ceremony does not change the facts about Charlotte Catholic's response to his particular conduct here. *Id.* Billard also misreads Charlotte Catholic's response to his Request for Admission No. 3 and answer to his complaint. *Id.*; Billard's Reply in Supp. of Mot. for Part. Summ. J. ("Billard's Rep."), Doc. 34 at 3. Again, what is at issue is Billard's conduct in opposition to Catholic teaching. Billard's arguments invite the Court to evaluate Charlotte Catholic's judgments about what does and what does not violate Church teaching, something the Court may not do without impermissible entanglement in religious questions. *See Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445-46 (1969); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981).

6

## II. Title VII's Exemptions For Religious Organizations Apply, And Charlotte Catholic Is Protected By RFRA And The First Amendment.

Even if the Court were to conclude that Billard could state a Title VII claim, Charlotte Catholic is not subject to Title VII liability here for multiple reasons. First, the religious exemptions to Title VII apply to Charlotte Catholic. Second, RFRA precludes liability. Finally, holding Charlotte Catholic liable here would violate the First Amendment.

### A. Title VII's Exemptions For Religious Organizations Apply Because Billard's Public Opposition Contravened Charlotte Catholic's Mission And Message.

The Supreme Court reiterated in *Bostock* that it is "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution" and that, in recognition of this guarantee, "Congress included [in Title VII] an express statutory exception for religious organizations." 140 S. Ct. at 1754 (citing 42 U.S.C. § 2000e-1(a)).

Sections 702 and 703 of Title VII ("Religious Exemptions") expressly exempt religious organizations from Title VII liability where the ***employment decision at issue is based on religious preference***. *See* 42 U.S.C. § 2000e-1(a) & e-2(e)(2). Section 702 provides that Title VII shall not apply to "a religious corporation, association, [or] educational institution . . . with respect to the employment of individuals ***of a particular religion*** to perform work connected with the carrying on by such . . . educational institution . . . of its activities." 42 U.S.C. § 2000e-1(a) (emphasis added). Similarly, Section 703 provides that "it shall not be an unlawful employment practice" for a religious educational institution "to hire and employ employees ***of a particular religion***" if its "curriculum . . . is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e)(2) (emphasis added).

The Religious Exemptions "enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices."[5] *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011) (quoting *Wuerl*, 929 F.2d at 951).

---

[5] These exemptions do "not simply confer a privilege on religious organizations, but instead establish[] a limit on federal jurisdiction, designed to accommodate the free exercise of religion and prevent federal courts from becoming entangled in religious matters." *Garcia v. Salvation Army*, No. CV-14-02225-PHX-DGC, 2016 WL 4732845, at *4 (D. Ariz. Sept. 12, 2016), *aff'd*, 918 F.3d 997 (9th Cir. 2019) (citing 42 U.S.C. § 2000e-1(a)).

7

Indeed, Congress "painted [the Religious Exemptions] with a broader brush, exempting religious organizations from the entire 'subchapter' of Title VII with respect to the 'employment' of persons of 'a particular religion.'" *Id.*

Crucially, an employment decision to release an employee "of a particular religion" includes the permission "to employ only persons whose beliefs and ***conduct*** are consistent with the employer's religious precepts." *Wuerl*, 929 F.2d at 951 (emphasis added). As the court explained in *Wuerl*, "it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Id.* Put differently, an employment decision based upon ***religious preference*** includes "the decision to terminate an employee whose ***conduct*** or religious beliefs are inconsistent with those of its employer.'" *See Kennedy*, 657 F.3d at 192 (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (emphasis added)). Further, Fourth Circuit precedent makes clear that the Religious Exemptions apply to employment decisions that are "based upon religious preference." *Rayburn*, 772 F.2d at 1166–67 (acknowledging that Section 702 applies when the ***reason*** for the employment decision is "based upon religious preference").

