UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| LONNIE BILLARD,<br>　　　　Plaintiff,<br>　v.<br>CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,<br>　　　　Defendants. | Civil Action No. 3:17-cv-0011 |

### SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.　Charlotte Catholic Released Billard For His Public Opposition To Its Religious Mission And Message.**

Against the evidence, Billard claims that he was released simply for the "act of marrying his long-time partner." Billard's Supp. Brief ("Billard's Supp."), Doc. 62 at 4–5. This is simply not what happened, because the undisputed evidence shows that Billard was released for his Facebook post in opposition to Catholic teaching on marriage, before he was married. *See* Billard Dep. 200, Doc. 31-1. Billard wrongly focuses on Paragraph 32 of Charlotte Catholic's answer, while ignoring the preceding paragraph, in which Charlotte Catholic admitted it "terminated Plaintiff because he announced his marriage to a same-sex partner." Compl. ¶ 31; Answer ¶ 31. Read together, Paragraphs 31 and 32 reinforce the position that Charlotte Catholic has taken throughout this lawsuit: that it released Billard not because of his sex, and not because of his sexual orientation, but because of his public opposition to the Catholic Church's teaching on marriage, in violation of employment policies he understood and agreed to abide by.

Billard misapplies *Bostock* in arguing that Charlotte Catholic would not have construed his engagement announcement "as 'advocacy' of against [sic] the Church's teachings" had he

1

"been a woman who posted on Facebook that she was getting married to Mr. Billard's husband." (Billard's Supp. at 4–5.) This is the wrong comparator. *Bostock* requires the Court to ask whether Charlotte Catholic would have released Billard not had he been a woman marrying a man, but had he been a woman who opposed Catholic teaching on marriage on Facebook. The evidence is clear and undisputed: Charlotte Catholic would have. There is also no evidentiary support for Billard's contention that if he had been a woman announcing his marriage to Donham, then Charlotte Catholic would not have objected. There is no evidence that such a marriage would have (or would not have) been in accordance with Catholic teaching on marriage. *See* Jugis Dep. 28, Doc. 31-20 (in response to this hypothetical, testifying that "more information would be needed, in that Catholics are expected to marry according to the rules of the Catholic Church"). Not every civil marriage between opposite-sex partners accords with Catholic teaching. *See, e.g.*, Ritter Decl. ¶ 23, Doc. 31-3 (female teacher released after she made public her decision to marry a Catholic man who had been divorced and did not have an annulment). In any event, Billard's false comparison invites this Court to adjudicate whether (had Billard or Donham been female) his marriage would have been consistent with Catholic teaching—this the Court plainly may not do.[1] *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981).

**II.    Title VII's Religious Exemptions Apply And Bar Billard's Claim.**

Contrary to Billard's assertions, the Supreme Court's *Bostock* decision confirms that Sections 702 and 703[2] of Title VII ("Religious Exemptions") apply to bar Billard's Title VII claim. In *Bostock*, the Court specifically contemplated that the exemptions could apply in "cases

---

[1] Billard's speculation as to whether Charlotte Catholic would have released someone for simply posting a positive Facebook message about a same-sex couple's marriage (Billard's Supp. at 5) would also lead to impermissible judicial entanglement.

[2] Notably, Billard only discusses Section 702 and does not contend that Section 703 is inapplicable to a Title VII claim. Billard's Supp. at 5–6. In any event, it is clear that both Sections apply here.

2

like ours"—that is, cases involving claims of sex discrimination against religious organizations.[3] 140 S. Ct. at 1753–54.[4]

The Supreme Court's textual approach to Title VII in *Bostock* (the statute's "plain statutory commands" are "the law," *id.* at 1754) confirms this conclusion. Under the plain terms of the Religious Exemptions, if a religious employer makes an employment decision based on an individual's "particular" "religious observance," "practice," or "belief," the employer is not liable under Title VII. 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2), 2000e(j). Billard acknowledges that Charlotte Catholic's decision was based on "its sincere religious beliefs." Compl. ¶¶ 31–32; Billard's Opp. To Defs.' Mot. for Summ. J., Doc. 32 at 9; Billard Dep. 120–21, 200.

