UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03153-RLY-TAB |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

This case places in stark relief the difficult questions that may arise when applying civil rights laws to religious institutions.  At issue is a religious school's decision to not renew the contract of a guidance counselor because of her marriage to another woman. Plaintiff asserts various claims under Title VII, Title IX, and Indiana state law. Defendants filed a Motion for Judgment on the Pleadings, arguing first that Title VII's exemption for religious employers bars her Title VII claims.  Religious exemption aside, Defendants claim they had a neutral, nondiscriminatory reason for their decision. Defendants also argue that Title VII preempts Plaintiff's retaliation claim under Title IX. Alternatively, Defendants argue the First Amendment bars all of Plaintiff's state and federal claims.

For the reasons that follow, the court finds that Title VII's exemption for religious employers does not bar Plaintiff's claims for discrimination on the basis of sexual orientation, retaliation, or hostile work environment under Title VII.  At this stage,

1

Plaintiff has alleged sufficient facts to support a claim that Defendants violated Title VII. The court also finds that it would be premature to bar Plaintiff's state and federal claims on First Amendment grounds.  But the court agrees with Defendants that Title VII preempts Plaintiff's Title IX claim for retaliation.  Therefore, Defendants' motion is **GRANTED in part** and **DENIED in part.**

## I.     Factual Background

Lynn Starkey is a lesbian, and she has been married to a woman since 2015. (Filing No. 1, Complaint ¶ 26).  Roncalli is a private Roman Catholic school operated by the Roncalli Board of Directors under the direction of the Archdiocese of Indianapolis. (*Id*. ¶ 13).  Starkey worked for the Archdiocese and Roncalli for 39 years and held several positions, including choral director and religion, music, and drama teacher.[1]  (Filing No. 20, Answer ¶ 14).  She also served as a guidance counselor from 1998 until 2007, and as co-Director of Guidance from 2007 until her termination in May 2019.  (*Id.*).

Starkey was employed pursuant to a "School Teacher Contract" subject to renewal on an annual basis.  (Compl. ¶ 23).  In 2017, the Archdiocese and Roncalli replaced the School Teacher Contract with a "School Guidance Counselor Ministry Contract" and an "Archdiocese of Indianapolis Ministry Description" for school guidance counselors. (Compl. ¶ 23; Answer ¶ 23; Filing No. 27-1, Archdiocese of Indianapolis Ministry Description, "Job Description"; Filing No. 27-2, School Guidance Counselor Ministry

---

[1] Starkey was employed by the Archdiocese from 1978 until 2009.  Roncalli was incorporated in 2009, and she worked directly for Roncalli from 2009 until 2019.  (Answer ¶ 14).  During this most recent period of employment, Starkey received employment benefits from Roncalli.  (*Id.* ¶ 3).

Contract, "Contract").  The job description specified that "[a]s role models for students, the personal conduct of every school guidance counselor . . . must convey and be supportive of the teachings of the Catholic Church," which includes "the belief that all persons are called to respect human sexuality and its expression in the Sacrament of Marriage as a sign of God's love and fidelity to His Church."  (Job Description ¶ V). Accordingly, an employee would be in default of her contract if she violated the Church's teachings on marriage.  The contract provided:

> 6. **Defaults.** The School Guidance Counselor shall be deemed to be in default under this contract in the event of any breach of duty hereunder, including, but not limited to the following: . . .
>
> i.      Relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church; and
>
> j.      . . . any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church.

(Contract, at 2).  The Catholic Church instructs that marriage is a "covenant" between a "man and a woman."  Code of Canon Law, Canon 1055.  The Catholic Church also believes that homosexual acts are "contrary to natural law" and "do not proceed from a genuine affective and sexual complementarity."  Catechism of the Catholic Church ¶ 2357.  "Under no circumstances can they be approved."[2]  *Id.*

---

[2] The court takes judicial notice of the Code of Canon Law and the Catechism of the Catholic Church.  Fed. R. Evid. 201.

