# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### No. 3:17-cv-00011

| | | |
|---|---|---|
| **LONNIE BILLARD,** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **CHARLOTTE CATHOLIC HIGH** | ) | |
| **SCHOOL, MECKLENBURG AREA** | ) | |
| **CATHOLIC SCHOOLS, and ROMAN** | ) | |
| **CATHOLIC DIOCESE OF CHARLOTTE,** | ) | |
| | ) | |
| **Defendants**. | ) | |

## FINDINGS AND CONCLUSIONS

**THIS MATTER** is before the Court on the parties' opposing Motions for Summary

Judgment. Plaintiff filed a Motion for Partial Summary Judgment, and Defendants filed a Motion

for Summary Judgment. (Doc. Nos. 26, 29). These motions are ripe for judicial review pursuant

to the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3). After considering the motions and

reviewing the pleadings, the Court enters the following findings and conclusions and orders that

Plaintiff's Motion for Partial Summary Judgment be granted and Defendants' Motion for

Summary Judgment be denied.

## I.    INTRODUCTION

The First Amendment and several statutes ensure that religious organizations, such as the

Roman Catholic Church, "are given proper protection as they seek to teach the principles that are

so fulfilling and so central to their lives and faiths." See Obergefell v. Hodges, 576 U.S. 644, 679

(2015). As such, the religious and philosophical objections to gay marriage are protected views

and, in some instances, protected forms of expression. At the same time, "our society has come

1

to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n, 138 S. Ct. 1719, 1727 (2018). For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil and employment rights. See id. The exercise of their freedom on terms equal to others in employment and all other aspects of life must be given great weight and respect by the courts. See id.

In this case, Charlotte Catholic High School seeks a variety of First Amendment and statutory protections to enable the school to terminate the employment of a substitute drama teacher—Mr. Lonnie Billard ("Plaintiff"). The school claims that he was fired for his support of gay marriage—something the Catholic Church opposes. Plaintiff claims he was fired, or at least suffered a more severe employment action, because of who he is as a gay man. The Court respects the sincerity of the Catholic Church's opposition to Plaintiff's actions. With a slightly different set of facts, the Court may have been compelled to protect the church's employment decision. However, where as here, Plaintiff lost his job because of sex discrimination and where he was working as a substitute teacher of secular subjects without any responsibility for providing religious education to students, the Court must protect Plaintiff's civil and employment rights.

## II.    PROCEDURAL HISTORY

Plaintiff brings a claim for a Title VII violation under the Civil Rights Act of 1964, which prohibits employers from failing or refusing to hire or to discharge an individual because of their sex. (Doc. No. 1 ("Complaint") at ¶ 35; Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII")). He brings the action against Charlotte Catholic High School, Mecklenburg Area Catholic

Schools, and the Roman Catholic Diocese of Charlotte (parties referred to hereinafter as "Defendants"). (Complaint at ¶¶ 5, 6, 7).

In May 2015, Plaintiff filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging Defendants violated Title VII when they terminated him from his role as a substitute teacher. (Id. at ¶ 8). The EEOC elected not to sue Defendants and, instead, issued Plaintiff a Notice of Right to Sue Letter in November 2016. (Id.). Plaintiff timely filed this action within 90 days of receiving the notice in January 2017. (Id.). In his Complaint, Plaintiff requests, *inter alia*, declaratory relief that Defendants violated Title VII, appropriate injunctive relief, and a variety of damages. (Complaint at 8). Plaintiff now moves for partial summary judgment on all matters other than the amount of damages, and Defendants move for summary judgment on all claims. (Doc. Nos. 26, 29).

## III.    FACTS

### a.    Plaintiff's Employment with Charlotte Catholic High School

Plaintiff is a former teacher and substitute teacher at Charlotte Catholic High School ("Charlotte Catholic") in Charlotte, North Carolina. (Complaint at ¶¶ 15, 18). Charlotte Catholic is a Catholic School that serves grades 9-12 in the Charlotte area. (Id. at ¶ 5). It operates within the Mecklenburg Area Catholic Schools ("MACS") system. (Id. at ¶ 6). MACS is a regional Catholic school system in the Charlotte area that is responsible for nine schools. (Id.). MACS is affiliated with the Roman Catholic Diocese of Charlotte ("Diocese"), an unincorporated religious association with its principal place of business in Charlotte, North Carolina. (Id. at ¶ 7). Plaintiff began working at Charlotte Catholic as a substitute teacher in the fall of 2000. (Id. at ¶ 11).  He was given a full-time teaching position in the fall of 2001, where he first taught English. (Id. at ¶ 15). After a year, he switched to teaching drama classes, which he taught full-time until the fall

of 2012. (Id. at ¶ 16). When Plaintiff retired from full-time teaching, he stayed on as a substitute teacher with Charlotte Catholic from the fall of 2012 until December 2014. (Id. at ¶¶ 18, 26). He was not required to sign a contract for employment with Charlotte Catholic as a substitute teacher. (Id. at ¶ 19). He primarily substituted for English courses because he had expertise in that subject. (Doc. No. 28-2 ("Pl. Decl.") at ¶ 27). Plaintiff only taught non-religious subjects during his time at Charlotte Catholic. (See Complaint at ¶¶ 15, 16).

While Plaintiff was employed by Charlotte Catholic full-time, he received positive work evaluations. (Id. at ¶ 21). He also won the Inspirational Educator Award from North Carolina State University in 2011 and the Charlotte Catholic Teacher of the Year award in 2012. (Pl. Decl. at ¶¶ 22, 23). Mr. Jerry Healy, principal of Charlotte Catholic at the time, said that Plaintiff was the "only teacher who had been nominated for the award every year since its inception." (Id. at ¶ 23).

### b. Plaintiff's Decision to Marry

Plaintiff came out as homosexual to his close friends and family in 1995. (Complaint at ¶ 22). He was married to a woman for about 24 years; they divorced around 2002. (Doc. No. 31-1 ("Billard Dep. 1") at 43-44, 87-88). Plaintiff met Richard Donham ("Mr. Donham") in 2000 when he and his wife were separated, began a romantic relationship with him, and moved in with him in 2002. (Id. at 102-04). Plaintiff listed Mr. Donham on required school contact forms as his "friend" or "housemate." (Id. at 88-90, 99). Sometimes he wrote that Mr. Donham lived at the same address as he did, and other times he listed Mr. Donham's address as another residence nearby. (See id. at 99-102).

Plaintiff brought Mr. Donham to Charlotte Catholic events, including the plays and musicals he directed each semester, a class trip to New York City, faculty parties, and a spaghetti

dinner fundraiser. (See Doc. No. 31-19 at 74-77, 114-15). Mr. Donham also served as a substitute teacher at Charlotte Catholic and at MACS middle school in 2003 and 2004. (Pl. Decl. at ¶ 40; Doc. No. 31-19 at 20-21). Occasionally, Mr. Donham would serve as a substitute teacher for Plaintiff's classes. (Doc. No. 31-19 at 89-92). When Assistant Principal Steve Carpenter ("Assistant Principal Carpenter") called the house to offer Mr. Donham a teaching assignment, Plaintiff would sometimes answer the phone for him, indicating they lived together. (Pl. Decl. at ¶ 40). Plaintiff and Mr. Donham spent time together in the break room at Charlotte Catholic and acted "like any other couple" at faculty and school events. (Billard Dep. 1 at 258-59; Pl. Decl. at ¶ 37). Plaintiff did not explicitly state while at work that he and Mr. Donham were in a sexual relationship. (Billard Dep. 1 at 260-61). However, he contends that some members of the administration at Charlotte Catholic knew he was in a same-sex relationship with Mr. Donham. (Pl. Decl. at ¶¶ 35, 38). Principal Kurt Telford ("Principal Telford") and Assistant Principal Carpenter's claim they were not aware that Plaintiff was homosexual until they heard about his Facebook post in December 2014. (Doc. No. 28-5 at 6-7; Doc. No. 28-3 at 26).

When United States v. Windsor was decided by the Supreme Court, Plaintiff and Mr. Donham discussed marriage. 570 U.S. 744 (2013); (Complaint at ¶ 22). They ultimately decided to get married when same-sex marriage was legalized in North Carolina in 2014. (Id.).

### c. The Catholic Church's Position on Marriage

The Catholic Church believes marriage should be between a man and a woman. (Doc. No. 31-15 at ¶ 21). Human sexual expression belongs to "husband and wife alone." (Id.). Therefore, unmarried people should not engage in sexual intercourse, and same-sex couples should not engage in sexual expression because they cannot be husband and wife. (Id. at ¶¶ 22, 27). Bishop Peter Jugis of the Diocese ("Bishop Jugis") believes that while people who

5

experience homosexual tendencies or thoughts are to be treated with respect and compassion, individuals who act on those thoughts engage in "disordered" conduct since their acts violate God's plan for human sexuality and reproduction. (Id. at ¶ 25). As Catholic institutions, MACS and Charlotte Catholic use Catholic ideology to inform policies at their schools on employee conduct and appropriate educational material. (Doc. No. 31-3 at ¶ 8). Plaintiff regarded himself as a practicing Catholic while he worked at Charlotte Catholic. (Billard Dep. 1 at 52-53). He admits that he was aware of the Catholic Church's teachings about marriage and its stance against same-sex marriage when he was an employee. (Id. at 120-21).

### d. Defendants' Religious Mission

The Diocese has "thousands" of employees and prohibits all of them from publicly engaging in or advocating for conduct contrary to the moral tenets of the Catholic faith. (Doc. No. 28-4 at 6, 15). Subversive conduct includes engaging in premarital or extramarital sex or engaging in same-sex marriage. (Id. at 25). Diocese employees include secretaries, information technology specialists, food service workers, teachers, substitute teachers, and building maintenance crews. (Id. at 7, 11; Billard Dep. 1 at 142-44). According to Bishop Jugis, the Diocese's prohibition of same-sex marriage extends to all its employees, regardless of whether the employees interact with the public at work or speak publicly about their relationship. (Doc. No. 28-4 at 18).