Here, the Religious Exemptions apply to Charlotte Catholic and bar Billard's claim. Charlotte Catholic plainly qualifies as a religious entity entitled to these exemptions, *e.g.*, *Kennedy*, 657 F.3d at 196; *Wuerl*, 929 F.2d at 951, which Billard does not dispute. *See* Arnsparger Decl. ¶¶ 6–13, Doc. 31-5; Ritter Decl. ¶¶ 4–5; Compl. ¶¶ 5–7. Further, Billard concedes that Charlotte Catholic's employment decision was "motivated by its sincere religious beliefs" that Billard's conduct violated the Church's teaching on marriage. Billard's Opp. to Defs.' Mot. for Summ. J. ("Billard's Opp."), Doc. 32 at 9; Billard Dep. 120–21. As noted above, there is no dispute that Charlotte Catholic operates its Catholic schools based upon the Church's principles and that the decision to release Billard "involved the application of religious doctrine or tenets of faith." *O'Connor v. Roman Cath. Church of the Diocese of Phoenix*, No. CV 05-1309 PHX-SMM, 2007 WL 1526736, at *3, *5 (D. Ariz. May 23, 2007) (calling this the "critical

8

inquiry"). Accordingly, the Religious Exemptions place Charlotte Catholic's decision to release Billard, "whose **conduct**" was "inconsistent with" its own, beyond Title VII's reach. *Kennedy*, 657 F.3d at 192 (citation omitted, emphasis added).

Billard wrongly argues that the Religious Exemptions apply only to claims for **religious** discrimination. Billard's Mot. for Part. Summ. J. ("Billard's MPSJ"), Doc. 27 at 13; Billard's Reply in Supp. of Mot. for Part. Summ. J. ("Billard's Rep."), Doc. 34 at 2–3. Courts reject this form-over-substance approach—which finds no basis in the text of the Religious Exemptions, because they are not cast in terms of a plaintiff's *claims*—and instead look to the **reason** for the employment decision. *Wuerl*, 929 F.2d at 951; *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450 F.3d 130, 139, 141–42 (3d Cir. 2006); *see also* Defs.' Opp. to Billard's Mot. for Part. Summ. J. ("Defs.' Opp."), Doc. 33 at 8–9; Defs.' Reply in Supp. of Mot. for Summ. J., Doc. 35 at 3. Given the undisputed facts, Billard's complaint is simply about Charlotte Catholic's "religious preference"—regardless of whether he styled his claim as one for religious discrimination. *See, e.g.*, *Curay-Cramer*, 450 F.3d at 139, 141–42 (Section 703 exempted defendant from plaintiff's sex-discrimination claim because her termination was rooted in religious preference; the styling of her claim was unimportant). Put another way, Billard was released because his "particular religion" and conduct—as manifested by his public opposition to Catholic teaching on marriage—was "inconsistent with" that of Charlotte Catholic. 42 U.S.C. § 2000e-1(a); *Kennedy*, 657 F.3d at 192.

Moreover, *Bostock* refutes Billard's argument. *Bostock*, like this case, involved a **sex-discrimination** claim, not a religious-discrimination claim. And yet, the Court envisioned that the Religious Exemptions could apply "in cases like ours." *See Bostock*, 140 S. Ct. at 1753–54. This Court should follow the Supreme Court's direction on the applicability of the Religious Exemptions in cases like this one. *Id.* at 1754; *see also Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) ("We likewise follow the Supreme Court's guidance in the Free Exercise Clause context . . . .").

9

**B.     RFRA Protects Charlotte Catholic From Title VII Liability For Releasing An Employee Who Publicly Opposes Its Catholic Mission And Message.**

Even if Billard could establish a claim under Title VII, RFRA precludes liability against Charlotte Catholic.

**1.     RFRA Applies In This Case.**

RFRA "'provide[s] very broad protection for religious liberty.'" *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (quoting *Burwell v. Hobby Lobby*, 573 U.S. 682, 693 (2014)). RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." *Id.* (quoting 42 U.S.C. § 2000bb-1(a)–(b)). "Government," as broadly defined by RFRA, includes "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1). Further, as the Court recognized in *Little Sisters*, "[p]lacing Congress' intent beyond dispute, RFRA 'applies to all Federal law, and the implementation of that law, whether statutory or otherwise,'" unless Congress "exclude[s]" the law "from RFRA's protections."[6] *Little Sisters*, 140 S. Ct. at 2383 (citing § 2000bb-3(a)–(b)).