Billard has offered no textual counterargument to the plain reading of the Religious Exemptions commanded by *Bostock*. Rather, he relies on Justice Alito's dissent, which references the Fourth Circuit decision in *Rayburn v. Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985). But *Rayburn* is of no help to Billard; there, the Fourth Circuit recognized "§ 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences" and went on to conclude that the First Amendment precluded the court from adjudicating the plaintiff's claims. 772 F.2d at 1166–71. Further, *Rayburn*, like Billard's other cited cases, reasoned not based on Title VII's text—as *Bostock* commands—but instead by invoking the "history of Congressional action relating to Title VII."[5] *See, e.g.*, *Herx v. Diocese*

---

[3] Prior to *Bostock*, the Fourth Circuit, like almost every other circuit, held that Title VII did not authorize claims for sexual orientation discrimination. *See, e.g.*, *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 751–52 (4th Cir. 1996). Thus, it was not necessary to consider the application of these exemptions in a "case[] like ours."

[4] The dissenting opinion of Justice Sotomayor, joined by Justice Ginsburg, in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), also supports this conclusion. There, the Justices invoked Title VII's religious exemptions as an alternative protection for religious schools in employment disputes. *Id.* at 2072 (Sotomayor, J., dissenting). In describing the exemptions, the Justices did not limit the applicability to whether the plaintiff had characterized his claims as religious discrimination. Rather, Justice Sotomayor wrote that the exemptions "protect a religious entity's ability to make employment decisions—hiring or firing—for religious reasons." *Id.* (Sotomayor, J., dissenting).

[5] Other cases involved employers maintaining policies that applied differently to men and women. *See, e.g.*, *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986). Charlotte Catholic does not treat homosexual and heterosexual people differently and does not have "a policy of firing any employee known to be homosexual." *Bostock*, 140 S. Ct. at 1742. Rather, Charlotte Catholic has the same expectations of both groups: that they conduct themselves at all times in a manner consistent with the teachings and the precepts of the Roman Catholic Church. *See* Diocese's Personnel

3

of Ft. Wayne-South Bend, Inc.*, 48 F. Supp. 3d 1168, 1175 (N.D. Ind. 2014) (citing *Rayburn*, 772 F.2d at 1167); *Vigars v. Valley Christian Center of Dublin, Cal.*, 805 F. Supp. 802, 807 (N.D. Cal. 1992). *Bostock* precludes this approach, as the Court explained that "legislative history can never defeat unambiguous statutory text." 140 S. Ct. at 1749–50. This Court should follow the plain text of the Religious Exemptions and the Supreme Court's direction in *Bostock*.

**III.     The Religious Freedom Restoration Act Applies And Bars Billard's Claim.**

Billard incorrectly asserts that the Religious Freedom Restoration Act ("RFRA") only applies when the government is a party to the case. Not so. RFRA's plain language applies to orders of this Court, *see* 42 U.S.C. §§ 2000bb-2(1), 2000bb-3, and the Supreme Court in *Bostock* recognized the applicability of RFRA to suits between **private parties**. 140 S. Ct. at 1754. And, while Billard contends that Charlotte Catholic's remedy lies with Congress on its purported "policy argument" that RFRA's applicability would turn on whether the EEOC intervenes in private litigation (Billard's Supp. at 10), Congress has already resolved this potential issue in RFRA by using "broad" language to protect religious entities, *see Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (noting that RFRA "provide[s] very broad protection for religious liberty") (citation omitted).

Billard makes no effort to satisfy RFRA's exacting strict-scrutiny test as set forth in *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014). Instead, he relies only on the generalized governmental interest "in protecting employees from discrimination based on sex." (Billard's Supp. at 10 (citing *Rayburn* and *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990)). But the cases Billard cites did not apply the RFRA framework. This Court must follow *Hobby Lobby*'s "to the person" standard. The issue in this case is whether the government has shown a compelling interest in forcing **Charlotte Catholic** to employ Billard despite his public

---

Policies Handbook, Doc. 31-3 at 36; Diocese's Code of Ethics, Doc. 31-4 at 3; CCHS Faculty Handbook, Doc. 31-4 at 38; MACS Employment Contract, Doc. 31-4 at 66.