3

Prior to August 2018, Starkey's fellow co-Director of Guidance was Shelly Fitzgerald.  (Compl. ¶ 27).  Fitzgerald is also a lesbian married to a woman.  (*Id.* ¶ 28). Roncalli officials confronted Fitzgerald about her marital status on August 10, 2018 after a parishioner at a local church had obtained a copy of Fitzgerald's marriage license and gave it to a priest.  (*Id.* ¶ 29).  Two days later, on August 12, 2018, Roncalli placed Fitzgerald on paid administrative leave and "requested that she not return to the campus without the permission of the school administrators."  (Answer ¶ 32).  On August 13, 2018, Starkey attended a meeting with Archbishop Charles Thompson, Superintendent of Archdiocesan Schools Gina Fleming, Roncalli's leadership, and a priest specializing in canon law.  (Compl. ¶ 36).  At the meeting, the canon law specialist outlined what constituted a "valid marriage" according to "Catholic Church teachings."  (*Id.* ¶ 37). Starkey asked why gay marriage was such a "hot button issue," compared with other sins. (*Id.* ¶ 38).  The next day, August 14, 2018, Starkey drafted and shared written remarks with Roncalli's principal, Chuck Weisenbach.  (Compl. ¶ 39).  Starkey asked whether it would be "useful for her to read [the remarks] at the upcoming Administrative Council meeting, so they could understand what it was like to work at Roncalli as a gay person." (*Id.*).  Principal Weisenbach asked if Starkey was in a civil union.  (*Id.*).  Starkey asked if he really wanted her to answer that question.  (*Id.*)  He answered affirmatively, so she said, "yes."  (*Id.*).

After Fitzgerald was placed on administrative leave, Starkey assumed much of Fitzgerald's work responsibilities.  (*Id.* ¶ 41).  Starkey felt that Defendants' treatment of Fitzgerald meant she and other gay employees were not welcome, and she feared she

would be targeted next.  (*Id.* ¶ 42).  On November 16, 2018, Starkey filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Archdiocese and Roncalli.  (*Id.* ¶ 43).

Starkey informally learned in March 2019 that her contract would not be renewed for the 2019-2020 academic year.  (*Id.* ¶ 44).  In May 2019, Roncalli officially notified Starkey by letter that her contract would not be renewed for the following school year.  (*Id.* ¶ 45).  The letter stated that Starkey's "civil union is a violation [of her] contract and contrary to the teaching of the Catholic Church."  (*Id.*).  Starkey filed amended Charges of Discrimination with the EEOC against the Archdiocese and Roncalli on March 25, 2019 and May 9, 2019.  (*Id.* ¶ 8).

On July 29, 2019, Plaintiff sued the Archdiocese and Roncalli asserting six claims: discrimination on the basis of sexual orientation under Title VII; retaliation under Title VII; hostile work environment under Title VII; retaliation under Title IX; tortious interference with a contractual relationship under Indiana state law; and intentional interference with employment relationship under Indiana state law.  Plaintiff asserts the state law claims against the Archdiocese only.

## II.    Standard of Review

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014).  "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "To analyze the sufficiency of a complaint we must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor."  *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

## III.   Analysis

Defendants present both statutory and constitutional arguments against application of Title VII, Title IX, and Indiana state law to its employment decisions.  The discussion begins with Defendants' Title VII arguments.  The court then proceeds to the First Amendment, which Defendants argue bars all of Starkey's claims.  Finally, the court considers whether Starkey's retaliation claim under Title IX is preempted by Title VII or otherwise barred by Title IX's exemption for religious institutions.

### A.    Title VII Does Not Bar Starkey's Federal Claims.

The court begins with Title VII.  First, Defendants' argue they are entitled to judgment on the pleadings because Title VII's exemption for religious institutions bars Starkey's Title VII claims.  Religious exemptions aside, Defendants next argue that they had a neutral, nondiscriminatory reason for their hiring decision: Starkey violated her employment contract by entering a same sex marriage.

#### 1.   Section 702

The court first considers Defendants' argument that Title VII does not apply to decisions by a religious employer when the decisions are based on religion.  Defendants

6

claim Title VII's religious exemption bars Starkey's claims because Starkey's same sex marriage violated Catholic teachings.