MACS and Charlotte Catholic use several documents to inform their employees of the Diocese's expectations for their behavior. These include a Code of Ethics, a Personnel Policies handbook, MACS employment contracts, training sessions conducted by Vicar of Education Father Roger Arnsparger ("Father Arnsparger"), and a Faculty Handbook for Charlotte Catholic specifically. (Doc. No. 31-3 at ¶¶ 8-15). The documents instruct employees of MACS and

Charlotte Catholic to uphold the teachings and principles of the Catholic Church by serving as role models to students. (Id. at ¶ 10). As role models, they may not publicly engage in conduct or advocacy that contradicts the moral tenets of the Catholic Church. (Id. at ¶ 14). These documents do not explicitly outline what beliefs the Catholic Church holds on marriage, and MACS does not have a written policy for LGBTQ+ employees. (Doc. No. 28-6 at 10). Plaintiff signed the Charlotte Catholic employment contract each year when he was teaching full-time, and received the Faculty handbook, Personnel Policies handbook, and Code of Ethics. (Billard Dep. 1 at 122-23, 127-28, 132, 134-41, 140-42). He also attended Father Arnsparger's training sessions, but walked out on two occasions because he disagreed with their tone. To him, Father Arnsparger made it seem like "all of [the teachers] sitting in the room were...unworthy and [needed] to [toe] the line as Father Arnsparger drew the line." (Id. at 113-16). Father Arnsparger described the purpose of his sessions as being to discuss the "essential role that all teachers play in the religious mission of MACS schools," which is to "provide a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially." (Doc. No. 31-5 at ¶¶ 18-19). Father Arnsparger did not indicate that he specifically mentioned same-sex marriage at these sessions. (Id.).

Importantly, Charlotte Catholic discourages teachers of secular subjects from instructing students on any sort of religious subject. The school asks that teachers who teach secular subjects refrain from instructing students on Catholic Doctrine. (Doc. No. 28-5 at 28). Secular teachers do not have to undergo religious training, do not have to be Catholic, and do not have to be Christian. (Doc. No. 28-3 at 58). The administration at Charlotte Catholic does not know the percentage of teachers at the school who are Catholic and does not ask if candidates are Catholic during job interviews. (Id. at 11, 14-15).

Although prayer is not required, teachers at Charlotte Catholic are expected to facilitate prayer at the beginning of their classes. (Doc. No. 31-3 at ¶ 5). Plaintiff opted to lead these prayers occasionally, and at other times he invited students to lead them. (Pl. Decl. at ¶ 29). He characterized these prayers as informal: prayer content was not specified and could be generally spiritual instead of strictly Catholic. (Id.). Furthermore, teachers, including Plaintiff, are required to accompany students to Masses held at the school, but they perform no religious function and serve essentially as chaperones. (Id. at ¶ 31).

In the past, MACS has fired school employees for violating the Catholic Church's beliefs on marriage. A male physical education teacher was fired for having an affair, a male teacher was fired for being in a same-sex relationship and adopting a child with his partner, and a female teacher was fired for planning to marry a Catholic man with no annulment. (Doc. No. 31-3 at ¶ 23).

### e. Plaintiff's Removal from Charlotte Catholic High School

In October 2014, Plaintiff announced his engagement to Mr. Donham on Facebook with a post that read:

> "Everyone sing along…. 'Goin' to the chapel and we're gonna' get ma-a-aried. Goin' to the chapel and we're gonna' get maa-aa-ried'. Yes, I'm finally going to make an honest (at least legal) man out of Rich. We will be married on May 2, 2015…details to follow. I cannot believe that I am saying this or that it is even possible. I thank all the courageous people who had more guts than I who refused to back down and accept anything but 'equal.' Ps. If you don't agree with this…keep it to yourself. You never asked my opinion about your personal life and I am not asking yours."

(Complaint at ¶ 23). At the time he announced his engagement, Plaintiff was Facebook friends with staff and parents associated with Charlotte Catholic. (Billard Dep. 1 at 284).

Plaintiff informed Assistant Principal Carpenter of his announcement several days after the Facebook post. (Pl. Decl. at ¶ 46). Assistant Principal Carpenter congratulated Plaintiff but stated that the Diocese would likely be unhappy with the message, although he said he would not

8

personally inform them. (Id. at ¶¶ 47-48). When he heard about the engagement announcement, Charlotte Catholic's Chaplain Father Matthew Kauth ("Father Kauth") met with Principal Telford to discuss it. (Doc. No. 31-16 at 6-7; Doc. No. 31-18 at 6-8). Principal Telford believed that Plaintiff could not serve as a substitute at Charlotte Catholic because of his engagement to Mr. Donham. (Doc. No. 31-16 at 7-9). Principal Telford communicated this to Assistant Principal Carpenter, who oversaw substitute assignments. (See Doc. No. 28-3 at 10-12, 45). Substitute teachers at Charlotte Catholic are not guaranteed teaching assignments but are given them at the discretion of Assistant Principal Carpenter. (Id.). Assistant Principal Carpenter typically contacts the chosen substitute when they are needed and asks if they are available. (Billard Dep. 1 at 259-60). After his conversation with Principal Telford, Assistant Principal Carpenter decided not to have Plaintiff return as a substitute teacher. (See Doc. No. 28-3 at 44-45).

In December 2014, after not receiving an assignment from Charlotte Catholic in some time, Plaintiff spoke to fellow teacher Ms. Joan Stretch and expressed his confusion. (Complaint at ¶ 25; Billard Dep. 1 at 200). She admitted that she had heard Plaintiff was unable to work at Charlotte Catholic any longer due to his intention to marry a man. (Id. at ¶¶ 25, 26). Plaintiff texted Assistant Principal Carpenter to confirm. Plaintiff was informed via phone call by Assistant Principal Carpenter that he could no longer work as a substitute teacher because he "announced his intention to marry a person of the same sex." (Doc. No. 8 at ¶ 26).

Plaintiff reports being emotionally devastated and suffering a loss of identity and self-worth after being eliminated from the substitute list at Charlotte Catholic. (Pl. Decl. at ¶ 56). He enjoyed the time he spent teaching children at the school and interacting with their parents. (Id.).

## IV.    LEGAL STANDARD

9

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248 (citations omitted). Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of her claim.

In considering cross-motions for summary judgment, this Court "examines each motion separately, employing the familiar standard" provided by Federal Rule of Civil Procedure 56. Desmond v. PNGI Charles Town Gaming, 630 F.3d 351, 354 (4th Cir. 2011) (citations omitted). Thus, each motion is reviewed "on its own merits 'to determine whether either of the parties deserve judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

## V.    DISCUSSION

### a.  Sex Discrimination Claim under Title VII and Bostock v. Clayton County

Title VII governs sex discrimination claims, making it illegal for an employer to fail or refuse to hire or discharge any person, or to discriminate against a person, with respect to their race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2. Bostock v. Clayton County held it is impossible to discriminate against someone for being homosexual or transgender without discriminating against them based on sex. 140 S. Ct. 1731, 1741 (2020). Therefore, an employer violates Title VII by firing someone for being homosexual or transgender. Sex need only be "one but-for" cause of the employment decision under Title VII, meaning the plaintiff's sex does not have to be the primary cause of the employer's action. Id. at 1739, 1744. It just needs to play a role in the reasoning behind the adverse employment action. See id. at 1739.

11

"Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. . . . [T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision."

Id. at 1741-42. In other words, when an employer fires an employee because they are homosexual, two factors may exist: the sexual preference of the individual, and their sex. Id. at 1742. That there are multiple factors does not change the employer's liability under Title VII. An "employer's ultimate goal might be to discriminate on the basis of sexual orientation," but along the way the employer must "intentionally treat an employee worse based in part on the individual's sex." Id. The employer also cannot escape liability for showing they treat men and women comparably as groups. Id. at 1744.

Religious employers enjoy several protections that enable them to uphold their religious convictions when making employment decisions. Id. at 1753-54. These protections include the Religious Freedom Restoration Act ("RFRA"), the First Amendment, the church autonomy doctrine, the ministerial exception, and Sections 702 and 703 exemptions under Title VII. Defendants bring all these defenses—except for the ministerial exception, which they stipulated away—to defend their employment decision. (Doc. No. 8 at ¶¶ 7-10; Doc. No. 28-1). The Court will deal with each of these defenses in turn but must first decide whether Defendants' termination of Plaintiff is the result, at least in part, of impermissible sex discrimination.

Defendants argue they did not fire Plaintiff because he was homosexual; instead, they fired him because he engaged in "advocacy" that went against the Catholic Church's beliefs when he "publicly announced his intention to marry a person of the same sex." (Doc. No. 8 at ¶ 26). To Defendants, the question is not if Plaintiff would have been fired for being a woman

marrying a man, but whether he would have been fired if he were a woman performing anti-Catholic advocacy. (Doc. No. 64 at 1-2). Defendants contend they would have taken the same action against Plaintiff if he were heterosexual or a woman (Id. at 2; Doc. No. 30 at 11).

In making this argument, Defendants contend that Plaintiff believed administrators at Charlotte Catholic knew about his same-sex relationship with Mr. Donham and did not punish him in any way until he announced his engagement. (Pl. Dec. at ¶¶ 35-38, 40) (asserting ex-Principal Healy, Assistant Principal Carpenter, and others knew about their relationship, and Mr. Donham was even a substitute teacher at the Catholic middle school). Defendants assert that this implies they were not punishing Plaintiff for being homosexual, but rather punishing him for his advocacy against the Catholic Church. (Doc. No. 63 at 10-11) (saying that the fact that Plaintiff alleged people knew about his relationship with Mr. Donham but did not do anything until they got engaged "demonstrates that Charlotte Catholic's decision to release Billard was not based on his sex or sexual orientation, even as understood in Bostock"). However, Principal Telford and Assistant Principal Carpenter both said they were not aware that Plaintiff was homosexual until December 2014, when they heard about his engagement post. (Doc. No. 28-5 at 6-7; Doc. No. 28-3 at 25-26). Defendants claim Plaintiff obscured the nature of his relationship with Mr. Donham, calling him his "friend" or his "housemate" on the address and emergency contact forms that he had to fill out each year to work at Charlotte Catholic. (Billard Dep. at 88-102). Since Principal Telford is the person who ultimately decided to relieve Plaintiff of his substitute teaching duties and is also the person who makes employment decisions at Charlotte Catholic, Defendants' argument as to this point is unconvincing. (See Doc. No. 28-5 at 7-9).