RFRA applies on its face to orders of this Court. This Court is part of the judicial "branch" of the United States, and a district judge is an "official" of the United States. Further, if this Court issues the injunction or judgment that Billard seeks under Title VII, that order would qualify as the "implementation" of Federal law. *See Frew v. Hawkins*, 540 U.S. 431, 438 (2004) (consent decree enforced by a federal district court "is a federal-court order that springs from a federal dispute and furthers the objectives of federal law"); *Missouri v. Fiske*, 290 U.S. 18, 27, 29 (1933) (where private parties seek a federal injunction, the resulting order carries the force of federal law "when there is a federal right to have that effect given to the [order]"); *see also In re Young*, 82 F.3d 1407, 1416–18 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated*, 141 F.3d 854 (8th Cir.), *cert. denied*, 525 U.S. 811 (1998) (applying RFRA in a suit between private

---

[6] Congress has not exempted Title VII from the application of RFRA, despite having the authority to do so.

parties based on the broad definition of "government," and because the "bankruptcy code is a federal law" and "federal courts are a branch of the United States").

This conclusion is especially warranted here, because limiting RFRA's application only to suits in which the government is a formal party to the action (as Billard argues) would lead to a perverse outcome in employment discrimination cases. Were this the rule, the applicability of RFRA—which Congress passed to "broad[ly]" protect religious liberty—would turn not on the merits of the claims, but instead on whether the EEOC, which has power to enforce Title VII, elects to sue or intervene (thus making the government a party to the case), or instead merely issues a right-to-sue letter to a private party. Moreover, *Bostock* demands this conclusion. There, the Supreme Court consolidated three cases involving claims of sex discrimination—two of which involved a suit between *private parties*—and recognized the applicability of RFRA "as a kind of super statute" that "might supersede Title VII's commands." 140 S. Ct. at 1754.

The Second Circuit in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) highlighted the illogic of denying RFRA protection in employment cases where the EEOC could intervene. There, a former clergy member sued his church-employer under the Age Discrimination in Employment Act ("ADEA")—which, like Title VII, is enforceable by the EEOC—claiming that the church unlawfully forced him into retirement. *Id.* at 99. The court noted RFRA's "broad" language and held that a RFRA defense was available because "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* at 103; *see also EEOC v. Cath. Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) (applying RFRA to two lawsuits alleging sex discrimination and retaliation—one brought by a private plaintiff and the other by the EEOC). Indeed, to hold otherwise would result in cases involving identical facts being decided differently, depending on whether the EEOC became a party to the case or whether the plaintiff, like Billard, procured the EEOC's absence as a party by requesting the issuance of a right-to-sue letter. *See* Billard's right-to-sue letter, Doc. 2.[7]

---

[7] Notably, the United States Department of Justice ("DOJ") has also taken the position that religious organizations can assert RFRA as a defense in lawsuits between private parties. *See Wheaton Coll. v. Sebelius*, No.

11

This Court can and should follow the well-reasoned decision in *Hankins*[8] and the Supreme Court's direction in *Bostock*, and should not reward gamesmanship that would deprive Charlotte Catholic of RFRA's statutory protections, particularly because in a case "of general public importance," such as the one here, the EEOC could still intervene today. *See* 42 U.S.C. §§ 2000e-4(g)(6), 2000e-5(f)(1).[9]

Cases outside of the RFRA context also support the conclusion that laws designed to protect against government action can be invoked in private litigation. For example, the Supreme Court has repeatedly applied the First Amendment in suits between private parties, when a private plaintiff enforces a government-created legal rule, whether by statute or common law, to burden a constitutional right. *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) ("Although this is a civil lawsuit between private parties . . . , [t]he test [for determining whether a law directed against government action can apply in private litigation] is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."); *Snyder v. Phelps*, 562 U.S. 443, 451-59 (2011) (The First Amendment served as a defense in state tort suits between two private parties); *see also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56-57 (1988) (a damages award for common law tort liability constituted government action to which the First Amendment was a defense in private litigation).[10]

12-01169 (D.D.C. Aug. 20, 2012), Ds.' Reply in Support of Mot. to Dismiss at 3-4. The DOJ's interpretation of RFRA carries significant weight. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332 (2011) (relying on the DOJ's *amicus* brief).