4

opposition to its religious message, and whether the imposition of Title VII liability is the *least restrictive means* of vindicating that interest. The answers to both questions are "no."[6]

IV. **The Church Autonomy Doctrine Extends Beyond The Ministerial Exception And Bars Billard's Claim.**

Billard's argument that the Church Autonomy Doctrine is limited to "ministers" cannot be squared with recent Supreme Court decisions, which have repeatedly made clear that the ministerial exception is simply one manifestation of the Church Autonomy Doctrine. *See Hosanna-Tabor Evangelical Church & Sch. v. EEOC*, 565 U.S. 171, 185–88 (2012) (recognizing the Doctrine's applicability outside of the "minister" context); *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020) (observing that "this broad principle" is not "exclusively concerned with the selection or supervision of clergy").[7]

Charlotte Catholic has met both prongs under this Doctrine—the undisputed evidence shows that (1) Charlotte Catholic released Billard based on its religious belief; and (2) this matter is plainly a dispute about "discipline, faith, internal organization, or ecclesiastical rule, custom or law."[8] Thus, Billard's claim is barred by the Church Autonomy Doctrine.

---

[6] Billard attempts to shift RFRA's burden of proof to Charlotte Catholic, but this is plainly inconsistent with the statute. Charlotte Catholic does not have the burden to propose a less restrictive alternative that equally furthers the government's interest. But even if it did, it has met that burden. The government can facilitate alternative employment or accommodate entities with religious objections, which Congress has already contemplated in carving out the Religious Exemptions under Title VII.

[7] Billard's reliance on the Fourth Circuit decision in *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000) is misplaced. Not only did the decision come *before* the Supreme Court's opinions in *Hosanna-Tabor* and *Guadalupe*, but the Fourth Circuit did not address the argument—much less hold—that a religious employer's only First Amendment defense to a Title VII claim is the ministerial exception. Also, Billard's quote from Justice Kagan's concurrence in *Little Sisters*—that there is "no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation"—is an inaccurate statement of the law. 140 S. Ct. at 2397 n.23 n.1 (Kagan, J., concurring). For example, the general principle of church autonomy plainly applies in disputes about control of church property and even in state-law matters involving breach of an employment contract. *See Guadalupe*, 140 S. Ct. at 2061; *Garrick v. Moody Bible Inst.*, 412 F. Supp. 859, 872–73 (N.D. Ill. 2019) (applying Doctrine to dismiss employee's breach-of-contract claim).

[8] This two-prong analysis comes from *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), which expressly declined to consider the ministerial exception because the plaintiff's claims were "based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine." *Id.* at 658 n.2. Billard claims he is "not challenging Defendants' speech about homosexuality," but rather their "actions in firing him." Billard's Supp. at 8 n.4. That distinction is immaterial: Charlotte Catholic's decision to release Billard was rooted in its religious beliefs, just as the speech in *Bryce* was rooted in religious beliefs.

5

This the 14th day of August 2020.

/s/ Joshua D. Davey
Joshua D. Davey (N.C. Bar No. 35246)
joshua.davey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP ("TROUTMAN PEPPER")
301 S. College Street
Charlotte, North Carolina 28202
Telephone: 704.916.1503
Facsimile: 704.998.4501

Moses M. Tincher (Ga. Bar No. 578906)
moses.tincher@troutman.com
TROUTMAN PEPPER
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.2593
Facsimile: 404.885.3900

Kevin M. LeRoy (Wis. Bar No. 1105053)
kevin.leroy@troutman.com
TROUTMAN PEPPER
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone: 312.759.1938
Facsimile: 312.759.1939

Leah D. Achor (Va. Bar No. 88964)
leah.achor@troutman.com
TROUTMAN PEPPER
1001 Haxall Point
Richmond, Virginia 23219
Telephone: 804.697.1326
Facsimile: 804.697.1339

*Attorneys for Defendants*