The court disagrees with Defendants' interpretation of Title VII's religious exemption.  Sexual orientation is a protected class under Title VII, and the language and legislative history of Title VII indicate Congress intended that religious institutions remain subject to Title VII's prohibition on discrimination on the basis of a protected class.  To be sure, this case requires a careful balancing of religious liberty and an employee's right to be free from discrimination.  The proper balance is to interpret Title VII's religious exemption to allow a religious employer to make hiring decisions in favor of coreligionists without facing claims of religious discrimination, but to allow a plaintiff to bring claims of other forms of Title VII discrimination.  The religious exemption does not bar Starkey's Title VII claims of discrimination on the basis of sexual orientation, retaliation, and hostile work environment.

The analysis begins with the text of the statute.  Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII's prohibition on employment discrimination on the basis of sex also prohibits discrimination on the basis of sexual orientation.  *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020).

7

But Title VII exempts religious institutions in certain circumstances. Section 702(a) reads: "This title shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).[3] Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j). Accordingly, "[t]he decision to employ individuals 'of a particular religion' under § 2000e-1(a) . . . has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (citations omitted).

This provision does not exempt religious educational institutions from all claims of discrimination. The plain language of Title VII indicates that the exception for religious institutions applies to one specific reason for an employment decision—one based upon religious preference. *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985). "By its very terms, [Section 702] applies only to discrimination on the basis of religion. The ban on discrimination in employment on account of race, national origin, or sex is still applicable to religious organizations." *Elbaz v. Congregation Beth Judea, Inc.*, 812 F. Supp. 802, 807 (N.D. Ill. 1992)

---

[3] A second exemption applies to schools that are "owned, supported, controlled, or managed by a particular religion or by a particular religious corporation" to "hire and employ employees of a particular religion" 42 U.S.C. §2000e-2(e)(2). Defendants note that while this exemption also applies, they do not rely on this provision.

8

(quotations omitted).  "It was open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not."  *Rayburn*, 772 F.2d at 1166-67.  The exemption "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination."  *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996).  What is more, the overwhelming weight of precedent holds that Title VII still applies to a religious organization charged with discrimination on the basis of sex, race, or national origin.  *E.g., Cline v. Catholic Diocese*, 206 F.3d 651, 658 (6th Cir. 1999); *Boyd*, 88 F.3d at 413; *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1277 (9th Cir. 1982); *EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277, 282 (5th Cir. 1981); *EEOC v. Miss. Coll.* 626 F.2d 477, 484 (5th Cir. 1980); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972).

The legislative history of Title VII reinforces the plain meaning of the statutory text that the religious exemption is narrow.  *Rayburn*, 772 F.2d at 1166.  During the enactment of the Civil Rights Act of 1964 and in later amendments, Congress considered the scope of Title VII's protection as applied to religious institutions.  Congress specifically rejected proposals that would have given religious employers a complete exemption from regulation under the Act.  The original House of Representatives' version of the 1964 Civil Rights Act completely exempted religious institutions from Title VII.  *Pac. Press Pub. Ass'n*, 676 F.2d at 1276.  The Senate's version subjected religious employers to Title VII but exempted those institutions only insofar as they were free to discriminate against individuals of a particular religion in positions connected with the

9

institution's religious activities. *Id.* The Senate rejected a proposal to completely exempt religious institutions, and the final version with the narrower exemption became law. *Id*. In 1972, Congress broadened the exception to allow religious employers to discriminate on the basis of religion in employment decisions connected to all the institution's activities, not just religious activities. *Id.* at 1277. But the Senate again rejected proposals to completely exempt religious institutions from Title VII. *Id*.

This analysis of Section 702 demonstrates that religious employers "remain subject to the provisions of Title VII with regard to race, color, sex or national origin." *Id.* (quoting Section-by-Section Analysis of H.R. 1746, the Equal Employment Opportunity Act of 1972, 92 Cong. Rec. S. 3461 (1972)). Given the language and legislative history, the court finds that Title VII, by "the affirmative intention of the Congress, clearly expressed," *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979), applies to the Defendants' employment decision. *See Rayburn*, 772 F.2d at 1167.