On the other hand, Plaintiff asserts that Defendants admitted they fired Plaintiff because he was a man who married another man. (Complaint at ¶¶ 26-27, 32-34). Assistant Principal

Carpenter advised Plaintiff that he could not return to Charlotte Catholic because he publicly announced his intention to marry someone of the same sex. (Doc. No. 8 at ¶ 26). While not established as an agreed-upon fact in the case, Plaintiff also asserts that Diocese Communications Director Hains stated that Plaintiff was fired for marrying a man and publicly stating on Facebook that he disagrees with the Catholic Church's teachings. (Complaint at ¶ 27). Plaintiff contends that if a woman on staff announced her engagement to her husband, this would not be considered religious advocacy. (See Doc. No. 62 at 4-5; Pl. Dec. at ¶ 49) (stating that a female teacher got engaged to her husband within a week of his engagement announcement and remained a teacher at Charlotte Catholic for an extended time thereafter). As such, he argues that it was the act of getting engaged that Defendants considered advocacy, and it was only considered advocacy because of Plaintiff's sexual orientation. (Doc. No. 62 at 4). Therefore, Plaintiff argues the school fired him for traits that it would tolerate in his female colleague— getting engaged to a man. (Id.).

Under Bostock, this Court finds that Plaintiff has raised a valid Title VII sex discrimination claim. An employer who discriminates will "almost never announce a discriminatory animus or ... provide direct evidence." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999). Here, that is not the case. Defendants admit to firing Plaintiff "because he is a man who intended to, and did, marry another man." (Doc. No. 8 at ¶ 32; Doc. No. 1 at ¶ 32). Defendants cannot escape Title VII liability by recharacterizing Plaintiff's announcement of his engagement as "advocacy." If Plaintiff were a woman who posted on Facebook that she was getting married to her husband, Defendants would not have interpreted her announcement as "advocacy" for or against the Catholic Church. Plaintiff's engagement was only considered advocacy because of his sex.

Even if this Court were satisfied that Plaintiff's action was advocacy, Plaintiff would still prevail on his sex discrimination claim because he received a harsher punishment than if he had simply expressed positive views of same-sex marriage as a straight person. Defendants admit that while they fired Plaintiff for his actions, they would only have reprimanded a straight teacher who spoke positively about same-sex marriage. (Doc. No. 28-5 at 23; Doc. No. 62 at 5). Principal Telford admitted that if a person went to a relative's same-sex wedding and spoke positively about it then he would merely ask them to speak with a priest. (Doc. No. 28-5 at 23). In contrast, Plaintiff lost his job for his positive Facebook post because he was the one getting married to a same-sex partner.

This is a classic example of sex discrimination under the but-for causation standard of Bostock. Defendants argue that they have fired people in the past for adultery or marrying a divorced person. (Doc. No. 31-3 at ¶ 23). But firing an employee for adultery or marrying a divorced person does not require Defendants to treat the employees differently depending on their sex. Here, Defendants openly admit that they took a more drastic action toward Plaintiff *because* he was homosexual. If Plaintiff were a heterosexual woman posting on Facebook about her engagement, there would be no issue to Defendants. And if Plaintiff were a heterosexual woman advocating for same-sex marriage via Facebook, Defendants would only ask Plaintiff to speak with a priest. Therefore, Plaintiff's sex, as a male, is a but-for cause of the decision to fire him.

### b. Sections 702 and 703 Religious Exemptions under Title VII

Defendants next argue that they qualify for religious exemptions under Sections 702 and 703 of Title VII and thus escape liability. An unanswered question in Bostock is whether a religious employer might have a viable statutory or constitutional defense to Title VII claims of

sexual orientation discrimination. In light of <u>Bostock</u>, sex discrimination occurs when an employer treats an employee differently or less favorably because of their sex, which is understood to include pregnancy, sexual orientation, and gender identity. 42 U.S.C. § 2000e-(k); <u>Bostock</u>, 140 S. Ct. at 1754. Religious discrimination, on the other hand, occurs when an employer makes an employment decision based on religious preference. <u>See</u> <u>e.g.</u>, <u>Hall v. Baptist Mem'l Health Care Corp.</u>, 215 F.3d 618, 625 (6th Cir. 2000) (employee fired for joining church that accepted gay people could not sue for religious discrimination); <u>Little v. Wuerl</u>, 929 F.2d 944, 951 (3d Cir. 1991) (employee fired for remarrying without obtaining annulment cannot sue for religious discrimination). Religion is defined to include "all aspects of religious observance and practice." 42 U.S.C. § 2000e-j. As of now, religious employers have strong legal protections for hiring and firing employees who have a role in promoting their religion's message if the employment decision is *religiously* motivated.

Section 702(a) and Section 703(e) of Title VII exempt religious institutions from suits for religious discrimination. Both sections do the same thing for the purposes of this suit; the difference between them is that they each identify a different type of institution covered under the religion exemption.

Section 702 states that Title VII's bans on religious discrimination do not apply to a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a). Religious discrimination is permitted when the organization is religious and promoting said religious "activities" is the purpose of the individual's employment. <u>Id.</u>

Section 703 is an exemption specifically for religious schools. It states that it is not an unlawful employment practice for an educational institution to hire and employ people of a particular religion if "such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e).

Courts have recognized a religious organization's ability to exempt itself from Title VII's ban on religious discrimination through Sections 702 and 703. In Rayburn v. Gen. Conf. of Seventh Day Adventists, a Section 702 Title VII exemption applied when a woman sued after she was denied a pastoral position within the church. 772 F.2d 1164, 1166 (4th Cir. 1985). This was because "[t]he role of an associate in pastoral care is so significant in the expression and realization of [the church's] beliefs." Id. at 1168. In Kennedy v. St. Joseph's Ministries, Inc., the religious-based nursing center was exempt from Title VII religious discrimination claims when they fired an employee for dressing in another religion's garb at work. 657 F.3d 189, 190-91 (4th Cir. 2011).

Although Sections 702 and 703 give religious institutions and schools more leeway for engaging in religious discrimination, they do not permit sex discrimination. Boyd v. Harding Acad. of Memphis, 88 F.3d 410, 413 (6th Cir. 1996). "While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." Rayburn, 772 F.2d at 1166. Defendants' argument would allow

17

a religious employer to "convert any claim of discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision." Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc., 496 F. Supp. 3d 1195, 1203 (S.D. Ind. 2020). "This would effectively strip employees of religious institutions of all Title VII protections, if the employer's religion clashed with the employee's protected class status." Id. "If Congress had intended to allow religious employers to avoid liability for discriminating on the basis of race, sex, or national origin, it could have done so." Id. "By its very terms, [Sections 702 and 703 apply] only to discrimination on the basis of religion. The ban on discrimination in employment on account of race, national origin, or sex is still applicable to religious organizations." Elbaz v. Congregation Beth Judea, Inc., 812 F. Supp. 802, 807 (N.D. Ill. 1992) (internal quotations omitted).

Under EEOC v. Mississippi College, a Fifth Circuit case, the court held that Mississippi College's "employment practices subject to Title VII [of sex discrimination] do not embody religious beliefs," which protected the college "from any real threat of undermining its religious purpose" by maintaining Title VII protections. 626 F.2d 477, 488 (5th Cir. 1980). The court reasoned that Congress intended to regulate the employment relationship of schools by Title VII because "the College is not a church," and the fact "[t]hat faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." Id. at 485. The court reasoned that creating an exemption from the statutory enactment greater than what Section 702 provides would "seriously undermine Congress' attempts to eliminate discrimination," so it was not appropriate. Id. at 489.

In <u>EEOC v. Fremont Christian Sch.</u>, the Ninth Circuit held that Title VII exemptions do not apply to a Christian school's practice of giving health insurance benefits solely to "head of household employees," which the school defined as only men or single women. 781 F.2d 1362, 1364 (9th Cir. 1986). Although this practice was a result of genuine religious beliefs regarding who could be the "head of a household," the court struck down the practice because of the state's "strong compelling...interest in eradicating discrimination, coupled with the fact that eliminating the employment policy involved here would not interfere with religious belief, and only minimally, if at all, with the practice of religion." <u>Id.</u> at 1364. The court wrote that the "language and legislative history of Title VII . . . indicate the statute exempts religious institutions only to a narrow extent." <u>Id.</u> at 1366.

Here, Defendants qualify as a religious educational institution under the meaning of Sections 702 and 703 because they are a (1) Catholic School managed in at least substantial part by a (2) Catholic Diocese through a (3) Catholic school system. (Doc. No. 8 at 2).  Defendants contend that Sections 702 and 703 exempt religious organizations from liability when the employment decision is based on religious preference. (Doc. No. 29 at 1). They argue that since they believe Plaintiff was fired for advocating against the moral tenets of the Church, then firing him should fall under the 702 and 703 exemptions to Title VII because they fired him for a religious reason. (<u>Id.</u>). Defendants contend that an employment decision to release an employee "of a particular religion" includes the permission "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." (Doc. No. 63 at 15 quoting <u>Little</u>, 929 F.2d at 951; Doc. No. 30 at 8). The religious reason Defendants allege they fired Plaintiff for was his single Facebook post, which they view as public opposition to fundamental tenets of the

Catholic faith, which includes honoring the sanctity of marriage as a relationship between a man and a woman. (Doc. No. 29 at 2; Doc. No. 31-15 at ¶ 21).

Plaintiff argues that 702 and 703 exemptions to Title VII do not authorize sex discrimination: they only allow religious discrimination. The Court agrees, and denies Defendants' assertion that they qualify for a Section 702 or 703 exemption. Under the Fourth Circuit's controlling precedent, Section 702 provides an exception only from Title VII's prohibition against discrimination in employment on the basis of religion; Section 702 "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." Kennedy, 657 F.3d at 192; accord Rayburn, 772 F.2d at 1166. As Justice Alito recognized, precedent indicates that religious exemptions under Sections 702 and 703 likely offer "only narrow protection" to religious employers that does not allow them to discriminate based on sex. 140 S. Ct. at 1781 & n.55 (Alito, J., dissenting) (citations omitted). The narrowness of these exceptions is highlighted by the Ninth Circuit's opinion in Fremont Christian Sch., 781 F.2d at 1366. Defendants do not cite a case that allows employers to discriminate based on sex when the sex discrimination in question is motivated by religion. "The proper balance is to interpret Title VII's religious exemption to allow a religious employer to make hiring decisions in favor of coreligionists without facing claims of religious discrimination, but to allow a plaintiff to bring claims of other forms of Title VII discrimination." Starkey, 496 F. Supp. 3d at 1201.

As mentioned earlier, in Fremont Christian Sch., the court struck down a policy that only allowed men and unmarried women to obtain health insurance benefits. 781 F.2d at 1364. Health insurance policies were not offered to married women because men were perceived as the spiritual heads of households. Id. ("Only the man can be the head of the household, regardless of

20

what his salary is in relation to that of his wife"). Even though the sex discrimination was motivated by the defendant's sincere religious beliefs, the court found that the discriminatory practice still did not qualify for an exemption because

> eliminating the employment policy involved here would not interfere with religious belief and only minimally, if at all, with the practice of religion. Because the impact on religious belief or practice is minimal and the interest in equal employment opportunities is high, the balance weighs heavily in favor of upholding Fremont Christian's liability under Title VII for its sexually discriminatory health insurance compensation program.