[8] The circuits are divided over whether RFRA applies in suits where the government is not a party, and the Fourth Circuit has not addressed the issue. *See Goodman v. Archbishop Curley High Sch.*, 149 F. Supp. 3d 577, 588 (D. Md. 2016).

[9] *See also Broussard v. First Tower Loan, LLC*, No. 2:15-cv-01161-CJB-SS, Doc. No. 70 (E.D. La. Sept. 16, 2015) (granting EEOC's motion to intervene); *Jones v. Holy Cross Hosp. Silver Spring, Inc.*, 64 F.R.D. 586, 590-91 (D. Md. 1974) (same).

[10] Billard's caselaw is inapposite. *See* Billard's MPSJ, Doc. 27 at 15 (citing *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999)). None of these cases concerned whether a governmental entity or agency like the EEOC could have participated in the action. Indeed, the *McGill* court specifically declined to follow *Hankins* in part because "[t]here is no EEOC-like agency that can bring trademark-enforcement actions." 617 F.3d at 411. The *Sutton* court took another approach, holding that RFRA applies to suits between private parties where one of the parties was "acting under color of law." 192 F.3d at 834. As for *Tomic*, the Seventh Circuit did not even examine RFRA. *See* 442 F.3d 1036. Finally, while Billard cites *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008), to cast doubt on *Hankins*, Billard's Rep., Doc. 34 at 4,

Likewise, here, it makes no difference that the government is not a party, because the question is whether state power "has in fact been exercised." Because Billard seeks an order of this Court against Charlotte Catholic, RFRA applies.

### 2. RFRA's "Exceptionally Demanding" "To The Person" Standard

Under RFRA, a person whose religious exercise is substantially burdened is entitled to an exemption from a law unless the government "demonstrates that *application of the burden to the person*—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Hobby Lobby*, 573 U.S. at 705 (citing 42 U.S.C. § 2000bb–1(b)) (emphasis added).

In *Hobby Lobby*, the Supreme Court thoroughly analyzed and applied RFRA's standard. There, the Court held that Department of Health and Human Services ("HHS") regulations requiring employers to cover certain contraceptives in their health plans under the Affordable Care Act ("the HHS mandate") were unenforceable against the plaintiffs (for-profit, closely held corporations whose owners sincerely objected to the use of such contraceptives on religious grounds) under RFRA. *Id.* at 692. In applying the RFRA framework, the Court first concluded that the HHS mandate substantially burdened the plaintiffs' exercise of religion because it required them to "engage in conduct that seriously violate[d] their religious beliefs," or face "severe" economic consequences. *Id.* at 720, 726.

Then, assuming the government had a compelling interest in guaranteeing free access to the contraception at issue, the Court observed that RFRA "contemplates a more focused inquiry: It requires the government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 726, 728 (quotation omitted). This individualized standard "requires [the court] to loo[k] beyond broadly formulated interests and to scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants."

the Second Circuit never reached the merits of the RFRA defense there, and one panel of the Second Circuit cannot overrule another, *see United States v. Jass,* 569 F.3d 47, 58 (2d Cir. 2009).

13

*Id.* (quotation omitted) (latter alterations in original). Applying the "exceptionally demanding" least-restrictive-means standard, the Court concluded that HHS failed to show it lacked other means of achieving its desired goal without imposing a substantial burden on the plaintiffs' exercise of religion. *Id.* at 728, 730–31.

In *Little Sisters*, the HHS mandate returned to the Supreme Court. By then, HHS and other federal agencies (the "Departments") had promulgated interim final rules in light of *Hobby Lobby*'s holding, which expanded and created exemptions to the contraceptive mandate for religious employers and others with moral objections to providing contraceptive coverage. *Little Sisters*, 140 S. Ct. at 2377–78. In *Little Sisters*, the Supreme Court rejected the argument that the Departments could not consider RFRA as part of their rulemaking process. *Id.* at 2382–83.

Reiterating again that RFRA "provides very broad protection for religious liberty" and "applies to all Federal law, and the implementation of that law, whether statutory or otherwise," *id.* at 2383 (internal punctuation omitted), the Supreme Court explained that "[i]f the Departments did not look to RFRA's requirements or discuss RFRA at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem." *Id.* at 2384.[11] The Court relied on two basic considerations: First, that it was "clear from the face of the statute that the contraceptive mandate is capable of violating RFRA." Second, Congress had not exempted the Affordable Care Act from RFRA's applicability. Therefore, "the potential for conflict between the [HHS] mandate and RFRA is well settled." *Id.* at 2383.