Defendants argue they did precisely what the language of Section 702 was meant to cover: They declined to rehire Starkey because her "particular religion", 42 U.S.C. § 2000e-1(a)—as manifested through her same sex marriage—was contrary to their own. According to the pleadings, Defendants informed Starkey that she would not be offered a contract for the upcoming school year because her "civil union is a violation [of her] contract and contrary to the teaching of the Catholic Church." (Compl. ¶ 45; Answer ¶ 45).

But the religious grounds for the decision and Starkey's sexual orientation are two sides of the same coin. *Bostock* is helpful on this point. The majority explained that Title

10

VII's "because of" test incorporated the but-for standard of causation. 140 S. Ct. at 1739. This form of causation is established whenever a particular outcome would not have happened but for a certain cause. *Id.* But-for causation in the Title VII context means "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* Starkey has alleged sufficient facts to allow the court to draw the reasonable inference that her sexual orientation was a but-for cause of Defendants' employment decision.

So, the question then becomes: Does a religious reason for an employment decision bar a plaintiff's Title VII claim when the religious reason *also* implicates another protected class?

The exemption under Section 702 should not be read to swallow Title VII's rules. It should be narrowly construed to avoid reducing Title VII's expansive rights and protections. Recall, religion is a protected class under Title VII. Section 702 allows religious employers to make employment decisions based on that class alone. It does not allow them to make decisions based on that class *and* another class. Defendants' argument would allow a religious employer to convert any claim of discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision. This would effectively strip employees of religious institutions of all Title VII protections, if the employer's religion clashed with the employee's protected class status. If Congress had intended to allow religious employers to avoid liability for discriminating on the basis of

11

race, sex, or national origin, it could have done so.  Instead, it adopted a limited

exception, one intended to respect the rights of religious employers to employ those of

the same faith, but that stopped short of allowing religious employers to otherwise limit

Title VII's protections.

Consider a religious employer that genuinely believes the Bible forbids interracial

marriage.  Under Defendants' interpretation of Section 702, that employer would be free

to terminate an employee who married someone of a different race.  Such an expansive

reading of Section 702 would sweep far more broadly than what Congress intended, as

evidenced by its repeated refusal to completely exempt religious institutions from Title

VII.  There is no principled difference between that hypothetical employment decision

and this case.  Just as that employer would be subject to Title VII's prohibition on racial

discrimination, Defendants are subject to Title VII's prohibition on sexual orientation

discrimination.

The court is not aware of any cases dealing with the questions presented here.

Defendants rely on cases that do not address an employer's hiring decision where the

religious reason behind the decision also implicates another protected trait.  Defendants

cite to several cases in which a plaintiff alleged religious discrimination under Title VII,

but these cases are not helpful.  In *Kennedy v. St. Joseph's Ministries, Inc.*, for example, a

Catholic nursing care facility informed the plaintiff that her clothing, which she wore "as

a matter of religious principle," was inappropriate for a Catholic facility.  657 F.3d 189,

190 (4th Cir. 2011).  Plaintiff sued under Title VII after her employer fired her for

refusing to change her attire.  *Id.* at 191.  The court granted summary judgment for the

12

employer because Section 702 "exempts religious organizations . . . from . . . claims of religious discrimination." *Id.* at 196.  If Starkey alleged religious discrimination, Section 702 would bar her claims.  But she alleges sexual orientation discrimination.