Id. at 1369.

Thus, religious entities are only allowed to be shielded from liability when they can show (1) the purpose of the employment decision is religious discrimination, and (2) that sex is not a but-for cause in the decision. If a religious institution presents convincing evidence that the employment practice results from religious discrimination, Section 702 deprives the EEOC of jurisdiction to investigate further to see whether the religious discrimination in question is a pretext for some other form of discrimination. Mississippi Coll., 626 F.2d at 485. However, since this Court has decided that sex was a but-for cause of Plaintiff's removal, Defendants do not qualify for Section 702 or 703 protection. It is clear that religious exemptions do not let religious organizations facially discriminate based on sex. Fremont Christian Sch., 781 F.2d at 1364.

Defendants would like to see the Section 702 and 703 exemptions broadened to afford greater protections to the Catholic Church and church-sponsored institutions. However, this could lead to legal outcomes that completely erase Title VII's protections for protected groups working for religious institutions. See Starkey, 496 F. Supp. 3d at 1203. Religious institutions oversee a great number of employees in the United States. Seventy-eight percent of private schools in the United States were religiously affiliated in 2014, and fourteen and half percent percent of hospitals were religiously affiliated in 2016. ("Private School Statistics at a Glance,"

Council for American Private Education, https://www.capenet.org/facts.html. Last visited June 16, 2021); ("Growth of Catholic Hospitals and Health Systems," Mergerwatch, http://www.mergerwatch.org/. Last visited June 28, 2021). Defendants' argument would let religious employers completely bypass Title VII liability, if they could prove their discrimination was related to a religious justification. This would erase protections against racial discrimination, sexism, gender discrimination, sexual orientation discrimination, and xenophobia by employers against hundreds of thousands of employees. "Consider a religious employer that genuinely believes the Bible forbids interracial marriage. Under Defendants' interpretation of Section 702, that employer would be free to terminate an employee who married someone of a different race." Starkey, 496 F. Supp. 3d at 1203; see also Leora F. Eisenstadt, Enemy and Ally: Religion in Loving v. Virginia and Beyond, 86 FORDHAM L. REV. 2659, 2659-63 (2018) (explaining how religion has been used to oppose and prohibit interracial marriage).

If Congress wished to allow religious employers to do all of these things, it could have. But instead, it wrote narrow exemptions in the form of Sections 702 and 703. Under the current statute, religious institutions may employ those with similar faiths, but they may not discriminate against other protected classes. This Court therefore agrees with judicial precedent that Sections 702 and 703 are narrowly drawn and holds that those exemptions do not apply to shield Defendants from liability in this case.

### c. Church Autonomy Doctrine

The First Amendment's Establishment Clause prohibits excessive government intrusion upon religion, and the Free Exercise Clause protects a religious organization's right to decide important matters of faith, governance, and religious doctrine. U.S. CONST. AMEND. 1. It has long been held that church autonomy, supported by the Religion Clauses, guarantees religious

organizations "independence from secular control or manipulation," especially regarding ecclesiastical matters. Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952).

Yet, "[c]hurches are not—and should not be—above the law. Like any other person or organization . . . [t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." Rayburn v. Gen. Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir. 1985); see, e.g., EEOC, 626 F.2d 477, cert. denied, 453 U.S. 912 (1981) (Title VII could be applied to promotion of secular teacher in religious educational institution); EEOC v. Sw. Baptist Theological Seminary, 651 F.2d 277 (5th Cir. 1981), cert. denied, 456 U.S. 905 (1982) (Title VII applicable to administrative and support staff at a seminary). The Fourth Circuit has clarified that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." EEOC v. Roman Cath. Diocese of Raleigh, N.C. 213 F.3d 795, 801 (4th Cir. 2000).

Because the church autonomy doctrine is not without limits and does not apply to secular decisions, even when made by churches, a threshold inquiry to trigger church autonomy protections is "whether the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 657 (2002) (citing Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). Next, the inquiry is whether the employment dispute is ecclesiastical, meaning it concerns "discipline, faith, internal organization, or ecclesiastical rule, custom or law," Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976), or a case in which the courts should find religious institutions civilly liable for "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." Gen.

Council on Fin. and Admin. of & United Methodist Church v. California Superior Ct., 439 U.S. 1369, 1373 (1978).

The ministerial exception is a branch of church autonomy doctrine. See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 190 (2012). Within employment discrimination law and Title VII of the Civil Rights Act of 1964, the ministerial exception prohibits legal claims relating to the employment relationships between religious organizations and their ministers. Id. at 188. The ministerial exception, as a "corollary" of the Establishment Clause, restricts the courts from addressing purely religious questions about the employment of ministers. Peter J. Smith & Robert W. Tuttle, Civil Procedure and the Ministerial Exception, 86 FORDHAM L. REV. 1847, 1884 (2018) (proposing that the "government not only lacks prescriptive jurisdiction to regulate the qualifications for ministerial employment, but the courts also face an adjudicative disability to deciding them"). The ministerial exception applies to organizations like Catholic schools and other organizations whose "'mission is marked by clear or obvious religious characteristics.'" Conlon v. InterVarsity Christian Fellowship, 777 F.3d 829, 834 (6th Cir. 2015) (quoting Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 310 (4th Cir. 2004)); see also Fratello v. Archdiocese of N.Y., 863 F.3d 190, 192-93, 206 (2d Cir. 2017) (applying the ministerial exception to a Catholic elementary school).

Defendants argue that the church autonomy doctrine provides broad protections, and that a religious institution is not limited to, nor must rely solely upon, a ministerial exception defense to avoid Title VII liability. (Doc. No. 63 at 16). Defendants also argue that the ministerial exception is simply one application of the broader church autonomy doctrine, and that the ministerial exception is a narrow defense "carved" out by the courts to protect the church from Title VII employment discrimination cases specifically brought by ministers. (Doc. No. 48 at 2)

24

(discussing Skrypczak v. Roman Cath. Diocese of Tulsa, 611 F.3d 1238, 1242 n.4 (10th Cir. 2010); (see also Doc. No. 35 at 5) (discussing Gomez v. Evangelical Lutheran Church in Am., No. 1:07CV786, 2008 WL 3202925, at *6-7 (M.D.N.C. Aug. 7, 2008)). The Court disagrees with both arguments.

The church autonomy doctrine is narrow in the sense that it prevents civil courts from taking "cognizance of purely spiritual or ecclesiastical questions." Watson v. Jones, 80 U.S. 679, 710 (1871). "Freedom to select the clergy, where no improper methods of choice are proven," is "part of the free exercise of religion," reserved to church autonomy, and exactly the type of religious issue that church autonomy is intended to preclude the courts from addressing. Kedroff, 344 U.S. at 116. As such, the ministerial exception was created to demarcate the line where a religious organization's First Amendment rights outweigh the government's compelling interest in eradicating employment discrimination. See Rayburn, 772 F.2d at 1168-69.

In the context of employment, the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception. See Roman Cath. Diocese of Raleigh, N.C. 213 F.3d at 801. If the church autonomy doctrine was so expansive as to create in all religious employers a First Amendment right to engage in employment discrimination, then there would be no need to have a ministerial exception because Title VII would not protect any employee of a religious organization. Religious autonomy means there are some specific cases in which religious organizations can discriminate against employees who perform certain key roles. Our Lady of Guadalupe, 140. S. Ct. at 2060. "[T]eachers at religious schools who are entrusted with the responsibility of instructing their students in the faith" are ideal candidates for a ministerial exception, but the Supreme Court never intended to expand a religious organization's autonomy to encompass all types of employment discrimination. Id. at

2055; see Herx v. Diocese of Ft. Wayne-South Bend Inc., 48 F. Supp 3d 1168, 1176-77 (N.D. Ind. 2014) (holding that a Catholic school language arts teacher was not a minister just because she supervised prayer); Bohnert v. Roman Cath. Archbishop of San Francisco, 136 F. Supp. 3d 1094, 1114-15 (N.D. Cal. 2015) (holding that a biology teacher was not a minister even though she spent some time daily on campus ministry duties).

Adding an additional wrinkle to this doctrine is that the ministerial exceptional defense likely cannot be waived. In Hosanna-Tabor, the Supreme Court held that the ministerial exception is an affirmative defense, and not a jurisdictional bar. 565 U.S. at 195 n.4. Even though the Court classified the ministerial exception as an affirmative defense, the reasoning of the Court in Hosanna-Tabor indicates that the ministerial exception is unwaivable. The "Religion Clauses bar the government from interfering" with the selection of ministers by religious organizations. Hosanna-Tabor, 565 U.S. at 181. "The Establishment Clause . . . prohibits government involvement in such ecclesiastical decisions." Id. at 189. It is thus "impermissible for the government to contradict a church's determination of who can act as its ministers." Id. at 185. In keeping with this logic, most circuits hold that a religious organization cannot explicitly waive the ministerial exception defense. Conlon, 777 F.3d at 836 ("The ministerial exception is a structural limitation imposed on the government by the Religious Clauses, a limitation that can never be waived."); Tomic v. Cath. Diocese of Peoria, 442 F.3d 1036, 1042 (7th Cir. 2006) (holding that the ministerial exception is not waivable), abrogated on other grounds by Hosanna-Tabor, 565 U.S. at 171; but see Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318-19 (11th Cir. 2012) (holding that a religious organization may waive the defense on appeal by failing to raise it in its brief).

While Defendants may be prohibited from waiving a ministerial exception defense, the parties are not prohibited from stipulating to a set of factual circumstances that they believe lead to a particular conclusion under the ministerial exception. In other words, courts cannot force a religious organization to recognize someone as a minister whom that organization has definitively declared is not a minister. To do so would have courts making impermissible ecclesiastical decisions. From the outset, Defendants stipulated that Plaintiff is not a "minister" for purposes of the ministerial exception. (Doc. No. 28-1). The Court agrees that Plaintiff, as a substitute teacher of a purely secular subject, occupied no such role. Even if Defendants had not entered into that stipulation, however, the Supreme Court's recent decisions would confirm that Plaintiff was not a ministerial employee.