### 3. RFRA Precludes Title VII Liability Here.

All of RFRA's elements are satisfied here. Billard seeks an injunction reinstating him and an order that would prohibit Charlotte Catholic from enforcing its employment policies and requiring it to employ opponents of its message. Compl. at 8. He also asks the Court to financially penalize Charlotte Catholic for its efforts to preserve the integrity of its Catholic

---

[11] Justices Alito and Gorsuch would have gone further and held that RFRA *compelled* the religious exemptions at issue. *Little Sisters*, 140 S. Ct. at 2387 (Alito, J., concurring). The majority did not reach this issue.

14

message. *Id.* An order of this Court granting such relief would have not only severe "economic consequences" for Charlotte Catholic, but it would also "seriously violate[ ] [its] religious beliefs." *See Hobby Lobby*, 573 U.S. at 720; Jugis Decl. ¶¶ 19–26, Doc. 31-15; Ritter Decl. ¶ 25; Jugis Dep. 62–63, Doc. 28-4. Thus, the substantial burden element is met.

Billard makes no real effort to justify his claims under RFRA's "exceptionally demanding" framework. While he argues that a compelling governmental interest exists in ending workplace discrimination, Billard's Rep., Doc. 34 at 5, *Hobby Lobby* requires a "more focused inquiry" that looks "beyond broadly formulated interests" and scrutinizes the application of the challenged law "to the person." 573 U.S. at 726, 728. Billard ignores this "to the person" standard and fails to show any compelling governmental interest in forcing Charlotte Catholic specifically to employ someone who publicly opposes core tenets of the religious message it exists to convey, or imposing sanctions if it refuses.

Billard also argues that Charlotte Catholic does not "offer any less restrictive alternative that 'equally furthers the Government's interest.'" Billard's Rep., Doc. 34 at 5. But this gets the analysis backwards, because RFRA places this burden on the government, not Charlotte Catholic. *See* 42 U.S.C. § 2000bb-1(b); *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (government "must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record"). Importantly, while "RFRA requires the Government to employ the least restrictive means of furthering a compelling interest that burdens religious belief, it does not require the converse—that an accommodation of religious belief be narrowly tailored to further a compelling interest." *Little Sisters*, 140 S. Ct. at 2396 (Alito, J., concurring).

In any event, the same less restrictive alternatives that the Supreme Court recognized in *Hobby Lobby* are available here: the government can pay to vindicate its own interests (perhaps by facilitating alternative employment) or accommodate entities with religious objections like Charlotte Catholic, which represent only a small fraction of employers—as Title VII ***already***

*does* without undermining the interests it was enacted to advance.[12]  *Hobby Lobby*, 573 U.S. at 727–33.  No record evidence indicates why these (or other) alternatives could not serve the government's interests and protect Charlotte Catholic's religious exercise.

### C.    The Church Autonomy Doctrine Protects Charlotte Catholic's Decision To Employ Persons Aligned With Its Catholic Mission And Message.

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  *Guadalupe*, 140 S. Ct. at 2055 (quoting *Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).  As the Supreme Court stated:

> [t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission.  Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Id.*  This guarantee of independence from governmental interference, the Church Autonomy Doctrine, is a principle long and deeply embedded in our nation's law.  *Id.* at 2061.

As the Supreme Court explained in *Guadalupe*, the Church Autonomy Doctrine is not limited to a religious organization's selection of its "ministers," although the so-called "ministerial exception" is one manifestation of the doctrine.  *Id.*  To the contrary, this "broad" principle guarantees "independence in matters of faith and doctrine and in closely linked matters of internal government" and is not "exclusively concerned with the selection or supervision of clergy."  *Id.*  In *Guadalupe*, the Supreme Court applied the Church Autonomy Doctrine's ministerial exception and held that it barred the employment discrimination claims of two elementary teachers at Catholic schools.[13]  *Id.* at 2061, 2066.  The Court emphasized that "[r]eligious education is vital to many faiths practiced in the United States" and that "[i]n the

---

[12]  *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal citation omitted).