In *Hall*, a college that was affiliated with a church that opposed homosexuality hired the plaintiff as a Student Services Specialist.  215 F.3d at 622.  The plaintiff was later ordained as a lay minister in a church which taught that there is nothing inherently inconsistent between homosexuality and Christianity.  *Id.*  Plaintiff informed her employer that not only was she a member of that church, but she was also a lesbian.  *Id.* at 623.  The college considered the views on homosexuality held by the plaintiff's church to be inconsistent with those of the college and fired her for this "conflict of interest."  *Id.* Plaintiff sued for religious discrimination, and like in *Kennedy*, the court found that the college was exempt from Title VII's prohibition against discrimination based on religion. *Id.* at 625.  The only protected class under Title VII at issue was religion, which fell squarely within Section 702's coverage.[4]

Similarly, in *Little v. Wuerl*, the plaintiff's employer did not renew her employment contract because she had remarried without pursuing the "proper canonical process available from the Roman Catholic Church to obtain validation of her second marriage."  929 F.2d 944, 946 (3d Cir. 1991).  The plaintiff sued under Title VII alleging religious discrimination. The court concluded that the religious exemption allowed

---

[4] It is important to note that the plaintiff in *Hall*, a lesbian, could not have filed a suit for discrimination on the basis of sexual orientation because sexual orientation was not a protected class at the time of that case.  *Hall*, then, provides little guidance on the facts of this case which involve religion and another protected class.

religious institutions to discharge a teacher "who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Id.* at 951. The difficulty with applying that rational to this case is that *Little* did not require the court to consider whether the same result would occur if the inconsistency between religious principles and conduct involved a protected class, such as sexual orientation. Title VII has nothing to say about remarrying without following the proper canonical process; it does have something to say about sexual orientation.

Defendants argue that it is not relevant under Section 702 whether a plaintiff articulates her claim as one of religious discrimination, sex discrimination, or race discrimination; it only matters whether the employer's actions were based on the employee's religious belief or practice. Accepting this point for argument's sake, even the cases cited by Defendants involving claims of sex or race discrimination against a religious employer fail to reckon with the question presented by this case. For example, the plaintiff in *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware., Inc.* signed her name to a newspaper advertisement commemorating and supporting *Roe v. Wade*. 450 F.3d 130, 132 (3d Cir. 2006). Her employer, a Catholic school, fired her after she refused to publicly recant her support for the advertisement and state that she was pro-life. *Id.* at 133. She filed suit under Title VII alleging sex discrimination, claiming that she was fired because she is a woman and that similarly situated male employees had been treated less harshly for similar conduct. *Id.* Not only did the court resolve the case on First Amendment grounds, which will be discussed later, but the court found that Curay-Cramer "did not engage in activity protected by Title VII when she lent her name

14

to the pro-choice position articulated by the advertisement." *Id.* at 136.  So *Curay-Cramer* sheds little light on the issue of whether Section 702 bars a plaintiff's Title VII claim that implicates both religious practice and another protected trait.

Section 702 allows religious employers to favor coreligionists in employment decisions.  It does not allow religious employers to do so in a way that also discriminates against another protected class.  The court concludes that Section 702 does not bar Starkey's federal claims.

### 2.    Neutral, Nondiscriminatory Reason

Section 702's exemption aside, Defendants claim to have a legitimate, nondiscriminatory reason for not rehiring Starkey: She violated the "morals clause" in her employment contract.  Her employment contract identified several conditions which would trigger a default, including relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church and any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church.  Defendants informed Starkey that her contract would not be renewed because her marriage to another woman was contrary to the teaching of the Catholic Church.  For this reason alone, Defendants argue, Plaintiff's Title VII claims must fail.

A complaint alleging sexual orientation discrimination under Title VII "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [sexual orientation]."  *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (2014) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)).

15

Whether the reason for Defendants' decision qualifies as neutral and nondiscriminatory is a matter for summary judgment.  Sexual orientation is a protected class, Starkey alleges Defendants terminated Starkey because of her same sex marriage.  At this stage, Starkey has carried her burden of pleading facts to support a plausible claim of a Title VII violation.