The Court in Hosanna-Tabor focused on four relevant circumstances in its ministerial exception analysis but explicitly declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." 565 U.S. at 190-92. First, whether the religious organization gave the employee the title of "minister, with a role distinct from that of most of its members." Id. at 191. Second, whether the employee's position "reflected a significant degree of religious training followed by a formal process of commissioning." Id. Third, whether the employee "held [themselves] out as a minister of the Church by accepting the formal call to religious service," or by claiming religious tax benefits. Id. at 191-92. And fourth, whether the employee's "job duties reflected a role in conveying the Church's message and carrying out its mission." Id. at 192. But the recognition of the significance of those factors in Hosanna-Tabor does not mean that they must be met—or even that they are necessarily important—in all other cases. Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140. S. Ct. 2049, 2063 (2020). The title "minister" is not

itself dispositive to the ministerial exception, as many religions do not use the term. Id. "What matters, at bottom, is what an employee does." Id. at 2064.

In Hosanna-Tabor, the Supreme Court held that a Lutheran school was shielded from an employment discrimination claim because Cheryl Perich qualified as a minister under the ministerial exception. In reaching this decision, the Court weighed the following factors in favor of finding that Ms. Perich qualified as a minister: she (1) possessed the title "Minister of Religion," (2) received religious educational training including eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of Lutheran teacher, (3) participated in a formal process of commissioning as a minister, (4) needed to obtain endorsement of her local Synod district, (5) passed an oral examination by the faculty committee at a Lutheran College, (6) became a minister only after election by the congregation, which recognized God's call to her to teach, (7) held herself out as a minister, and (8) carried out the church's mission by "leading students toward Christian maturity," teaching religion four days a week, leading students in prayer three times a day, accompanying students to weekly chapel, and leading chapel twice a year. Hosanna-Tabor, 565 U.S. at 191-92. "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church," the Court held that "Perich was a minister covered by the ministerial exception." Id. at 192.

In Our Lady of Guadalupe, the Supreme Court held that two different Catholic elementary schools were shielded by the ministerial exception from employment discrimination claims brought by Ms. Morrissey-Berru and Ms. Biel. 140 S. Ct. at 2066-67. The Court looked broadly at the roles these teachers served in their schools to determine if the ministerial exception should apply. In reaching this decision, the Court weighed the following facts in favor

of finding that Ms. Morrisey-Berru qualified as a minister: she (1) took religious education courses at the school's request, (2) was expected to attend faculty prayer services, (3) entered into employment agreements at the beginning of each year that clearly stated the school's Catholic mission and her role in advancing it, (4) participated in school liturgical activities, (5) was considered a catechist by the Archdiocese, (6) taught religion in her classroom and tested students on that curriculum, (7) directed and produced an annual passion play, (8) prepared and accompanied students to weekly Mass and other religious services, and (9) prayed with her students, including a daily Hail Mary. Id. at 2056-57. The Court weighed the following facts in favor of finding that Ms. Biel qualified as a minister: she (1) attended a conference that taught ways to incorporate God into the classroom, (2) entered an employment contract "nearly identical to Morrissey-Berru's," (3) was required to teach religion for 200 minutes each week, (4) administered a test on religion each week, (5) used a religious textbook in her classroom, (6) worshipped with her students, (7) prepared students to be active in the Mass by teaching them about the Eucharist and confession, (8) prayed with her students at monthly Masses, and (9) was required to pray with her students every day—Ms. Biel prayed with her students twice a day. Id. at 2058-59. Because of the "abundant record evidence that [] both [teachers] performed vital religious duties[,]" the Court held that they qualified as ministers under the ministerial exception. Id. at 2066.

Unlike the teachers in these two most recent Supreme Court cases, very few facts weigh in favor of finding that Plaintiff is a minister. The only factor that weighs in favor of finding that he is a minister is that he works at a Catholic School with a Catholic mission and was tasked in his employment handbook with helping Defendants carry out their religious mission. However, many other facts in the record indicate that he was not a minister, as Defendants have stipulated.

First, Defendants did not bestow the title of "minister, with a role distinct from that of most of its members[,]" on Plaintiff. Hosanna-Tabor, 565 U.S. at 191. Plaintiff was primarily a substitute teacher of English and drama—purely secular subjects. Unlike the plaintiff in Hosanna-Tabor, who was issued a "diploma of vocation" and accorded the official title of "Minister of Religion, Commissioned," Plaintiff here was a non-contractual secular employee. 565 U.S. at 191. Furthermore, unlike the plaintiff in Hosanna-Tabor, Plaintiff was not required to be a Catholic or even a Christian to hold his post.

Second, the Court agrees with Defendants that Plaintiff's position did not "[reflect] a significant degree of religious training followed by a formal process of commissioning." Id. The plaintiff in Hosanna-Tabor had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher. Id. Here, however, Plaintiff did not have to undergo any religious training. (Doc. No. 31-17 at 58:6-17). He attended some individual religious training sessions when serving as a full-time employee of Charlotte Catholic High School, but this does not amount to a significant amount of religious training. (Doc. No. 31-1 at 120:2-21).

Third, Plaintiff did not "[hold] [himself] out as a minister of the Church by accepting the formal call to religious service" or by claiming religious tax benefits. Hosanna-Tabor, 565 U.S. at 191-92. Plaintiff, as with other teachers at Charlotte Catholic, would sometimes begin class with a prayer. (See Doc. No. 31-1 at 106-09). But sometimes he would have students lead prayer and sometimes there would be no prayer at all. (See id.). The content of the prayer was not specified, the prayers could be ecumenical, and the prayers were not required. (Doc. No. 31-17 at 64:1-14; Doc. No. 31-1 at 106).

Finally, Plaintiff's position as substitute English and drama teacher did not directly "[reflect] a role in conveying the Church's message and carrying out its mission." Hosanna-Tabor, 565 U.S. at 192. Charlotte Catholic High School teachers do not have to reference Catholic principles. (Doc. No. 31-17 at 74:2-17). The High School administration prefers that secular teachers, like Plaintiff, avoid discussing Catholic doctrine. (Doc. No. 31-16 at 28:2-15). Unlike all three teachers in Hosanna-Tabor and Our Lady of Guadalupe, Plaintiff did not teach religion in his classes and was not tasked with preparing students for participation in Catholic worship services.

In sum, the church autonomy doctrine is not as broad as Defendants would have the Court believe. See Little Sisters of the Poor Saints Peter & Paul Home v. Penn., 140 S. Ct. 2367, 2397 n.1 (2020) (Kagan, J., concurring in the judgment) (explaining that in the context of employment discrimination, "there is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation"). The ministerial exception is the strongest expression of that doctrine in the employment context, and the exception likely cannot be waived. However, Defendants have stipulated that Plaintiff was not a minister, and the Court agrees. But even if they had not made such a stipulation, the Court would find that Plaintiff was not a minister for the purposes of the ministerial exception. As such, church autonomy does not shield Defendants against Title VII liability for sex discrimination.

### d. The Religious Freedom Restoration Act

Defendants next argue that RFRA shields them from Plaintiff's sex discrimination claim. (Doc. No. 30 at 18). RFRA was passed in reaction to the Supreme Court's decision in Employment Division v. Smith, where the Court altered the First Amendment's Free Exercise

test to permit laws that are facially neutral, even if they incidentally burden religious exercise. See Emp. Div., Dept. of Hum. Res. of Or. v. Smith, 494 U.S. 872 (1990); 42 U.S.C. § 2000bb(a)(4). RFRA reinstituted the Sherbert-Yoder test. 42 U.S.C. § 2000bb(b)(1). This test did not allow the government to substantially burden religion—even with a facially neutral law— without a compelling governmental interest. See Wisconsin v. Yoder, 406 U.S. 205, 220 (1972).

Therefore, under RFRA, once it is found that the government is substantially burdening a party's free exercise of religion—as defined by RFRA—the government's action can only survive by satisfying the RFRA exception. 42 U.S.C. § 2000bb-1. The exception has two parts: (1) whether the burden imposed on the party asserting RFRA is in furtherance of a compelling governmental interest, and (2) whether the imposed burden is the least restrictive means of furthering the compelling governmental interest. Id. Essentially, when RFRA is asserted as a defense, it functions as a burden-shifting statute. Listecki v. Official Comm. Of Unsecured Creditors, 780 F.3d 731, 736 (7th Cir. 2015).

Whether RFRA applies to suits between private parties has not been resolved by the Supreme Court or the Fourth Circuit. See Bostock, 140 S. Ct. at 1754. This Court holds that RFRA does not apply to suits between purely private parties.

As an initial matter, it is important to clarify that RFRA does not operate under the First Amendment; therefore, cases in which the First Amendment has been permitted as a defense in suits between private parties are irrelevant. Defendants argue that, since the First Amendment has been used as a defense in suits between private parties before, RFRA can as well. (Doc. No. 63 at 12). In N.Y. Times v. Sullivan, the New York Times was sued by Sullivan, a Public City Commissioner in Alabama, in his personal capacity, for libel under Alabama law. 376 U.S. 254, 256 (1964). The New York Times asserted the First Amendment as a defense to the Alabama

32

libel law. <u>See id.</u> at 264-65. The Supreme Court sustained the defense, explaining "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." <u>Id.</u> Likewise, in <u>Hustler Mag., Inc. v. Falwell</u>, 485 U.S. 46, 56-57 (1988), the Supreme Court allowed <u>Hustler Magazine</u> to use the First Amendment as a defense to Virginia's intentional infliction of emotional distress law because the law prohibited speech that is protected by the First Amendment.

The Supreme Court in <u>Snyder v. Phelps</u>, 562 U.S. 443, 451 (2011), stated that the First Amendment's plain text, which reads "Congress shall make no law … abridging the freedom of speech," allows the First Amendment to be used as a defense in state tort suits—as seen in <u>Sullivan</u> and <u>Hustler Magazine</u>. Of course, the Free Exercise Clause reads the same way: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I. This language, however, is inapplicable to the instant case because RFRA *is not* an exercise of First Amendment Free Exercise Clause enforcement. <u>City of Boerne v. Flores</u>, 521 U.S. 507, 532-35 (1997). Thus, the language "Congress shall make no law" is simply not applicable to a RFRA defense. Therefore, the reasoning underlying the application of the First Amendment as a defense is inapplicable to RFRA.