[13]  The Court in *Guadalupe* also rejected the argument that only a "co-religionist" can be a minister for purposes of the exception, because [d]eciding such questions would risk judicial entanglement in religious issues. *Id.* at 2068-69.

16

Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Id.* at 2064–65. Further, "[e]ducating and forming students in the Catholic faith"—as in this case—"lay at the core of the mission of the schools . . . [whose] employment agreements and faculty handbooks specified in no uncertain terms that [the plaintiffs] were expected to help the schools carry out this mission." *Id.* at 2066.

The Church Autonomy Doctrine applies here. Lower courts applying the Church Autonomy Doctrine have used a two-step analysis to determine whether the First Amendment bars a claim against a religious organization. First, the court examines whether "the alleged misconduct is rooted in religious belief." *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) (citation omitted); *see also Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 2020 WL 1536565, at *4–5 (D. Utah Mar. 31, 2020). If this threshold requirement is met, courts then examine whether the dispute "is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law," or a "purely secular dispute" with a third party. *Bryce*, 289 F.3d at 657 (citation omitted).

Even assuming Billard does not qualify as a "minister"[14]—though this is a close call in light of *Guadalupe*—the Church Autonomy Doctrine applies to bar his Title VII claim. *See id.* at 658 n.2 (finding it "unnecessary" to determine whether plaintiff was a "minister" for purposes of the ministerial exception because his "claims are based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine"). Billard does not dispute that Charlotte Catholic's "alleged misconduct is rooted in religious belief." Billard's Opp., Doc. 32 at 9; Telford Dep. 7–8; Decl. Jugis ¶¶ 15–26; Ritter Decl. ¶ 25. It is also undisputed that Billard knew that the employees at CCHS are prohibited from public conduct or advocacy for positions opposed to the fundamental moral tenets of the Catholic faith. Billard Dep. 122–23, 127, 134–42. Thus, this is not a "purely secular" dispute, but a religious dispute. *See Bryce*, 289 F.3d at 657; *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 (N.D. Ill.

---

[14] The parties previously stipulated that Billard is not a "minister" under the test set forth in *Hosanna Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). *See* Parties' Stipulation, Doc. 28-1.

2019) (religious autonomy may require dismissal where a religious employer offers a religious justification of the adverse action even if plaintiff is not a "minister"); *Demkovich*, 343 F. Supp. 3d at 776-77 (Church Autonomy Doctrine, not the ministerial exception, barred a Catholic church employee's hostile work environment claim based on alleged "abusive and harassing behavior" in response to employee's sexual orientation and same-sex wedding).

The Supreme Court's decisions in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), also support this conclusion. The Court in both cases emphasized that "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Masterpiece*, 138 S. Ct. at 1727 (quoting *Obergefell*, 135 S. Ct. at 2607). Consequently, both demonstrate that the Constitution preserves a place—including in the public sphere—for religious beliefs alongside other constitutionally-protected exercises. Accordingly, religious institutions and religious people may "advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned," *Obergefell*, 135 S. Ct. at 2607, and these sincerely held beliefs are still entitled to full protection and consideration under the First Amendment. *Masterpiece*, 138 S. Ct. at 1727, 1732. Under *Masterpiece* and *Obergefell*, and now, under *Guadalupe*, Charlotte Catholic maintains the right to teach and practice its Catholic view of marriage, and cannot be compelled, under penalty of law, to employ teachers who advocate positions contrary to those beliefs. *See EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000) ("The Supreme Court has always safeguarded the 'unquestioned' prerogative of religious organizations" in matters of internal governance) (quoting *Watson v. Jones*, 80 U.S. 679, 728–29 (1871)).

### D.    The First Amendment Right Of Free Association Bars Billard's Claim.

Even putting aside the Religion Clauses, the First Amendment right of free association bars Billard's claim. As the Supreme Court explained in *Boy Scouts of America v. Dale*, the

18

"freedom of association plainly presupposes a freedom not to associate."  530 U.S. 640, 648

(2000) (citation omitted).  When the government adopts a law forcing the inclusion of a person

whose presence "affects in a significant way the group's ability to advocate public and private

viewpoints," it violates this right to free expressive association unless the law serves a

compelling state interest that cannot be achieved through less restrictive means.  *Id.* at 647–48.