The same is true for her claims of retaliation and hostile work environment under Title VII.  Starkey claims she was retaliated against for engaging in a protected activity by filing Charges of Discrimination with the EEOC against Defendants and by opposing Defendants' unlawful employment practices.  These unlawful employment practices include Defendants' actions towards Fitzgerald, Starkey's co-Director of Guidance, due to Fitzgerald's sexual orientation.  Starkey further alleges that the work environment at Roncalli was hostile toward homosexual students, faculty, and staff.  Starkey offered to read remarks at an upcoming Administrative Council meeting so the school's leadership could understand what it was like to work at Roncalli as a gay person.  At this stage of the litigation, Starkey has alleged sufficient facts for her Title VII claims to survive Defendants' motion for judgment on the pleadings.

**B.     The First Amendment Does Not Bar Starkey's Claims on the Pleadings**

Turning to the First Amendment, Defendants argue that various First Amendment doctrines bar all of Starkey's federal and state law claims.  These doctrines include religious autonomy, the prohibition on government entanglement with religion, and the freedom of association.  The court finds that it is premature to grant Defendants' motion on First Amendment grounds.

### 1.    Religious Autonomy

"As a general matter, it does not violate the First Amendment to apply federal employment discrimination laws to churches and other religious employers." *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 973 F.3d 718, 723 (7th Cir. 2020).  But, the First Amendment ensures churches have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952)).  "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).  *But see Demkovich*, 973 F.3d at 723 ("[C]hurches are not exempt from federal employment discrimination laws as applied to their non-ministerial employees.").  "Religious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring).  After *Morrissey-Berru*, the question is straightforward: "What matters, at bottom, is what an employee does."  140 S. Ct. at 2064.

But to make that determination requires a record, and whether Starkey in fact held one of these key roles is sharply disputed.  According to Starkey's job description—

"Ministry Description"— the Archdiocese considers the school guidance counselor to be a minister of the faith.  The description provides that guidance counselors should facilitate faith formation in several ways, including praying with students, teaching and celebrating Catholic traditions, and conveying the Church's message and modeling a Christ-centered life.

Starkey disputes this characterization of her role.  Her Complaint states that her job duties and responsibilities as guidance counselor did not include any religious or teaching duties.  She claims she never performed any important religious functions for the Catholic Church, and she asserts that her role as a guidance counselor did not include leading prayer or other religious services, nor did it include integrating religious teachings into her interactions with students.

Defendants suggest that the "overarching principle of religious autonomy" bars employment discrimination claims arising from a religious employer's application of religious doctrine regardless of whether the employee qualifies as a minister.  But such an expansive reading of the church autonomy doctrine would render the ministerial exception superfluous.  That exception exists to protect a religious institution's ability to make employment decisions that are "essential to the institution's central mission." *Morrissey-Berru*, 140 S. Ct. at 2060.  If Defendants could claim that religious autonomy protects employment decisions regardless of whether the position was religious or secular, it is not clear why the Supreme Court reaffirmed the ministerial exception's narrow application to only those employees who have responsibilities "that lie at the very core of the mission of a private religious school."  *Id*. at 2064.  Because Starkey's

18

allegations must be taken as true at this stage of the litigation, there is a factual dispute over what her job duties entailed.  Defendants may not invoke religious autonomy as grounds for dismissal on the pleadings.

The same result is true for Starkey's state law claims.  The cases Defendants rely on involve plaintiffs who filled religious roles.  *See Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003) (finding that interfering with a church's decision regarding the Acting Director of Notre Dame's Program for Church Leaders at the University of Notre Dame would violate the church autonomy doctrine.); *McEnroy v. St. Meinrad School of Theology*, 712 N.E.2d 334 (Ind. Ct. App. 2004) (finding that interfering with a church's decision regarding a seminary professor would require the court to interpret and apply religious doctrine).  Whether Starkey's position was religious in nature or implicated the Church's ability to govern itself is a factual matter that cannot be decided now.

## 2.    Excessive Entanglement

Defendants' excessive entanglement argument is similarly unavailing at this stage. Plaintiff claims Defendants treated similarly situated heterosexual employees more favorably.  Specifically, her Complaint alleges that Defendants employ heterosexual teachers who are in legally valid, opposite sex marriages that violate Church teachings. Defendants respond that it would result in excessive entanglement with religion if the court were to measure the severity of various violations of Church teachings.  *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006).