Second, the plain language of the statute shows that RFRA does not apply to private parties. The relevant portions of RFRA include:

> 42 U.S.C. § 2000bb:
> (a) Findings
> The Congress finds that--
>> (3) governments should not substantially burden religious exercise without compelling justification;
>> (4) in <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion;

Case 3:17-cv-00011-MOC-DCK   Document 69   Filed 09/03/21   Page 33 of 54

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are--

(1) to restore the compelling interest test as set forth in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963) and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb-1: Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial Relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb-2: Definitions

As used in this chapter--

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

42 U.S.C. § 2000bb-3: Applicability

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

Defendants rely heavily on a Second Circuit decision that has since been called into question by the Second Circuit. <u>See</u> <u>Hankins v. Lyght</u>, 441 F.3d 96, 104 (2d. Cir. 2006) (holding RFRA applies in suits between private parties); <u>See also</u> <u>Rweyemamu v. Cote</u>, 520 F.3d 198, 201 & n.2 (2d Cir. 2008) (stating the Second Circuit has doubts about its determination in <u>Hankins</u>,

34

and that it "does not understand" how RFRA can apply to suits between private parties "regardless of whether the government can enforce it"). The Hankins court reasoned that the language of RFRA was broad enough to encompass suits between purely private parties because the statute states RFRA "applies to all Federal law, and the implementation of that law," including "as a … defense in a judicial proceeding." 441 F.3d 96 at 103 (quoting §§ 2000bb-3(a), 2000bb-1(c)). The court decided that the only conceivable limiting language is the phrase "and obtain appropriate relief against a government." Id. (quoting § 2000bb-1(c)). The court said interpreting the phrase "against the government" as being restrictive would require a reading "involv[ing] a convoluted drawing of a hardly inevitable negative implication." Id.[1]

The dissent in Hankins, written by then-judge Sotomayor, began by stating that the limiting language the majority noted is not, in fact, the only such language, and that all of the statute's provisions must be read as a whole. See id. at 114. The dissent then analyzed the langauge of Section 2000bb-1(b), which states the "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person." Id. The term "demonstrates" is defined as "meet[ing] the burdens of going forward with the evidence and of persuasion." Id. (quoting § 2000bb-2(3)). The dissent concluded that the government cannot "demonstrate" the burden, as defined by the statute, without being a party. Id. Furthermore, the dissent said the phrase "obtain appropriate relief against a *government*" limits RFRA to suits where the government is a party. Id. (emphasis in original). The dissent went on to address Section 2000bb-3(a), which states RFRA applies to "all Federal law." Id. at 115 (quoting 2000bb-3). The dissent reasoned that, when reading the statute as a whole, this "provision simply

---

[1] The only case other than Hankins that can be construed as favoring Defendants' position is In re Young, 141 F.3d 854 (8th Cir. 1998). However, the Eighth Circuit in this case did not even discuss—much less hold on—the private party issue.

requires courts to apply RFRA to all Federal law in any lawsuit to which the government is a party." Id. (internal quotations omitted).

Three other circuits have decided the issue, and all three have sided with the dissenting opinion in Hankins and held that RFRA does not apply to suits between private parties. See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 410 (6th Cir. 2010); see also Listecki, 780 F.3d at 737; Tomic, 442 F.3d at 1042; Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835-36 (9th Cir. 1999). The Sixth Circuit decided RFRA did not apply to suits between private parties. McGill, 617 F.3d at 410. In addition to adopting the textualist analysis of the Hankins dissent, the McGill court noted that RFRA requires the burden to be imposed by the government and that a compelling justification is required by the government. Id. at 411. Since the government cannot satisfy this burden without being a party, the court reasoned that RFRA cannot apply to suits between private parties. Id. The Seventh Circuit came to the same conclusion. Tomic, 442 F.3d at 1042. Judge Posner, writing for the court, described the majority's decision in Hankins as "unsound" and reasoned that "RFRA is applicable only to suits to which the government is a party." Id. In a later case, the Seventh Circuit expanded on Judge Posner's statement by explicitly holding that RFRA is a burden-shifting test where the burden of evidence and persuasion shifts from the party asserting RFRA to the government. Listecki, 780 F.3d at 736-37. The court expressly held that "RFRA is not applicable in cases where the government is not a party." Id. at 736. The Ninth Circuit also decided that RFRA does not apply to suits in which the government is not a party. Sutton, 192 F.3d at 835-36. The court stated RFRA was only applicable to private parties who were willfully participating with a government entity in some activity such that it would be fair to attribute their conduct to the government. Id. at 843. Thus, the Ninth Circuit essentially required a party to either be the government, or to be

so intertwined with the government that it would be fair to consider the party's actions to be the government's. See id.

In addition to the decisions in the circuit courts, district courts have almost universally agreed that RFRA does not apply to suits between private parties. See Boggan v. Miss. Conf. of the United Methodist Church, 222 Fed. App'x 352 (8th Cir. 2007) (affirming a district court decision that held RFRA does not apply to suits between private parties); see also Mathis v. Christian Heating & Air Conditioning, Inc., 158 F. Supp. 3d 317, 325-28 (E.D. Pa. 2016) (relying heavily on the reasoning in Listecki and McGill and explicitly rejecting the majority's reasoning in Hankins); Goodman v. Archbishop Curley High Sch., Inc., 149 F. Supp. 3d 577, 588-589 (D. Md. 2016) (stating—in a case between two private parties—that "there is no basis to dismiss this case under [RFRA]"); Johnson v. Wireman, No. 1:15-CV-02254, 2019 WL 1383575, at *5 (W.D. Pa. Mar. 27, 2019) (holding RFRA does not apply unless the government is a party).

Moreover, as noted earlier, the Hankins decision has received criticism from the Second Circuit itself. See Rweyemamu, 520 F.3d at 201 & n.2. Some district courts in the Second Circuit have also expressed their hesitations about applying RFRA to suits between private parties. See Redhead v. Conf. of Seventh-Day Adventists, 440 F. Supp. 2d 211, 218-19 (E.D.N.Y. 2006) (stating "[t]he court has strong reservations in proceeding on the assumption that the RFRA is applicable in a suit between private parties, especially considering the plain language of the statute"); see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 531 B.R. 439, 483-84 (Bankr. S.D.N.Y 2015) (stating RFRA does not apply because the government is not a party); Wisc. Province of Soc'y of Jesus v. Cassem, 373 F. Supp. 3d 378, 390 (D. Conn.

2019) (stating "[t]he text of the statute lends itself to the interpretation that the Government must be taking some action in order for RFRA to apply").

In addition to the nearly uniform precedent holding that RFRA does not apply to purely private parties, it is clear from the Court's own analysis of the statute that the plain text mandates that RFRA does not apply in such circumstances. When interpreting a statute, a court should apply the plain and ordinary meaning if the statute is not ambiguous. See Bostock, 140 S. Ct. at 1749 ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end."). In determining the plain or ordinary meaning of a statute, it is helpful to apply canons of construction to glean the plain or ordinary meaning from the text. See Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001). Canons of statutory construction "need not be conclusive[,]" but "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." Id. (internal citations omitted). In the instant case, the statute is clear: RFRA only applies when the government is a party to the suit.

The whole-act rule is often pertinent for statutes that have multiple sections, like RFRA. This rule stipulates that any one section of a statute cannot be read in isolation; rather, it must be read in conjunction with the rest of the statute. See Hankins, 441 F.3d at 114-15 (applying the whole-act rule when interpreting RFRA) (Sotomayor, J., dissenting); see also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-42 (1989) (analyzing section of Bankruptcy Code in conjunction with the rest of the act); Philbrook v. Glodgett, 421 U.S. 707, 713 (1975) (analyzing assistance statute for dependent children with whole-act rule); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) (analyzing Consumer Credit Protection Act with whole-act rule). Since RFRA is a multi-section statute, an analysis of RFRA necessarily involves interpreting each section in

conjunction with the rest in order to determine the statute's plain meaning. While applying the whole-act rule, the Court will also apply the following canons: the presumption of consistent usage, the rule to avoid surplusage, the general terms canon, and *expressio unius est exclusio alterius*.

Under RFRA, Section 2000bb-1(b) clearly stipulates the *government* must *demonstrate* the burden is in furtherance of a compelling governmental interest and is the least restrictive means of serving this interest. The word "demonstrate" "means meets the burdens of going forward with the evidence and of persuasion[.]" § 2000bb-2(3). The word "government" as used in this section cannot mean a private plaintiff because the term is clearly defined in Section 2000bb-2(1). In this definition, there is no mention of a private party or any word or phrase that can be construed as such. See § 2000bb-2(1). The presumption of consistent usage stipulates that "a term generally means the same thing each time it is used." United States v. Castleman, 572 U.S. 157, 174 (2014) (Scalia, J., concurring). Accordingly, under this canon, the word "government" as used in Section 2000bb-1(b) must have the same meaning as the word "government" as defined in Section 2000bb-2(1). Thus, the party carrying the burden cannot be a private party. Since the government cannot carry the burden of persuasion and evidence if they are not a party to the suit, see Hankins, 441 F.3d at 114-15, and a private citizen cannot carry the burden in the government's place, the government must be a party for a RFRA claim.

Defendants attempt to argue that the judiciary constitutes the government under the statute. However, since the meaning is presumed to be the same throughout, it cannot be argued that the judiciary—as the "government"—is "substantially burdening" Defendants pursuant to Section 2000bb-1(a) because the judiciary—as the same "government" in 2000bb-1(a)—cannot carry the burden of evidence and persuasion required of the "government" in Section 2000bb-

1(b). There is no meaningful variation in the way the term is used, so the term "government" used in each section must carry the same meaning. See Matthew R. Christiansen & William N. Eskridge, Jr., Congressional Overrides of Supreme Court Statutory Interpretation Decisions, 1967—2011, 92 Tex. L. Rev. 1317, 1447 (2014) (stating the canon of meaningful variation "presumes that different statutory language must have completely different meanings"). Thus, the judiciary cannot be the source of the "burden" under the definition of "government" defined in the statute. Any attempt to argue that Congress could be the source of the governmental burden, rather than the judiciary, would meet the same fate because Congress is equally incapable of carrying the burden of persuasion and evidence.

Additionally, the rule to avoid surplusage states "that a court should give effect, if possible, to every clause or word of a statute." Moskal v. United States, 498 U.S. 103, 104 (1990). Based on the definitions of "government" and "demonstrate" provided in the statute, it is logically impossible to have the government demonstrate the application without being a party to the case. See §§ 2000bb-2(1), 2000bb-2(3). Thus, under Defendants' interpretation of RFRA, Section 2000bb-1(b), which requires the government to demonstrate the exception to RFRA, would become ineffectual.