Applying this standard, the Court in *Dale* held that forcing the Boy Scouts of America to

associate with a former assistant scoutmaster openly opposed to the group's views on

homosexuality would violate the organization's right to free expressive association by "send[ing]

a message, both to the youth members and the world" that was contrary to the message that the

Boy Scouts sought to convey.  *Id.* at 653.

This case requires the same result.  Charlotte Catholic is engaged in expressive activities

as it actively seeks to instill Catholic teachings, including on marriage, in its students.  Forcing

Charlotte Catholic to formally associate with Billard by retaining him as a substitute teacher after

he publicly advocated for same-sex marriage would constitute compelled expressive association

in violation of the First Amendment.

Further, no evidence shows that forcing Charlotte Catholic to retain Billard is the least

restrictive means of advancing a compelling governmental interest.  While the government

certainly has a compelling interest in protecting employees from discrimination in general, the

question here is not whether ending discrimination generally is a compelling interest, but rather

whether there is a compelling interest in burdening Charlotte Catholic's exercise of religion by

forcing it to employ those who oppose core tenets of its Catholic message.  "[T]he First

Amendment does not permit federal courts to dictate to religious institutions how to carry out

their religious missions or how to enforce their religious practices."  *Hall*, 215 F.3d at 626.

Accordingly, Billard's claim fails.[15]

---

[15] Ignoring the Supreme Court decision in *Dale*, Billard argues that Charlotte Catholic lacks a First
Amendment right to free exercise of religion when the ministerial exception is not implicated.  Billard's Opp., Doc.
32 at 10-11; Billard's Rep., Doc. 34 at 3.  That assertion is meritless.  The Supreme Court in *Hosanna Tabor* plainly
reaffirmed the "right to freedom of association . . . enjoyed by religious and secular groups alike," separate and apart
from the ministerial exception.  Defs.' Opp., Doc. 33 at 13 (citing *Hosanna Tabor*, 565 U.S. at 189).

19

## <u>CONCLUSION</u>

For the foregoing reasons, Charlotte Catholic respectfully requests that this Court grant its Motion for Summary Judgment, deny Billard's motion for partial summary judgment, and dismiss this case with prejudice.

This the 7th day of August 2020.

/s/ Joshua D. Davey
Joshua D. Davey (N.C. Bar No. 35246)
joshua.davey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS
LLP ("TROUTMAN PEPPER")
301 S. College Street
Charlotte, North Carolina 28202
Telephone: 704.916.1503
Facsimile: 704.998.4501

Moses M. Tincher (Ga. Bar No. 578906)
moses.tincher@troutman.com
TROUTMAN PEPPER
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.2593
Facsimile: 404.885.3900

Kevin M. LeRoy (Wis. Bar No. 1105053)
kevin.leroy@troutman.com
TROUTMAN PEPPER
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone: 312.759.1938
Facsimile: 312.759.1939

---

And, even if it were unclear whether judgment for Billard would violate the First Amendment (far from it), applying Title VII to require a Catholic school to retain a teacher publicly opposed to its religious teaching on marriage would, at a minimum, raise "serious constitutional questions." *See N.L.R.B. v. Cath. Bishop of Chi.*, 440 U.S. 490, 501 (1979); *see also Curay-Cramer*, 450 F.3d at 140. Absent a "clear expression of an affirmative intention of Congress" to the contrary, the doctrine of constitutional avoidance requires the Court to interpret Title VII narrowly to avoid reaching those questions. *Cath. Bishop*, 440 U.S. at 501. There is no such intention by Congress here because, as discussed above, Title VII exempts employers like Charlotte Catholic from Billard's claim. *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (§ 702 avoids entanglement concerns); *see also Wuerl*, 929 F.2d at 951 (applying the Title VII exemptions to bar plaintiff's discrimination claim and avoid "substantial constitutional questions").

20

Leah D. Achor (Va. Bar No. 88964)
leah.achor@troutman.com
TROUTMAN PEPPER
1001 Haxall Point
Richmond, Virginia 23219
Telephone: 804.697.1326
Facsimile: 804.697.1339

*Attorneys for Defendants*