19

The court is not convinced this case turns on whether Starkey can identify a suitable comparator. Sexual orientation is a protected class. Starkey alleges Defendants declined to renew her contract because she married a woman. Thus, it is not necessary for Starkey to identify another class of individuals who were treated more favorably. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (holding that the correct legal standard in employment discrimination cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.").

To the extent there are entanglement concerns—and there may be—they are more appropriately addressed after discovery for the reasons outlined above. "[R]ecognition of the risk of governmental entanglement in religion prompted the development of the ministerial exception." *Herx v. Diocese of Fort Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1182 (N.D. Ind. 2014) (collecting cases). Indeed, several of the cases cited by Defendants were resolved on these grounds. In *Maguire v. Marquette University*, the plaintiff filed suit under Title VII alleging that a religious university refused to hire her as a theology professor because she was a woman and because of her perceived support of abortion. 627 F. Supp. 1499, 1502 (E.D. Wis. 1986), *aff'd in part and vacated in part*, 814 F.2d 1213 (7th Cir. 1987). The court found that the religious exemption applied to that employment decision because the First Amendment prevented the court from "delv[ing] into the hiring decisions relating to the theology department of Marquette." *Id.* at 1503. Critical to the court's decision was the position sought by the plaintiff: "There is

20

probably no teaching position at Marquette University which is more closely tied to the University's religious character than that of theology professor." *Id.* at 1504. Similarly, in *Rayburn*, the court cited entanglement concerns in declining to interfere with a church's selection of an associate in pastoral care. *Id.* 772 F.2d at 1171. But the court noted that a church's "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." *Id.*

Because the parties dispute what Starkey's role as a guidance counselor entailed, it is premature to dismiss her claims because they would result in governmental entanglement with religion.

### 3.      Freedom of Association

Finally, the court considers Defendants' argument that the freedom of association protects their right to disaffiliate with Starkey. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). "Freedom of association therefore plainly presupposes a freedom not to associate." *Id.* at 623. But that freedom is not absolute. *Id.* The right to freely associate may be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

Relying on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), Defendants argue that the First Amendment protects an expressive organization's right to disaffiliate with

21

anyone who would undermine the group's message.  In *Dale*, a former Eagle Scout

applied for adult membership in the Boy Scouts as an assistant scoutmaster.  *Id.* at 644.

The organization initially approved the application, but later revoked his membership

after learning Dale was gay and an outspoken gay rights activist.  *Id.* at 645.  The Court

recognized the right to freedom of association prohibited the forced association with an

individual who undermined the Boy Scouts' ability to express its view that homosexuality

was not "morally straight."  *Id.* at 651.

But *Dale* does not require anti-discrimination laws to give way automatically in

the face of a freedom of association defense asserted by an expressive organization.  The

Court's holding "is not to say that an expressive association can erect a shield against

antidiscrimination laws simply by asserting that mere acceptance of a member from a

particular group would impair its message."  *Id.* at 653.  "[T]he freedom of expressive

association, like many freedoms, is not absolute."  *Id.* at 648.  The Court's analysis turned

in part on the particular law at issue.  Plaintiff sued under New Jersey's public

accommodation law, which prohibited discrimination on the basis of sexual orientation in

places of public accommodation.  *Id.* at 645.  The Court found issue with applying the

law "to a private entity without even attempting to tie the term 'place' to a physical

location."  *Id.* at 657.  The Court even noted that several courts had ruled the Boy Scouts

is not a place of accommodation.  *Id.* at 657 n.3.  Applying Title VII in this case does not

raise those issues.

More importantly, the court does not read *Dale* as expansively as Defendants

suggest.  *Dale* did not arise from the employment context.  The plaintiff sought

membership in a private organization.  The freedom of association cases relied upon in *Dale* reveal the doctrine's applicability to parade groups, political parties, and other non-employment contexts.  *See e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995); *Democratic Party of United States v. Wisconsin ex rel. La Folette*, 450 U.S. 107 (1981).  And the Supreme Court has explicitly rejected a freedom of association defense in the employment context.  *See Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984) ("[P]rivate discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.") (quotations and citations omitted).