Moreover, RFRA may be used as a "defense in a judicial proceeding[,] and [the defendant may] obtain appropriate relief against a government." § 2000bb(b)(2). In an adversarial judicial system, parties to a suit are described as arguing "against" one another. The word "relief" is used when asking the court to have the other party alter their behavior. As stated above, the word "government" cannot mean a private party. This court does not have any jurisdiction over a party that is not involved in the suit, so the court can only grant relief against parties to the suit. The phrase "against a government," therefore, is best understood—in the

40

context of the adversarial judicial system—as meaning the government must be an adversary to the party asserting RFRA in the suit. See id. Thus, Defendants, by attempting to assert RFRA against a private party, are asking the Court to not give effect to the phrase "against a government." In other words, Defendants' argument treats that phrase as mere surplusage.

Under the rule to avoid surplusage, this Court cannot disregard the majority of the written statute simply because the purpose clause indicates a return to a common law test that occasionally had different results. See Bostock, 140 S. Ct. at 1749 (stating "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration"). The purpose clause states that RFRA is reinstituting the First Amendment's Sherbert-Yoder test, which was sometimes applied to private parties. § 2000bb(b)(1); see also Molko v. Holy Spirit Ass'n., 762 P.2d 46 (Cal. Sup. Ct. 1988). Interpreting this clause to mean that RFRA applies to suits between private parties would practically render the majority of the statute ineffectual. To illustrate, what effect would the definitions of "government" and "demonstrates" have if the given definitions are necessarily canceled out by the common law meanings under Sherbert-Yoder? Moreover, what purpose would there be for *any* other section in the statute? If Congress did intend to have RFRA apply to suits between private parties, the evidence is not found anywhere within the statute.

The only way to give effect to every word of the statute is to hold that RFRA only applies when the government is a party. Contrary to Defendants' argument, it *is* logically possible for RFRA to apply "to all Federal law" *and* apply only when the government is a party. See § 2000bb-3(a); see also Hankins, 441 F.3d at 115 (Sotomayor, J., dissenting) (stating "there is no acceptable reading of the statute that would" support holding that RFRA applies to suits between private parties). RFRA practically acts as a modifier to every federal law, and the requirement

that the government be a party simply acts as a condition that must be met in order to trigger RFRA's protections, even though these protections will potentially reach each and every federal law. In short, while RFRA modifies every federal law, the conditions necessary to trigger its protections are not always satisfied.

It is important to note that the general terms canon cannot save Defendants' argument that not allowing a RFRA defense in a suit between private parties would improperly limit the phrase "applies to all Federal law." "The General-Terms Canon dictates that '[w]ithout some indication to the contrary, general words (like all words, general or not) are to be accorded their full and fair scope [and] are not to be arbitrarily limited.'" Koenke v. Saint Joseph's Univ., No. CV 19-4731, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)); see also § 2000bb-3(a). RFRA explicitly states that "[g]overnment shall not substantially burden a person's exercise of religion" and that government must demonstrate the exception to RFRA. See §§ 2000bb-1(a-b). These sections directly indicate that the phrase "all Federal law" is, in fact, limited to suits where the government is a party.

Of course, the rule to avoid surplusage canon states that all words and phrases should be given effect *if possible*. Moskal, 498 U.S. at 104. One way in which it would not be "possible" to give the words their plain meaning is if it were to produce an absurd result. See Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (explaining "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms") (citations omitted). The "absurdity doctrine" began when (and has remained constant since) the Marshall Court stated that the duty of a court to follow the statute ceases when "the plain meaning of a provision, not contradicted by any other provision in

the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." John F. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2388 (2003) (quoting Sturges v. Crowinshield, 17 U.S. 122, 202-03 (1819)).

Defendants contend that reading the statute to not apply when the government is not a party triggers the absurdity doctrine. Here, the EEOC issued a right-to-sue letter to Plaintiff, which means the EEOC *specifically chose not to* enforce Title VII. See Perdue v. Roy Stone Transfer Corp., 690 F.2d 1091, 1093 (4th Cir. 1982) (noting that "on at least two occasions, the Supreme Court has referred to statutory notice of the right to sue as a jurisdictional prerequisite to private enforcement"). The EEOC is mandated by law to issue the right-to-sue letter if they do not decide to bring enforcement action, or after 180 days. Id. at 1092-93. Instead of enforcing Title VII, the EEOC allowed Plaintiff to enforce his rights himself. At this point, there is no government involvement. The right-to-sue letter itself cannot constitute government action because it is precisely the opposite: it is government *inaction*. Defendants' absurdity argument, then, is that having a different legal standard—for a suit between private parties where the government could intervene, and a suit where the government is formally a party—is itself absurd. The majority in Hankins relied on this distinction in stating RFRA applies to suits between private parties. Hankins, 441 F.3d at 103-04. The majority stated that "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party," and that a decision on the merits should not depend on who brings the action. Id. at 103. The dissent in Hankins rejected the significance of this distinction and ultimately determined that RFRA's protections can change based on who is enforcing it because

43

the plain language of the statute says that it does, in fact, change. Id. at 115 (Sotomayor, J., dissenting).

Other courts have noted such a distinction exists and have considered the lack of an agency that can intervene as one of many factors in their decisions. See Listecki, 780 F.3d at 737 (stating the only circuit to apply RFRA to a suit between private parties did so when the government could have been a party); McGill, 617 F.3d at 411 (stating one of the court's reasons for not following the majority in Hankins—in addition to the plain language not supporting their decision—was because the government could have enforced the statute in Hankins). However, one court has considered the distinction directly and rejected its significance. See Mathis, 158 F. Supp. 3d at 328 (explicitly rejecting the reasoning in Hankins regarding the absurdity of having different standards for government and private enforcement).

The Court concludes that the alleged undesirable policy consequence of having a different standard for private and government enforcement can hardly be called absurd. The United States as a nation has always been cautious of governmental overreach. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010) (stating the First Amendment is "[p]remised on mistrust of governmental power"); see also Letter from Thomas Jefferson to James Madison (Dec. 20, 1787) (on file with National Archives) (stating "I own I am not a friend to a very energetic government. It is always oppressive."). This is the entire reason for the inclusion of the Bill of Rights—including the Free Exercise Clause of the First Amendment—in the Constitution. Letter from Thomas Jefferson to James Madison (Dec. 20, 1787) (on file with National Archives) (stating "no just government should refuse" a Bill of Rights because government cannot be trusted). The Bill of Rights was not designed to protect a citizen from his neighbor, but rather to protect the citizen from the government. Barron v. City of Baltimore, 32

44

U.S. 243, 250 (1833) (the amendments to the Bill of Rights "demanded security against the apprehended encroachments of the general government."). Therefore, distinguishing between private and government enforcement is not monstrous or absurd; rather, the distinction is in keeping with both the ideas of the Framers and two hundred years of precedent interpreting the Bill of Rights.

Lastly, the canon *expressio unius est exclusio alterius* stipulates that the expression of "one item of [an] associated group or series excludes another left unmentioned." N.L.R.B. v. SW General, Inc., 137 S. Ct. 929, 940 (2017) (quoting Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002)). The canon applies when "circumstances support a sensible inference that the term left out must have been meant to be excluded." SW General, 137 S. Ct. at 940 (quoting Echazabal, 536 U.S. at 81) (internal alterations omitted). Here, there is such an inference that suits between private parties were meant to be excluded. Section 2000bb-1(b) gives rise to an inference that the government must be a party in order to carry out their burden of proof. Section 2000bb-2(1) defines government, leaving no room for private parties to be included. There is simply no other language inconsistent with this interpretation. Thus, the inference that private parties are meant to be excluded from RFRA is valid.

Since the plain meaning of the statute is clear, the Court's job is at an end. See Bostock, 140 S. Ct. at 1749. However, even if the Court looks to extratextual sources for legislative intent, RFRA's legislative history does not favor Defendant's position that RFRA applies to private parties. The Court in Bostock explained that "[l]egislative history, for those who take it into account, is used to clear up ambiguity, not create it." 130 S. Ct. at 1749 (citations omitted) (internal quotations omitted). While the Hankins majority stated the legislative history did not favor one interpretation over the other, many courts—as well as then-judge Sotomayor's dissent

in Hankins—have stated the legislative history favors finding RFRA does not apply to suits between private parties.[2] 441 F.3d at 103; see id. at 115 n.9 (Sotomayor, J., dissenting) (explaining there is not a single example of a citation to a case involving private parties in the legislative history); Listecki, 780 F.3d at 737 (finding the legislative history of RFRA to be comprised solely of cases in which the government is a party); McGill, 617 F.3d at 411 (reasoning that "RFRA's legislative history supports our view that Congress did not intend the statute to apply against private parties"). Thus, precedent indicates that legislative history does not support Defendants' position.

The dissent in Hankins noted it was telling that in twelve years since RFRA's enactment in 1994, no court had previously held that RFRA applies to private parties. 441 F.3d at 115. It has now been twenty-seven years, and Hankins, a decision questioned by district courts in the Second Circuit and the Second Circuit itself, still stands alone as the only court holding RFRA applies to private parties. This Court will not be the second. In sum, the Court follows the overwhelming majority of precedent and holds that RFRA does not apply to suits between private parties because the plain text of RFRA indicates the government must be a party, the distinction between private and government enforcement is not absurd, and the legislative history does not contradict the plain text of RFRA.

### e. Freedom of Expression and Freedom of Association

---

[2] The Senate Committee on the Judiciary issued a report on RFRA that "began by stating that the nation was founded by those with a conviction that they should be free to practice their religion 'free from Government interference' and 'Government actions...' In describing RFRA's purpose, the report refers to 'government actions,' 'only governmental actions,' and 'every government action.'" Listecki, 780 F.3d at 737 (quoting S. Rep. No. 103–111, at 4, 8–9 (1993), reprinted by 1993 U.S.C.C.A.N. 1892, 1894). Furthermore, all of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. See S.Rep. No. 103–111 [1993 U.S.C.C.A.N. 1892] (1993); H.R. Rep. 103–88 (1993).

Finally, Defendants argue that the freedom of association protects their right to not affiliate with Plaintiff. Freedom of association is a constitutional right falling in the "close nexus between the freedoms of speech and assembly." Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958) (citations omitted). There are two protected forms of association, the latter of which is relevant to the instant case: "intimate association" and "expressive association." Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984). Intimate association is not at issue here, as it pertains to the "choices to enter into and maintain certain intimate human relationships[.]" Id. at 617. Expressive association has been derived from the First Amendment and its guarantees of speech, assembly, and petition. Bates v. City of Little Rock, 361 U.S. 516, 522–23 (1960); United Transp. Union v. State Bar of Michigan, 401 U.S. 576, 578–79 (1971); Healy v. James, 408 U.S. 169, 181 (1972). "Freedom of association therefore plainly presupposes a freedom not to associate." Roberts, 468 U.S. at 623.