As a final note, if a religious employer could simply assert a freedom of association defense and defeat a discrimination claim, it is again not clear why the Supreme Court reaffirmed the ministerial exception in *Morrisey-Berru*.  If freedom of association applies in the religious employment context, the ministerial exception is unnecessary.  Because the court finds freedom of association inapplicable, that argument fails.

**C.    Starkey's Retaliation Claim Under Title IX Is Preempted by Title VII**

The court now turns to the final issue.  Plaintiff claims she was retaliated against in violation of Title IX because she opposed Defendants' actions regarding Fitzgerald and herself.  Defendants respond that Title VII preempts this claim.  Defendants are correct.

Title IX prohibits discrimination on the basis of sex in any education program receiving federal financial assistance.  20 U.S.C. § 1681(a).  While Title IX does not

23

contain a separate retaliation provision, "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005).  In the Seventh Circuit, "all employment-discrimination claims must be brought under Title VII." *Brown v. Ill. Dep't of Human Servs.*, 717 F. App'x 623, 625-26 (7th Cir. 2018) (citing *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857 (7th Cir. 1996), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).  "Title VII provides a comprehensive statutory scheme for protecting rights against discrimination in employment," and it is "well-established that Title VII's own remedial mechanisms are the only ones [] available to protect the rights created by Title VII." *Waid*, 91 F.3d at 861-62.

Defendants urge this court to adhere to Seventh Circuit precedent and find that "all employment-discrimination claims must be brought under Title VII." *Brown*, 717 F. App'x at 625–26 (citing *Waid*, 91 F.3d 857).  Plaintiff argues *Jackson*'s recognition of a private right of action for retaliation under Title IX allows her claim to proceed.  The question is whether the Seventh Circuit approach in *Waid* survived *Jackson*.

The court finds that there is no conflict between the two cases.  In *Jackson*, the plaintiff's retaliation claim arose from his opposition to the unequal funding for the girls' basketball team, not from discriminatory employment practices.  544 U.S. at 172.  In *Waid*, the plaintiff's claim arose directly from discriminatory employment practices; she claimed she was passed over for a teaching position because of her sex.  91 F.3d at 860. Because her claim arose from discriminatory employment practices, her action proceeded

24

under Title VII.  Such is the case here.  Starkey's retaliation claim arose from Defendants' discrimination against Fitzgerald, which Starkey opposed, and her own actions in filing Charges of Discrimination with the EEOC.  Unlike *Jackson*, Starkey's claim arose from the employment context and therefore must proceed under Title VII.  Jackson also lacked a viable Title VII claim, so "*Jackson* does not shed light on the impact of Title VII on the implied private remedies afforded by Title IX because the Supreme Court had no need to grapple with the issue presented here."  *Othon v. Wesleyan Univ.*, No. 3:18-CV-00958, 2020 WL 1492864, at *10 (D. Conn. Mar. 27, 2020).

Plaintiff responds that while the Seventh Circuit has ruled that Title IX discrimination claims are preempted by Title VII in the employment context, it has not ruled that Title IX retaliation claims are also preempted.  But *Jackson* held that Title IX's private right of action includes claims for retaliation because retaliation falls within the statute's prohibition on discrimination.  Because retaliation is a form of discrimination, Starkey's Title IX claim is preempted.  The court, therefore, does not need to consider whether Title IX's exception for religious employers applies.

## IV.    Conclusion

The court concludes that Title VII's religious exemption does not bar Starkey's Title VII claims.  The court also concludes that Starkey has alleged sufficient facts to support her Title VII claims of sexual orientation discrimination, retaliation, and hostile work environment.  But it is premature to conclude whether the First Amendment bars Starkey's claims.  Finally, the court agrees with Defendants that Title VII preempts Plaintiff's retaliation claim under Title IX.

25

Accordingly, Defendants' Motion for Judgment on the Pleadings (Filing No. 58) is

**GRANTED in part** and **DENIED in part**.

**SO ORDERED** this 21st day of October 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

26