"To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'" Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000). However, "[t]he First Amendment's protection of expressive association is not reserved [solely] for advocacy groups[,]" and those who merely engage in "some" form of expression fall under its protections. Id. This inquiry requires the court to "independently review the factual record" Id. at 648-49 (citing Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 568 (1995)).

Here, freedom of expressive association does not exempt Defendants from Title VII's anti-discrimination provisions. Moreover, even if freedom of expressive association were applicable, the goals of Title VII are sufficiently compelling and narrowly tailored to warrant its application.

47

Defendants argue that freedom of association protects the action of firing Plaintiff. (Doc. No. 63 at 25-26). To support their argument, Defendants note that they are engaged in expressive activities by seeking to instill Catholic teachings in their students. (Id. at 26). Therefore, forcing Defendants to retain Plaintiff as a substitute teacher would constitute compelling expressive association in violation of the First Amendment. (Id.). This argument fails because it disregards clear precedent that freedom of expressive association is inapplicable in commercial contexts where Title VII's antidiscrimination provisions apply, ignores critical aspects of the Dale decision that make it inapplicable to this case, and fails to consider the overall purpose of the freedom of expressive association.

The only First Amendment rights that would allow a religious institution to circumvent Title VII's protections are the Establishment and Free Exercise ("Religious") Clauses. The Fourth Circuit has expressly stated that, "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C., 213 F.3d 795, 801 (4th Cir. 2000). If the freedom of expressive association encompassed the same rights as the Constitution's Religious Clauses, "the First Amendment analysis [would] be the same," which would be a "result [that] is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." Hosanna-Tabor, 565 U.S. at 189. There would thus be no need to conduct careful analysis of whether a relationship between a religious organization and its employee fell under the ministerial exception. See, e.g., Bryce, 289 F.3d at 656 ("For example, courts have recognized a ministerial exception that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches.") (citations omitted). Moreover, if freedom of association

applied to any entity with an expressive mission, then businesses engaged in some small amount of expressive association would be granted an exception from all statutes governing the relationship between a business and the people they interact with. This preposterous result cannot be the case.

Furthermore, hiring paid employees is commercial activity, not expressive association. Freedom of association does not apply in the employment context. The Supreme Court has specifically ruled that Title VII does not infringe upon the First Amendment rights of employers. Wisconsin v. Mitchell, 508 U.S. 476, 487 (1993) ("In Hishon, we rejected the argument that Title VII infringed employers' First Amendment rights.") (citation omitted); see also Hishon v. King & Spaulding, 467 U.S. 69, 78 (1984). "[T]here is only minimal constitutional protection of the freedom of commercial association." Roberts, 468 U.S. at 634 (O'Connor, J., concurring in part). Furthermore, the Court has acknowledged that "[o]nce a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." Hishon, 467 U.S. at 74.

To advance their novel theory regarding freedom of association, Defendants rely almost entirely on Boy Scouts of America v. Dale, a Supreme Court case involving an anti-discrimination claim brought by a Boy Scouts assistant scoutmaster whose membership was revoked after the Boy Scouts learned he was gay. 530 U.S. at 643-44; (Doc. No. 63 at 25-26). Defendants claim that because the Dale Court ruled against compelling association with a former scoutmaster who was gay, the same outcome is warranted here. This argument fails because it disregards critical aspects of the Dale decision that make it inapplicable to this case.

In Dale, the Supreme Court ruled that freedom of expressive association exempted the Boy Scouts of America from a discrimination claim filed against them. 530 U.S. at 661. Among

the Court's reasons for application of freedom of expressive association was the plaintiff's volunteer status and the fact that the suit sought to enforce a public accommodations law against "a private entity without even attempting to tie the term 'place'" in the statute "to a physical location." Dale, 530 U.S. at 657-59 (2000).

The differences between Dale and the instant case are numerous. The Boy Scouts is a private organization in which the plaintiff was a *volunteer*. See Dale, 530 U.S. at 644. By contrast, the instant case involves employment. Moreover, the action in question in Dale was the application of a New Jersey law banning discrimination on the basis of sexual orientation in places of public accommodation. Dale, 530 U.S. at 645. The Supreme Court was especially suspicious of the application of a public accommodations "law to a private entity without even attempting to tie the term 'place' to a physical location." Id. at 657. Unlike Dale, the instant case does not need to implicate a particular place because it involves a violation of employment protections. The Boy Scouts of America expressly acknowledged that their organization would have been subject to any employment laws which prevented discrimination based on sexual orientation. Dale, 530 U.S. at 672 (Stevens, J., dissenting) ("we are unaware of any statute or ordinance . . . which prohibits discrimination against individual's employment upon the basis of homosexuality. . . . *In the event that such a law was applicable, it would be necessary for the Boy Scouts of America to obey it*") (quoting Boy Scouts President and Chief Scout Executive Letter on policies and procedures with regards to gay men in the Boy Scouts). Due to the Bostock ruling, Title VII now bans such discrimination. Bostock, 140 S. Ct. at 1744. In short, Dale does not provide significant support for Defendants' arguments.

Next, even if freedom of expressive association were to apply, Plaintiff's claims easily satisfy the compelling interest test in this case because Title VII is narrowly tailored to serve the

government's compelling interest in protecting employees from discrimination based on sex. "The right to associate for expressive purposes is not, however, absolute." Roberts, 468 U.S. at 623. "Infringement on [the right to expressive association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Id. It is the court's job to determine if forced inclusion of an individual would impair a group's expressive message. See Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 69 (2006). Thus, to properly apply freedom of expressive association, the Court must weigh the government's interest with the level of restriction imposed on associational freedom by pursuing that interest. See id. There must be a compelling interest and no significantly-less-restrictive means to achieve that interest. Roberts, 468 U.S. at 623.

How much application of a law will restrict associational freedom is a fact-dependent inquiry determined by the group's characteristics and what (if any) speech would be compelled or restricted by such application. For instance, in Roberts, the Supreme Court ruled on the constitutionality of a Minnesota law banning discrimination in places of public accommodation as applied to the United States Jaycees, a nonprofit membership-based organization whose objectives were to pursue educational and charitable opportunities designed to "promote and foster the growth and development of young men's civic organizations in the United States[.]" 468 U.S. at 612-13 (citations omitted). The Court looked to the size and selectiveness of the Jaycees, noting that they were "large and basically unselective[.]" Id. at 621. Next, the Court examined the impact upon the Jaycees of enforcement of the antidiscrimination law, noting that the Jaycees "failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association." Id. at 626 (citations omitted). The Court further

noted that "even if enforcement of the Act causes some incidental abridgment of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes." Id. at 628. The Court ruled that Minnesota's anti-discrimination law was constitutionally applied to the Minnesota chapter of the Jaycees because "the State has advanced [its] interests through the least restrictive means of achieving its ends." Id. at 626.

Here, Defendants retaining Plaintiff as a substitute teacher for secular classes would not significantly impair its freedom of expressive association. To be clear, Defendants are engaged in expressive activities as the school actively seeks to instill Catholic teachings, including on marriage, in its students. Plaintiff's decision to marry his partner is not in keeping with Catholic teaching. However, Plaintiff is a lay employee, who comes onto the campus of a religious school for the limited purpose of teaching secular classes, with no mandate to inculcate students with Catholic teachings. Indeed, Defendants do not require Plaintiff to be Catholic, and they even explicitly encourage him and other teachers of non-religious subjects to refrain from teaching religious topics in their classrooms. (Doc. No. 28-5 at 28). When students had emotional or spiritual questions outside his disciplines of drama and English, Plaintiff was required to refer those students to the proper individual to handle them, such as by referring a student having a hard time at home to the counseling department. (Doc. No. 28-3 at 19:7-15; 102:17-23). As such, while retaining Plaintiff implicates Defendants' expressive mission, it does not significantly do so.

Even though there is some impairment of Defendants' expressive activities, Title VII is sufficiently compelling to warrant its application here. For a law to qualify for application despite imposing upon an organization's expressive activities, the law must be "'narrowly drawn' to serve a 'sufficiently strong, subordinating interest' 'without unnecessarily interfering

with First Amendment freedoms.'" <u>Roberts</u>, 468 U.S. at 634 (O'Connor, concurring in part) (citations omitted). Title VII is narrowly tailored in part because of the carve-outs for religious discrimination contained in Sections 702 and 703. The Fourth Circuit has further indicated its acceptance of Title VII's tailoring, noting that it is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school[.]" <u>Rayburn</u>, 772 F.2d at 1169 (citations omitted). And in <u>Dole v. Shenandoah Baptist Church</u>, the Fourth Circuit held that protecting non-ministerial employees from sex discrimination in church-affiliated schools is an interest "of the highest order" and "a less restrictive means of attaining its aims is not available." 899 F.2d 1389, 1398 (1990) (citations omitted). The Court has also already discussed the fact that Title VII does not unnecessarily interfere with First Amendment associational freedoms.

As in <u>Rayburn</u> and <u>Dole</u>, Plaintiff's right to be free from sex discrimination in employment under Title VII is a compelling interest of the highest order. <u>See</u> <u>EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.</u>, 884 F.3d 560, 593 (6th Cir. 2018) ("The undisputed record demonstrates that Stephens has been and would be harmed by the Funeral Home's discriminatory practices in this case, and the [government] has a compelling interest in eradicating and remedying such discrimination."); <u>cf.</u> <u>Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rights Comm'n</u>, 138 S. Ct. 1719, 1727 (2018) ("[T]he laws and the Constitution can, and in some instances must, protect [same-sex couples] in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."). Furthermore, a less restrictive means of attaining Title VII's aims is not available.

In short, freedom of expressive association does not bar Plaintiff's claim because it involves commercial employment, and thus freedom of association does not apply to the instant

case. But even if freedom of association were to apply, Title VII is sufficiently compelling and narrowly drawn law for its application to be warranted.

## VI.     CONCLUSION

Because the Court concludes that Defendants' employment action against Plaintiff violates Title VII's prohibition on sex discrimination and because the Court finds that Sections 702 and 703 of Title VII, church autonomy, RFRA, and freedom of association do not shield Defendants from liability, the Court holds that Defendants are liable for sex discrimination under Title VII. This case will now proceed to trial to determine the appropriate relief that should be granted.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Partial Summary Judgment, Doc. No. 26, is **GRANTED**, and Defendants' Motion for Summary Judgment, Doc. No. 29, is **DENIED**.

Signed: September 3, 2021

Max O. Cogburn Jr.
United States District Judge