UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

LONNIE BILLARD,                    )
                                   )
            Plaintiff,             )    No. 3:17-CV-11
                                   )
        vs.                        )
                                   )
CHARLOTTE CATHOLIC HIGH            )
SCHOOL, ET AL,                     )
                                   )
            Defendants.            )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 16, 2020

APPEARANCES:

On Behalf of the Plaintiff:

        JOSHUA BLOCK, ESQ.
        American Civil Liberties Union
        125 Broad Street, 18th Floor
        New York, New York 10004-2400

        IRENA COMO, ESQ.
        ACLU of North Carolina
        P.O. Box 28004
        Raleigh, North Carolina 27511

        S. LUKE LARGESS, ESQ.
        Tin Fulton Walker & Owen
        301 East Park Avenue
        Charlotte, North Carolina 28203

                    Cheryl A. Nuccio, RMR-CRR
                     Official Court Reporter
                   United States District Court
                    Charlotte, North Carolina

APPEARANCES:

On Behalf of the Defendant:

     JOSHUA DANIEL DAVEY, ESQ.
     Troutman Peppers Hamilton Sanders, LLP
     301 South College Street, 34th Floor
     Charlotte, North Carolina 28202

     MOSES M. TINCHER, ESQ.
     Troutman Pepper Hamilton Sanders, LLP
     600 Peachtree, N.E., Suite 3000
     Atlanta, Georgia 30308

<u>P R O C E E D I N G S</u>

(Due to COVID-19, the courtroom has been reconfigured to allow for social distancing.  The proceedings were reported to the best of my ability to hear and understand what was being said from my position in the back of the well behind counsel.  Some participants appeared via Zoom.  Many participants wore masks.)

(Court called to order 10:00 AM.)

THE COURT:  All right.  I'll hear from the defendant.

MR. DAVEY:  Thank you, Your Honor.  Joshua Davey and Moses Tincher of the Troutman Pepper law firm here on behalf of the defendant in this case, the Roman Catholic Diocese of Charlotte, Charlotte Catholic High School, and Mecklenburg area Catholic schools.

Your Honor, we're here on the diocese's motion for summary judgment and Mr. Billard's motion for partial summary judgment.  We're asking the Court to grant the diocese's motion and to deny Mr. Billard's motion.

This case, Your Honor, presents the question of whether a Roman Catholic high school, Charlotte Catholic High School, a school that exists to transmit and teach the Catholic faith to the next generation, can require its teachers to refrain from public conduct in opposition to the religious beliefs of the Catholic church with respect to

1  marriage.  And the answer, Your Honor, we submit, is not
2  difficult and the answer is that Charlotte Catholic can do
3  that.

4          Your Honor, the free exercise of religion is
5  literally the first liberty guaranteed in the Bill of Rights.
6  And time and again, including recent cases, Your Honor, the
7  Supreme Court and the courts of appeals have emphasized that
8  Title -- that Title VII of the United States Constitution
9  ensures the rights of religious organizations to operate
10 religious schools, including the right to create and maintain
11 communities comprised of individuals who subscribe to and
12 practice the faith that Charlotte Catholic seeks to instill in
13 its students.

14          It's not hard to understand why that's important to
15 religious organizations like Charlotte Catholic because
16 Charlotte Catholic is a mission-driven organization not a
17 money-driven organization.  And the mission, Your Honor, is
18 the message, specifically the Catholic religious message, the
19 promulgation of the Catholic faith, to the students at
20 Charlotte Catholic High School.  The school uses its teachers
21 to convey that message.  And it's easy to see how that message
22 is undermined if the school is required under penalty of law
23 to employ teachers who oppose the message it seeks to convey.

24          Importantly, Your Honor, even in the recent Supreme
25 Court decisions which have expanded and recognized rights and

1  protections for gay and lesbian Americans, Your Honor, the
2  Supreme Court at the same time has made it very clear that
3  religious groups like Charlotte Catholic maintain the right to
4  create these communities comprised of individuals who
5  subscribe to the Catholic faith and that they're free to do
6  that, Your Honor, and that the courts in protecting the rights
7  of gay and lesbian Americans need to simultaneously protect
8  the rights of religious groups to teach and promulgate their
9  faith, Your Honor.
10         We think that Mr. Billard's claims in this case fail
11  for several reasons which I'll touch on.
12         First of all, we believe that the religious
13  exemptions to Title VII, Section 702 and Section 703 of the
14  statute, apply because the reason for the defendant's decision
15  to release Mr. Billard from his employment was based on their
16  religious preference for someone who would live in a manner in
17  accordance with the Catholic faith, Your Honor.
18         Secondly, Your Honor, we don't believe that
19  Mr. Billard can prove that his sex or his sexual orientation
20  was a motivating factor in the decision to release him.  To
21  the contrary, Your Honor, the undisputed evidence here shows
22  that --
23         THE COURT:  You're saying his sex or sexual
24  orientation was not a -- was not a motivating factor.
25         MR. DAVEY:  That's right, Your Honor.

1          THE COURT:  Are you saying that the announcement

2     that he was getting married is some kind of advocacy instead

3     of just a common announcement?

4          MR. DAVEY:  Well, Your Honor, if you look at the

5     Facebook post, what he did is he said, "I intend to marry

6     Mr. Donham," his partner.  And he also said, "If you disagree

7     with this, keep it to yourself," and, you know, referenced a

8     song about going to get married.  And that, Your Honor, we do

9     believe is advocacy in favor of a position that is opposed to

10    what the church teaches about marriage.

11         THE COURT:  "If you disagree with this, keep it to

12    yourself" is an advocacy for -- he's not telling -- he's not

13    trying to argue with anybody about whether they should agree

14    or disagree.  He's just saying keep it to yourself if you

15    disagree.  But you're saying that's advocacy.

16         MR. DAVEY:  Your Honor, that's --

17         THE COURT:  Mighty poor advocacy.  If you came in

18    and said, you know, Judge, I just want you to know if you

19    don't think we should win, that's okay and I'm going to sit

20    down and let the other side argue, that's not much advocacy,

21    is it?

22         MR. DAVEY:  Your Honor, that's how my client

23    understood it, as an advocacy for that position.

24         But the facts are Mr. Billard posted on Facebook his

25    intention to get married.  And then as a result of that, he

was informed by the assistant principal at Charlotte Catholic
that he would not be able to serve as a substitute teacher.

THE COURT:  And it's clear that if he'd made an
announcement he was getting married to a woman, that would not
have been a problem for the Charlotte Catholic Church.

MR. DAVEY:  Your Honor, I disagree.  Under the
*Bostock* case in the Supreme Court, the Court kind of gave us
the road map for how you evaluate these things.  And what it
said is that the way you know if the decision is based on sex
is if you take Mr. Billard and you make him a woman and ask
what would have happened under those circumstances, Your
Honor.  And the evidence is undisputed here that if
Mr. Billard had been a woman and had gone on Facebook and
promoted same sex marriage, then the same result would have
happened.

THE COURT:  No, that's not my question.  My question
is had he said I, a man, am going to marry a woman, that would
have been okay.

MR. DAVEY:  That's also not quite right, Your Honor.
Because it's not just enough in the Catholic faith for a man
to marry a woman; they have to be free to marry.  And I think
if you look at the facts here -- and again, following the
Supreme Court's analysis in *Bostock*, if you make Mr. Billard a
woman and his spouse, Mr. Donham, is a divorced Catholic man
who doesn't have an annulment, then that arrangement, Your

1  Honor, is not something that the Catholic church would
2  recognize.  In fact, there's evidence in the record under
3  those exact facts, Your Honor, that another teacher was
4  released from employment for entering into that type of
5  marriage, again, inconsistent with the Catholic view on
6  marriage.
7  Your Honor, I'd like to first address the religious
8  exemptions to Title VII unless the Court has further questions
9  about that specific point.
10  THE COURT:  No, go ahead.
11  MR. DAVEY:  Section 702 of Title VII provides that
12  "this subchapter," those are the words used, "this
13  subchapter," and that refers to Title VII itself, "shall not
14  apply to religious employers, including religious schools,
15  with respect to employment of individuals of a particular
16  religion who carry on the religious mission of the school.
17  Section 703, Your Honor, of Title VII provides that
18  it's not a Title VII violation --
19  MR. LARGESS:  Your Honor, I hate to interrupt, but
20  it appears that Zoom has been frozen for a minute or two here.
21  I don't know if they can hear the argument.
22  THE COURT:  Okay.  Hold on.
23  MR. LARGESS:  Sorry, Josh.
24  MR. DAVEY:  Not a problem.
25  THE COURT:  Now, I'm seeing his eyes are moving.  Is

1    he frozen or is he...

2            MR. LARGESS:  My screen has been frozen.

3            THE COURT:  Can you hear us?

4            (No response.)

5            THE COURT REPORTER:  My screen is frozen.

6            THE COURT:  I mean, he looks -- appears to be...

7            THE CLERK:  It's working for us, but not for him.

8            MR. LARGESS:  Did he respond to you verbally, Your

9    Honor?

10           THE COURT:  Can you hear us?

11           (No response.)

12           THE CLERK:  Okay.  We're going to have to reconnect.

13   I don't know what else to do.

14           (Pause.)

15           THE CLERK:  It's frozen.  Can we take a break to get

16   IT in here?

17           THE COURT:  I guess we have to stop.  I hate to

18   interrupt your train of thought.  Let's get IT in here, and

19   they need to stay in here for the rest of the hearing so we

20   don't have to stop again.

21           (Pause.)

22           THE COURT:  All right.  Proceed.

23           MR. DAVEY:  Can you all see them?  We can't see

24   them.  That's fine, but I just...

25           THE CLERK:  You should be able to.

1        MR. DAVEY:  Is Your Honor ready?

2        MR. LARGESS:  I guess the question is where they got

3   cut off, Judge.  Do we need to establish that?

4        What was the last thing you guys heard?

5        UNIDENTIFIED SPEAKER:  The last I heard was the

6   discussion about if you disagree, keep it to yourself and

7   whether that constituted advocacy.  But we don't need to

8   repeat parts --

9        THE COURT:  Yeah, I think that's -- let's move on.

10        MR. DAVEY:  I'll proceed, Your Honor, with the

11   Title VII --

12        THE COURT:  Just proceed where you are and if we

13   need to --

14        MR. DAVEY:  As we were discussing just a moment ago,

15   Section 702 to Title VII provides that this subchapter,

16   meaning all of Title VII, does not apply to religious schools

17   who make an employment decision in preference for someone of a

18   particular religion.

19        Likewise, Section 703 provides that it's not a Title

20   VII violation for a religious school like Charlotte Catholic

21   High School to hire employees of a particular religion where

22   its curriculum is devoted to advancement of that religion.

23        There's no dispute, Your Honor, that Charlotte

24   Catholic and the defendants in this case are covered by these

25   exemptions.  They fall within the definition of a religious

1  entity for purposes of the exemption.

2          THE COURT:  Can you point to any appellate precedent

3  holding that sex discrimination is permissible as long as it's

4  done in the name of religious conviction?

5          MR. DAVEY:  Well, Your Honor, there's a number of

6  cases that we've cited that hold that the religious exemptions

7  to Title VII apply to sex discrimination claims.  And I can

8  point you to some of these.  The *Little versus Wuerl* case from

9  the Third Circuit, Your Honor, the *Hall* case in the Sixth

10 Circuit, the *Curay-Cramer* case in the Third Circuit all hold

11 this way, Your Honor.  And I think it's consistent if you read

12 *Rayburn* and and if you read *Kennedy*, the two Fourth Circuit

13 cases that address this.  They require the same conclusion.

14 And if you read *Kennedy* it explains Congress's purposes in

15 enacting these religious exemptions to Title VII, Your Honor.

16 And I'm going to quote from the decision.

17          "Congress intended to enable religious organizations

18 to create and maintain communities comprised solely of

19 individuals faithful to their doctrine of practices whether or

20 not every individual plays a direct role in the organization's

21 religious activities."  That's the motivation there, Your

22 Honor.

23          And what those decisions say is that the -- it's not

24 the case, Your Honor, that these exemptions create a blanket

25 exception for religious organizations from sex discrimination.

1  That's not what we're saying.

2          The important thing to evaluate, though, Your Honor,

3  is what is the reason for the employment decision and whether

4  the reason for the employment decision is motivated by

5  religious preference.  It's not important how the plaintiff

6  styles the claim.  What's important is what is going on behind

7  the decision.

8          And there's no dispute on these facts, Your Honor,

9  and Mr. Billard doesn't contest that the defendant's decision

10  to release him from employment was based on their sincere

11  religious beliefs in view of the Catholic belief about

12  marriage, Your Honor.  That's not in dispute here.  And we

13  submit, Your Honor, that based on that, and based on the cases

14  we've cited, that the Title VII exemptions apply.

15          Your Honor, I think there's another reason to read

16  them that way which is also talked about in *Kennedy* and

17  *Rayburn*, the Fourth Circuit cases that touch on this, and

18  that's the principle, Your Honor, of constitutional avoidance.

19  And of course, that principle dictates that if there's a way

20  to interpret Title VII that avoids substantial constitutional

21  questions, then the Court should adopt that interpretation.

22          And so the question here, Mr. Billard contends that

23  the exceptions only apply if the plaintiff asserts a religious

24  discrimination claim, Your Honor, and we believe that the

25  exception can apply where the reason for the employment

1 decision is based on religious preference. And so in deciding

2 as between the two, if there's a way to avoid a serious

3 constitutional question, then the Court should adopt that

4 reading of the exceptions, Your Honor.

5 If Mr. Billard's reading is right, then what Title

6 VII does is it prohibits Catholic schools from requiring

7 non-ministerial employees to refrain from conduct with respect

8 to marriage that violates the Catholic view of marriage, Your

9 Honor. That type of a prohibition obviously raises

10 significant constitutional questions. And we've briefed some

11 of those with respect to the church autonomy doctrine with

12 respect to RFRA.

13 Your Honor, those are concerns that can be avoided

14 if the Court adopts the reading of the exceptions to Title VII

15 that we believe are required by the plain text of the statute.

16 If Congress had intended to provide that those exceptions

17 applied only if the plaintiff brings a claim for religious

18 discrimination, that would have been easy to do. But if you

19 look at the text of Section 702, it says this subchapter

20 doesn't apply where the reason for the decision is based on

21 religious preference, Your Honor. And that's what *Rayburn*

22 says about those exceptions, that that's what it means.

23 So, Your Honor, we believe that the argument

24 Mr. Billard is making about this, that it's either a choice

25 between saying that a religious organization is not subject to

any sex discrimination claim or it's saying that the religious
organization is off the hook all together, Your Honor, or that
the religious exceptions only apply if the claim is styled as
one for religious discrimination, Your Honor, that's a false
choice.  What the statute, Your Honor, requires and the case
law requires is a middle ground.  That the Court has to look
at the reason in a case like this, the reason for the
employment decision.  And here it's not disputed that it was
motivated by sincere religious belief, Your Honor.  And where
that's the case, Title VII doesn't prohibit a Catholic school
from requiring its teachers, Your Honor, to conduct themselves
publicly in accordance with Catholic teaching.

Your Honor, I'm going to move on to the substantive
Title VII argument.  We touched on this a moment ago, Your
Honor.  That we don't believe that Mr. Billard can prove
there's any evidence to support that either his sex or his
sexual orientation was the motivating factor in Charlotte
Catholic's decision to release him from employment.

And *Bostock*, of course, is the most recent work from
the Supreme Court on how the Court is to evaluate this type of
claim.  And what the Supreme Court said there in terms of how
the Court can determine if an employment action is taken
because of sex, and I'll quote from the decision, "If the
employer intentionally relies in part on an individual
employee's sex when deciding to discharge the employee, put

1  differently, if changing the employee's sex would have yielded
2  a different choice by the employer, then a statutory violation
3  occurred."

4          THE COURT:  Let me get this -- I want to get the
5  factual -- the facts that this is based on.  This is based on
6  this announcement.  This wedding announcement is what this is
7  based on, right?

8          MR. DAVEY:  Correct.  Yes, Your Honor.

9          THE COURT:  No statements or anything inside the
10  school during teaching.  No -- no posts supporting marriage,
11  gay marriage in general.  Just I'm going to get married to
12  someone and if you disagree, keep it to yourself.  I mean,
13  that's the -- that's the facts that Charlotte Catholic is
14  basing this on.

15          MR. DAVEY:  Your Honor, Mr. -- that's essentially
16  right.  Mr. Billard in October of '14, 2014, posted on
17  Facebook and he said, "Going to the chapel and we're going to
18  get married.  Going to the chapel and we're going to married.
19  Yes, I'm finally going to finally make an honest, at least
20  legal, man out of Rich."  That's Mr. Donham, his partner.
21  "We'll be married on May the 2nd, 2015.  Details to follow.  I
22  cannot believe I'm saying this or that it's even possible.  I
23  thank all the courageous people who had more guts than I who
24  refused to back down and accept anything but equal.  PS if you
25  don't agree with this, keep it to yourself.  You never ask my

1  opinion about your personal life and I'm not asking yours."

2           That's what he posted on Facebook.  That came to the

3  attention of the Charlotte Catholic administration.  And he

4  was informed in December that he would not be able to continue

5  to serve as a substitute teacher.  Those are the facts, Your

6  Honor.  I don't think there's any dispute about those facts.

7           THE COURT:  A little different than the statement,

8  "Woman, who is here to condemn you?"

9           "No one, Lord."

10           "And neither do I."

11           MR. DAVEY:  Your Honor, with respect to the test

12  articulated by *Bostock*, I think, as we said, there's no

13  dispute about the facts.  There's no dispute that

14  Mr. Billard's announcement of his intention to marry

15  Mr. Donham was a violation of the employment policies that he

16  agreed to abide by as a teacher at Charlotte Catholic High

17  School.  And there's no dispute, Your Honor, that Charlotte

18  Catholic had applied those policies in other cases involving

19  similar conduct, and we've cited some of those examples, Your

20  Honor.

21           And on these facts, then, following the *Bostock*

22  test, Your Honor, I think it's undisputed that if Mr. Billard

23  had been a woman and had gone on Facebook and had thanked

24  advocates of same sex marriage and said I don't want to hear

25  your opinion, Your Honor --

1          THE COURT:  It said the same thing.  You can argue

2     about whether -- your statement is that he's advocating for it

3     rather than making an announcement for it.  But if there was

4     a -- if -- I will agree with you, if a woman had gone on and

5     said I am marrying a woman, I'm sure that Charlotte Catholic

6     would have taken the same position.

7          The question is whether or not the fact that he was

8     a man making an announcement that he was marrying a man,

9     that's the issue that we have here, whether that is

10    discrimination; whether they've engaged in and violated his

11    rights with regard to that, not as -- I agree with you.  I

12    don't think there's any question if it was a woman to woman,

13    it would be the same.

14         MR. DAVEY:  Yes, Your Honor.  And I think further to

15    that point, though, if a woman employee, and this is what the

16    evidence supports, had gone on Facebook and had said something

17    to the effect of what Mr. Billard said, I am grateful to

18    advocates who promoted this before me -- that's the import of

19    his message:  Thanking those who had advocated for this cause,

20    Your Honor.  If that had been the message from a female

21    employee, whether gay or straight, married or not, the

22    evidence is the result would have been the same, Your Honor.

23    And that's the *Bostock* test.

24         THE COURT:  All right.

25         MR. DAVEY:  And I think *Bostock* does not -- what

1    *Bostock* holds, Your Honor, is that it's a Title VII violation
2    to fire someone merely for being gay or transgender.  But
3    *Bostock* does not proscribe conduct-based rules, and in
4    particular does not proscribe conduct-based rules based on
5    sincere religious belief, and that's in the *Bostock* decision
6    itself, Your Honor.

7         *Bostock* -- going back to the Title VII exemptions,
8    *Bostock* recognized that those exemptions, while not presented
9    in that case because it didn't involve a religious employer,
10   could apply to claims like these involving a Title VII sex
11   discrimination claim similar to the one Mr. Billard brings.

12        Your Honor, I'd like to next turn to the Religious
13   Freedom Restoration Act issue.  As I've indicated, I don't
14   believe that Title VII applies to Mr. Billard's claims.  But
15   even if it did, under RFRA, the defendants are entitled to an
16   exemption.  RFRA provides that government shall not
17   substantially burden a person's exercise of religion even if
18   the burden results from a rule of general applicability.

19        THE COURT:  Does the language of that statute
20   restrict the statute scope to government action?

21        MR. DAVEY:  The statute proscribes action by the
22   government, Your Honor.  And I think there's no dispute that
23   this Court is part of the government.

24        THE COURT:  So you're saying anything by the Court,
25   then.  It's your position that any -- any action by the Court

1   is going to violate RFRA.

2          MR. DAVEY:  Well, Your Honor, I don't know if I'd

3   say any action.

4          THE COURT:  That's adverse -- that's adverse to --

5   in a situation like this is going to violate RFRA.

6          MR. DAVEY:  What Mr. Billard is asking the Court to

7   do is award damages, to reinstate him, and to issue an

8   injunction.  And certainly if the Court were to do that and

9   prohibit Charlotte Catholic from requiring its teachers to

10  conduct themselves in a manner consistent with the Catholic

11  faith, that would be an action by the government and that

12  would be a substantial burden on the religious exercise of the

13  defendants, and I don't believe Mr. Billard contests that much

14  of it, Your Honor.

15         And so the question is what to do under RFRA, Your

16  Honor.  RFRA is a burden-shifting statute, and you can see

17  this from the Supreme Court's discussion of how the statute

18  works in *Hobby Lobby*.  Once a person has shown the existence

19  of a substantial burden -- and, Your Honor, we believe the

20  defendants have done that here -- the burden then shifts to

21  the government to show that RFRA's least restrictive means

22  test is satisfied.  What that requires is a showing that,

23  number one, the particular burden, the burden as applied to

24  Charlotte Catholic High School, is in furtherance of a

25  compelling governmental interest and it is the least

1  restrictive means of furthering that compelling governmental
2  interest, Your Honor.
3          And there's no evidence to support the conclusion
4  that requiring Charlotte Catholic High School on these facts
5  to employ someone opposed to its religious message furthers a
6  compelling governmental interest or is the least restrictive
7  means of doing so.  And we know that from *Hobby Lobby*, Your
8  Honor, where the Court recognized that an exception to a
9  generally applicable rule -- there, a contraceptive mandate;
10 here, a Title VII issue if it applies, Your Honor -- does not
11 seriously undermine the government's interest.  In fact, just
12 as in *Hobby Lobby* where there were exceptions to the mandate
13 at issue there, Title VII already contains exceptions for
14 religious organizations from its prohibitions as we discussed,
15 Your Honor.
16         So just as in *Hobby Lobby*, the appropriate thing
17 under RFRA was for an exception to be granted to the
18 particular defendant at issue there.  Likewise here, if Title
19 VII applies to Mr. Billard's claims, then under RFRA the
20 defendants are entitled to an exception because they've made a
21 showing.  The evidence is undisputed that it's a substantial
22 burden, Your Honor, and the compelling interest standard
23 cannot be satisfied on this record.
24         Mr. Billard's real argument isn't that the RFRA
25 standard doesn't apply -- isn't met, rather.  His argument is

that RFRA does not apply in lawsuits involving private
parties.  He contends it only applies if the government is a
party to the case, Your Honor.  But that's wrong for a number
of reasons.

First, we know that's wrong because the Supreme
Court in *Bostock* said it was wrong.  There again, there was no
religious defendant before the Court, Your Honor, but the
Supreme Court said that in cases like these involving a
private Title VII plaintiff, not the EEOC, that RFRA could
apply.

It's also not consistent with RFRA's plain text,
Your Honor, because RFRA proscribes certain government action
that creates a substantial burden on religious exercise.

THE COURT:  If people are going to come to the
courts to enforce laws, then -- and the courts are the
governmental action, then isn't that just sort of -- just sort
of a get-out-of-jail-free card for any religion to do it?  We
can start the religion of what's happening now and have our
own little doctrine and then just do anything we wanted to do
to discriminate and nobody could do anything about it.  Sounds
like everybody ought to be at church.

MR. DAVEY:  Your Honor, I disagree respectfully.
RFRA has a pretty high standard that has to be met and -- to
show a substantial burden and the government has the option to
show a compelling governmental interest.  In many cases, of

course, it would be able to do that, Your Honor. But here, it hasn't attempted to carry that burden.

And Your Honor, to the extent that RFRA could apply outside these facts, Your Honor, that's what Congress enacted. Congress, in fact, wrote into the statute its intentions in enacting RFRA, which were to restore the compelling interest test that existed prior to the Supreme Court's decision in *Employment Division versus Smith* and to provide -- this is what Congress expressly said in enacting RFRA, "We want to provide a claim or defense to persons whose religious exercise is substantially burdened by government," Your Honor. And that standard is met here.

One last point with respect to Mr. Billard's argument that RFRA only applies in actions involving private litigants, Your Honor. That, in particular, doesn't make sense in a Title VII case like this because the EEOC saw Mr. Billard's charge of discrimination. The EEOC could have filed this lawsuit itself without Mr. Billard. The EEOC could have intervened in this lawsuit. Could still do so today if it wanted, Your Honor. And in fact, Mr. Billard asked for a right to sue letter and asked the EEOC not to, essentially, intervene. And now we're here, Your Honor. And it makes no sense for the substantive protections that RFRA is designed to convey to turn on whether or not on the same facts, same claim by Mr. Billard, on whether or not he asked the EEOC to get

1    involved or whether the EEOC chose to get involved.

2            And the Second Circuit, Your Honor, in the *Hankins*

3    decision recognized this and said that at least with respect

4    to schemes like Title VII where there's a governmental

5    enforcer who has the option of getting involved, RFRA clearly

6    applies to those types of claims.

7            And again, Your Honor, going back to *Bostock*.

8    *Bostock* says to follow the plain text of the statute, Your

9    Honor.  And if we do that, it's clear that on this record the

10   defendants have met their burden of showing a substantial

11   burden on their religious exercise.  There's no dispute that

12   this Court falls within the definition of government in the

13   statute, Your Honor.  The only question is whether the very

14   high bar set forth in the *Hobby Lobby* decision from the

15   Supreme Court is satisfied here.

16           And again, that requires that Mr. Billard not simply

17   articulate that eradication of sex discrimination is a

18   compelling governmental interest.  It is, and we don't dispute

19   that, Your Honor.  But what it requires is that Mr. -- that

20   the government or Mr. Billard or someone make a showing that

21   requiring Charlotte Catholic High School, this defendant, to

22   employ someone who opposes its religious message is the least

23   restrictive means of accomplishing that goal.  And under *Hobby*

24   *Lobby*, Your Honor, that argument just doesn't work because the

25   exception is not going to undercut the governmental goal if

1  it's extended to the tiny fraction of religious employers who
2  seek to uphold the definition of marriage that's consistent
3  with two millennia of Catholic teaching.

4          Your Honor, finally I'll touch briefly on our First
5  Amendment arguments.  Mr. Billard's claims are also barred by
6  the First Amendment principles of church autonomy and
7  associational freedom, Your Honor.  And I think the recent
8  Supreme Court case --

9          THE COURT:  If you go to freedom of expression, it's
10  really -- it really is a cotton loophole.  There's nothing --
11  I mean, if you go with freedom of expression, if you go with
12  that, then there's -- then you can do anything you want to do
13  because I'm freely expressing my First Amendment rights;
14  therefore, I can do what I want to do and move on.

15          MR. DAVEY:  Your Honor, the Supreme Court in the *Boy*
16  *Scouts versus Dale* case said that the freedom to associate
17  presupposes the right not to associate.  And I acknowledge,
18  Your Honor, that line of reasoning has not been applied on
19  facts like these, Your Honor.  I think it's probably not a
20  surprise to anyone that this case may go up on appeal, Your
21  Honor, and we need to preserve those arguments.

22          But Your Honor, I think there's another point to be
23  made there too.  Prior to the *Bostock* decision, it was the
24  near universal rule of the court of appeals that Title VII did
25  not recognize a cause of action for sexual orientation-based

discrimination.  And prior to the Second Circuit's decision just a few years ago, no court of appeals had held that Title VII extends to claims like this.  And as a result of that, Your Honor, we now -- and this is -- the *Bostock* court recognized this.  We're now in a situation where the courts have to reconcile the holding of *Bostock* with the principle reiterated time and again by the Supreme Court that the courts must protect the rights of religious organizations and religious schools like Charlotte Catholic to have communities centered around (inaudible), Your Honor.  So it's not shocking, and I don't think anyone should be surprised, that there aren't a lot of decisions dealing with some of these issues on these specific facts because this is the first wave, Your Honor, of cases like this after *Bostock*.

But going back to the church autonomy point, Your Honor.  The Supreme Court recently issued its decision in the case *Our Lady of Guadalupe versus Morrissey-Berru*, Your Honor. And the Supreme Court talked about this church autonomy doctrine and said that it's rooted in a broad principle that religious organizations need to be able to operate free from governmental interference.  And Your Honor, that principle dictates a particular application, what's called the ministerial exception, but it's not limited to the ministerial exception.

THE COURT:  And you all waived the ministerial.

1          MR. DAVEY:  Your Honor, yes.  We don't think
2   Mr. Billard is a minister under the test articulated in the
3   Supreme Court in *Hosanna-Tabor* a few years ago.  We're not
4   contending he meets that specific --
5          THE COURT:  There are a lot of arguments that sound
6   like you touch on the ministerial.  I mean, when you read your
7   briefs and read their briefs, everybody is kind of talking
8   like there is an issue on the ministerial exception.  If you
9   read both sides' writings, there's a lot of stuff there that's
10  kind of telling the courts -- you're arguing the ministerial
11  exception even though you're not using the ministerial
12  exception.  You're trying to push the -- push that -- because
13  if you've waived that, you know, that's -- if he's not a
14  minister, then the question is is he out there advocating
15  against the religion.
16         MR. DAVEY:  Well, I think, Your Honor, the question
17  is -- again, ministerial exception is one application of this
18  church autonomy doctrine and that holds that if a person is a
19  minister -- again, Mr. Billard isn't, but if he was, then he
20  clearly would not have a Title VII claim, Your Honor.
21         But the question for the Court is whether the -- and
22  we submit it does, whether that church autonomy principle
23  extends any further than a minister, Your Honor.  And the
24  Supreme Court has said yes.  And Your Honor, I believe what
25  the Supreme Court has said in its directives to the lower

courts is to safeguard the rights of religious organizations
and that they need to be able to create and maintain
communities made up of like-minded individuals, Your Honor.
If they cannot acquire teachers to conduct themselves in a
manner consistent with the faith that they're hired to help
pass on to the next generation, Your Honor, then it's hard to
see -- if that isn't covered by the church autonomy doctrine,
I'm not sure what would be.

So that's our argument, Your Honor.  We believe that
the Supreme Court's reasoning clearly extends to these facts
even if these precise facts haven't been presented in a case
like this.

Your Honor, at the end of the day, Mr. Billard's
argument is that Title VII prohibits Charlotte Catholic High
School from requiring its teachers in their public conduct to
refrain from public opposition to the very message that
Charlotte Catholic seeks to convey.  And we submit that that's
not the law, Your Honor.  We think that the Supreme Court has
made it very clear and the lower federal courts have made it
clear that religious institutions like Charlotte Catholic have
a right to create and maintain communities, including
teachers, of individuals who agree to conduct themselves in a
manner consistent with the teachings of the church, Your
Honor.

And the Title VII exceptions apply here, Your Honor.

1  We don't believe that Mr. Billard can make out his case under
2  the elements of Title VII.  We think RFRA applies and we think
3  the First Amendment applies.

4          And we also think, Your Honor, that it's clear that
5  in every recent decision in which the Supreme Court has
6  extended or recognized protections for gay and lesbian
7  Americans, it has also recognized the need to simultaneously
8  preserve the rights of religious organizations.  When the
9  Supreme Court in 2015 in *Obergefell* recognized the right to
10 same sex marriage, it said at the same time religious
11 organizations that have a different view have the right to
12 continue to teach that view and the First Amendment provides
13 that protection.

14         In *Bostock*, Your Honor, this term, the Supreme Court
15 said it was deeply concerned with preserving the promise of
16 the free exercise of religion and that it recognized that even
17 though Bostock didn't involve a religious employer, that the
18 Title VII exceptions and RFRA and the church autonomy
19 principles we discussed provide protection to religious
20 employers on facts like these, Your Honor.

21         So in closing, we would submit that Charlotte
22 Catholic has the right to teach and practice its Catholic view
23 of marriage and that necessarily entails the right to require
24 its teachers to conduct themselves in a manner consistent with
25 the message that it seeks to convey.  And I'll conclude with

1   that unless Your Honor has any further questions.

2            THE COURT:  I may in a minute.  Let me hear from the

3   other side.

4            I'm viewing him on television here.  I can see

5   there, but it's clearer here so I'm going to go here.

6            MR. BLOCK:  Great.  Thank you, Your Honor.  Joshua

7   Block appearing on behalf of plaintiff Lonnie Billard.  Thank

8   you for letting me appear remotely today.  I'll just begin by

9   addressing some of the arguments that we heard today.

10           The facts are clear that Mr. Billard was a beloved

11  teacher at Charlotte Catholic High School for more than ten

12  years, but he was fired after he posted on Facebook that he

13  was marrying his same sex partner Mr. Donham.  That's

14  undisputed and that's simple.

15           Defendants here try to draw a distinction between

16  the act of becoming engaged and the act of telling someone

17  you're engaged, but that doesn't make a difference one way or

18  the other.  All that matters is that in order to enforce their

19  policy against Mr. Billard as an individual, they had to treat

20  him as an individual differently than they would have treated

21  a woman who is marrying a man or a woman who was announcing on

22  Facebook she was marrying a man.  No matter how you

23  characterize it as announcing you're engaged or getting

24  engaged, the individual sex here is playing an indispensable

25  but-for cause in the individual's -- in the individual

1  employment decision.

2         THE COURT:  Let me ask this question.  Did he go too

3  far when he thanked those who had advocated for the right to

4  marry who you love?

5         MR. BLOCK:  Well, Your Honor, today is the very

6  first day in the course of this entire case, in the course of

7  all discovery, all depositions, all briefing that defendants

8  have ever mentioned those other portions of the Facebook

9  announcement.  If you look at all of their admissions, all of

10  their responses to the interrogatories, all of the briefs

11  they've submitted to this Court, that has never once come up.

12  Over and over again they say that what he did wrong was

13  announce his intention to marry a same sex partner.  So if

14  from the beginning of the case the defendants made this

15  argument and preserved it, then we could have responded

16  through discovery and that would be at issue.  I don't think

17  it's at issue here based on the undisputed record before the

18  Court.  Defendant's counsel can't inject a material question

19  of fact by bringing it up at the last minute at oral argument.

20  There's no evidence in the record pointing to those portions

21  of -- I'm sorry, Your Honor.

22         THE COURT:  Has Mr. Billard engaged in any advocacy

23  supporting same sex marriage?

24         MR. BLOCK:  No, Your Honor.  The only thing he did

25  was post this message on Facebook.  This isn't an issue where

1  Mr. Billard, you know, campaigns for marriage equality or
2  posted a political message or even attended a gay pride rally.
3  All he did was announce that he was getting married to his
4  same sex partner.  And in order to determine that that
5  announcement constituted advocacy of any kind, it was a
6  but-for cause that he was a man getting married instead of a
7  woman getting married.

8          THE COURT:  What's the -- what is the evidence that
9  the reason for firing was sex discrimination rather than
10 religious?

11         MR. BLOCK:  Well, it's uncontested that they had a
12 religious motivation for discriminating.  But the *Bostock*
13 decision is crystal clear that motivations for discrimination
14 aren't what matters if they're using sex as a but-for cause of
15 accomplishing that goal.  So in *Bostock* itself the employer
16 said we're not just discriminating based on sex.  We're
17 discriminating based on sexual orientation and we would apply
18 that equally to a gay man or a gay woman.  And the Court said
19 that doesn't matter.  The motives might be to discriminate
20 based on sexual orientation, but in order to accomplish that
21 goal along the way, they had to treat individual employees
22 differently on the basis of sex.

23         So if they're using an individual's sex as a but-for
24 cause of the decision in a particular case, their reasons for
25 doing so don't make any difference.  The Court says their

motivations, what they call it, what someone else may call it don't matter.  All that matters is that sex is being used as a but-for cause.

And that didn't begin with *Bostock*.  That's also what the Court said in *Johnson Controls*:  That whether a policy facially discriminates on the basis of sex isn't determined by the motivations of the discriminator, it's determined by what the policy on its face does.  And on its face a policy saying a man can marry -- can announce they're marrying another -- a man can announce they're marrying a woman but cannot announce they're marrying another man facially discriminates on the basis of sex regardless of the subjective motivations for having that policy.

I do want to object -- I want to address a little bit more this issue of these other portions of the Facebook post that they're bringing up now for the first time.  They said the record is undisputed that they've taken similar actions in other cases.  All the other cases they're talking about are cases where someone actually violated Catholic teachings about marriage:  They got married to a Catholic who hadn't previously had an annulment; they had an extramarital affair.  They actually haven't introduced any evidence in the record about other cases where they've punished so-called advocacy.  And in fact, the depositions show that they admitted they wouldn't fire someone just for advocacy.

1    The individual who fired Mr. Billard testified under

2 oath that if someone just posted a message on Facebook

3 supporting same sex marriage, he would have asked them to

4 speak with the priest; he wouldn't have fired them.  And

5 that's what defendant's declaration by Janice Ritter also

6 says.  They say when someone does something in opposition to

7 Catholic teaching, we try to see if it can be addressed short

8 of firing someone.  Only if the employee persists in it do we

9 go to the step of firing.

10    So I don't think all these questions about the

11 so-called advocacy of the Facebook post are even in front of

12 this Court.  But if they were, the undisputed evidence shows

13 that it actually would not have triggered a firing.  And in

14 fact, throughout the deposition of the board's 30(b) -- the

15 school board's -- excuse me, Charlotte Catholic's 30(b)(6)

16 witness, it was crystal clear that the policy prohibits anyone

17 from marrying a same sex partner regardless of whether they

18 talk about it publicly or not, regardless of what type of

19 employee they are.  They can work in a back office, you know,

20 administering the IT equipment and they cannot say a word to

21 anyone about their marriage, it still violates their policy.

22    So I think just as a matter of undisputed fact here,

23 this is a policy against men marrying men or women marrying

24 women and that's what they applied in this case.

25    If the Court doesn't have any other questions about

1  the sex discrimination issue, I'd be happy to address the

2  other alleged defenses that defendants raised.

3          THE COURT:  Go ahead and do that.

4          MR. BLOCK:  So I'll begin with Section 702.  The

5  language of the statute says that this provision does not

6  apply with respect to employees -- with respect to employment

7  of individuals of a particular religion.  It doesn't say --

8  that language is very specific in saying the portion of Title

9  VII that doesn't apply is the portion that prohibits

10 discrimination against individuals of a particular religion.

11 And Fourth Circuit precedent is just crystal clear on this

12 point that all that does is it provides a defense to claims of

13 religious discrimination.  It does not provide any defense to

14 claims of race, sex, color, or national origin discrimination.

15          Defendants here say you should use the cannon of

16 constitutional avoidance, but that's exactly what the Fourth

17 Circuit did in *Rayburn*.  *Rayburn* was the first case in which

18 the Fourth Circuit recognized the ministerial exception.  But

19 before going to that constitutional holding, they said we need

20 to look closely at 702 to see if there's any statutory way to

21 avoid this constitutional question.  And after their

22 exhaustive analysis, they said that there wasn't a way to

23 avoid the question; that they had to reach the constitutional

24 question because they had no power to carve out an exception

25 to the statute that Congress (inaudible).

1    And you know, the defendants here would like Rule
2  702 to mean something else, but we're at the lowest rung of
3  the federal judiciary right now.  We're bound by Fourth
4  Circuit precedent and the Court doesn't have discretion to
5  write on a clean slate even if it were inclined to except
6  defendant's arguments.

7    And saying that there were other cases that somehow
8  embrace these arguments, defendants are just blatantly
9  misrepresenting the holdings of those courts.  As we explain
10  in our brief, this is on pages 6 and 7 of our opening
11  supplemental brief, all of the cases that they're pointing to
12  are cases in which an employee was fired for a reason that
13  didn't explicitly discriminate on the basis of sex.

14    In *Little* they were fired for remarrying without
15  obtaining an annulment.  In other cases they were fired for
16  advocating in favor of abortion rights.  The employees in
17  those cases tried to say that even though they weren't
18  facially being discriminated against on the basis of sex,
19  the -- their employer somehow punished their type of advocacy
20  differently than they would have punished other types of
21  advocacy, such as, you know, opposition to support for the war
22  in Iraq or support for the death penalty.

23    And the Court said we're not going to look behind to
24  see, you know, how the defendants are applying their religious
25  beliefs to see if they're coming down harder for some

religious beliefs than others. That's not the business of the courts.

None of those cases involved a case in which a policy facially discriminated. And in fact, all of the cases involving the head of household payments confront the situation exactly. In the Fourth Circuit, in the Ninth Circuit, in other courts across the country, there were schools that said their religious beliefs require that they pay married men more than married women because of their religious belief that the man is the head of household and has to provide. It's a sincere religious belief. But every single court said that sincere religious belief is facially discriminating on the basis of sex, and so 702 and 703 don't apply.

The Fourth Circuit's case on this, *Dole versus Shenandoah*, was not a Title VII case. It was a Fair Labor Standards Act case involving the Equal Pay Act. But the other cases were all Title VII cases too. And it's crystal clear in those cases that they're acknowledging that this is religiously motivated, but they're also saying it's facially discriminatory so 702 doesn't apply.

And the same thing has come up in lower court decisions where someone gets pregnant using IVF. It's uncontested that the employers in those cases had a religious objection to IVF technology; but nevertheless, Title VII

explicitly prohibits pregnancy discrimination as part of
discrimination on the basis of sex.  And the cases like *Herx*
say this violates Title VII's prohibition on pregnancy
discrimination and 702 doesn't give you a defense regardless
of your religious beliefs.

One more thing about constitutional avoidance.
There's no constitutional question in this case to avoid.
Their best argument is under RFRA.  But under the Constitution
itself, it's crystal clear that if an employee is not a
ministerial employee, there is no constitutional problem with
requiring a religious employer to abide by the generally
applicable rules of Title VII.  There are a bunch of statutory
accommodations such as the (inaudible) exemption in 702, such
as RFRA.  But there's not a serious constitutional case to be
had that either the -- either part of the First Amendment
gives a religious employer a constitutional right to
discriminate against non-ministerial employees on the basis of
sex.  No court ever has accepted that argument.

So they try to get around --

THE COURT:  Let me ask this question, though.  You
have a -- you have a religious school where one of the
doctrines is opposed to gay marriage, gay -- any -- gay, I
guess, anything.  And you've got a person who is -- there who
is married to a same sex partner and comes into that school.
Is that not a situation where every day that they come in

1  there's not a problem for the school with regard to that

2  doctrine since the person that's there is violating that

3  doctrine?

4          MR. BLOCK:  Well, Your Honor, I think that

5  ultimately there may be a conflict for the school, that the

6  school may very well experience it as a burden on their

7  religious exercise if that's how they interpret their

8  doctrine, but neither RFRA nor the Constitution categorically

9  prohibits placing a burden on religious exercise.

10          Everyone, including a religious school -- every

11  employer, including a religious school, is bound by Title VII.

12  Churches are not above the law.  And if there is a

13  compellingly -- compelling governmental interest that's

14  narrowly tailored, the government can burn a religious

15  exercise.  RFRA says that explicitly.

16          And so the question here, like in -- this exact same

17  issue, again, came up in the head of household payments --

18  this is in the Fourth Circuit -- where the school said we have

19  a sincere religious belief that we can't pay married women as

20  much as married men.  You're forcing us to act inconsistently

21  with our religious beliefs.  And the Fourth Circuit said

22  (inaudible) in their religious beliefs, but nevertheless

23  protecting sex discrimination in employment of non-ministerial

24  employees is an interest of the highest order and that

25  prohibiting that discrimination is the most narrowly tailored

1    way of achieving it.

2             So, you know, in our society there may come

3    instances in which rights to equality and rights to religious

4    freedom are in tension and we have many, many, many

5    protections for Charlotte Catholic and other religious schools

6    when that happens.  They can fire a ministerial employee for

7    whatever reason they want.  Title VII doesn't apply at all.

8    And under the Supreme Court cases, many teachers qualify as

9    ministerial employees if they're actually teaching religion.

10            That's not what happened here.  Mr. Billard was

11   actively told he shouldn't say anything about religion.  Leave

12   that to the religious teachers.  And of course, they've

13   stipulated that the ministerial exception doesn't (Zoom

14   froze).

15            THE COURT:  Okay.  It's just frozen.

16            MR. LARGESS:  Yes.

17            THE COURT:  Chris, it just froze on us.

18            MR. LARGESS:  Ms. Como is still active, but...

19            There we go.  He doesn't realize he froze.  I think

20   you're going to need to tell him.

21            MR. BLOCK:  Oh, I froze?

22            MR. LARGESS:  Yeah, you froze for a while, Josh.

23            MR. BLOCK:  Oh, that's too bad.  I said something

24   really, really compelling during that time.

25            What's the last thing you heard?

1          THE COURT:  You were talking about -- you weren't

2     off for long.  I heard most of what your argument was.  You

3     were off probably -- probably for a minute.

4          MR. BLOCK:  All right.  So I was just saying that on

5     top of the ministerial exception, 702 gives them the right to

6     dictate their religious beliefs to their employees in a way

7     that no private for-profit company could.  This is extremely

8     strong authority to discriminate based on religious beliefs.

9     It's just not unlimited.  They can do it as long as they're

10    not using those religious beliefs in a way that requires

11    discrimination based on race, sex, color, or national origin.

12         So we're talking about huge amounts of accommodation

13    for religious exercise here, but that doesn't mean that the

14    religious school always wins.  When it comes to interest of

15    the highest order, which is protecting employees who are paid

16    for salary from employment discrimination on the basis of sex

17    or race or, for that matter, sexual orientation, those are

18    compelling governmental interests and compelling governmental

19    interests are allowed to outweigh religious exercise if

20    they're narrowly tailored.

21         Their argument about RFRA is that even assuming that

22    RFRA were to apply here, their argument is, well, it might be

23    compelling to prohibit other employers from discriminating,

24    but it's not compelling to prohibit us from discriminating.

25    And again, the Fourth Circuit rejected that argument in

1   *Rayburn* and *Dole*. Dole was a religious school and they said
2   it's still a compelling interest of the highest order.
3         But the real problem with their argument is in *Hobby*
4   *Lobby*, the reason why it was possible to grant an exception
5   was because the effect of granting an exception would have a
6   negative impact on the individual employees of precisely zero.
7   You could give an exception to *Hobby Lobby* and the employees
8   would still get their insurance for birth control. It had
9   zero negative impact on them. That's why it wasn't narrowly
10   tailored and an exception was available.
11         They say, well, this situation is similar because of
12   all the people in the world who are protected by -- from sex
13   discrimination, we're just allowing religious schools to
14   discriminate. But that's not how it works. The government
15   has a compelling interest in protecting Mr. Billard as an
16   individual, as an individual human being, from discrimination
17   on the basis of sex in employment. That is a compelling
18   interest. And the only way to protect him as an individual is
19   to prohibit employers from discriminating against him on the
20   basis of sex. That's exactly what the Sixth Circuit said in
21   *Harris Funeral Home*.
22         Which brings me back to one more point about RFRA.
23   It's not true that the -- all the plaintiffs in RFRA, you
24   know, were just involved in private litigation without the
25   government. The name of the *Harris Funeral Home* case was *EEOC*

1   *versus Harris Funeral Homes*.  It was brought by the EEOC and
2   for that reason Harris Funeral Homes was allowed to raise a
3   RFRA defense in the Sixth Circuit.  Then when the solicitor
4   general's office prohibited the EEOC from defending its
5   judgment on appeal, private counsel for Ms. Stevens came and
6   intervened.  But the reason why RFRA was absolutely in that
7   case is because EEOC was a party.
8           So when the Supreme Court is talking about RFRA, and
9   actually explicitly mentions that the Sixth Circuit rejected a
10  RFRA defense in *Harris Funeral Homes*, but that was an appeal
11  for cert.  The government was absolutely a party in that case.
12          THE COURT:  All right.  Let's move on.
13          MR. BLOCK:  Yeah.  Actually, I think I've covered
14  almost everything.  There's the church autonomy argument.
15  Again, I think that's, you know, very much covered by our
16  briefs.  The only cases they point to in which some other
17  ecclesiastical autonomy applied was very unusual circumstances
18  in which a ministerial employee couldn't challenge their
19  firing so they said that their employer's speech, their
20  antigay speech somehow constituted sexual harassment.  And the
21  courts that they cite said no, no, no, no, you know, you're
22  really just challenging the church's doctrine there.  You
23  know, the speech is protected.  None of those cases involved
24  firing someone.
25          The footnote I'd make to that is actually the two

district court cases they cite from the Seventh Circuit have now actually been abrogated on appeal. The Seventh Circuit just recently held that, in fact, the ministerial exception and church autonomy don't bar sexual harassment claims. I think that whether or not that decision is correct is neither here or there because it doesn't apply to our case. But I would just note that, you know, right now those district court decisions aren't even good law in the Seventh Circuit.

And then as for *Dale*, you know, again, this is yet another unprecedented argument that hasn't been accepted by any court. *Dale* was a public accommodations case involving a volunteer scout leader. It was about an organization's ability to choose its own members. Mr. Billard isn't applying to be a member of the church. He is an employee who receives salary for the work he performs. That is a commercial transaction. It's commercial association. And the fact that it has religious meaning to defendants doesn't change the fact that it is subject to Title VII as a commercial transaction.

THE COURT: All right.

MR. BLOCK: I guess that's all I have, Your Honor.

THE COURT: All right. Let me hear a quick brief response from the defense.

MR. DAVEY: Very briefly, Your Honor.

We've long contended Mr. Billard's Facebook post about advocacy, so I'm not sure exactly where this waiver

1   concept is coming from.  That's been our position for a long

2   time.

3         Your Honor, I just disagree with Mr. Block about his

4   argument about Section 702.  I think the plain text there says

5   this subchapter, that's Title VII, doesn't apply.  And it goes

6   to what is the reason for the employment decision, Your Honor.

7   And there's just no dispute that the decision here of the

8   defendants was motivated by their sincere religious belief

9   which is something that is constitutionally protected, Your

10   Honor.  And the Supreme Court has reiterated time and again

11   courts should protect, even in cases like this that involve

12   rights of gay and lesbian individuals as well.

13         Your Honor, Mr. Block spent a lot of time talking

14   about the government's interest in eradicating sex

15   discrimination.  Again, we don't have a disagreement with that

16   as a general matter.  But what *Hobby Lobby* says, Your Honor,

17   is that the government -- to carry its RFRA burden in this

18   case, the government must show it has a compelling interest in

19   requiring Charlotte Catholic High School to employ individuals

20   who oppose its religious message, Your Honor, and that showing

21   just can't be made here.  And we don't think that interest

22   exists, and you can tell that, Your Honor, because Title VII

23   itself contains exceptions.  RFRA is out there to protect

24   religious organizations.  And there's the First Amendment,

25   Your Honor, and you have to balance those in weighing what is

the governmental interest at issue.

Your Honor, in closing, Charlotte Catholic is not just some commercial defendant the way that Mr. Billard would like to portray them -- Mr. Billard's counsel would like to portray them. They're a religious school that exists to transmit a good message.

THE COURT: Yeah, they're a good school.

MR. DAVEY: And Mr. Billard knew what he was signing up for when he came to teach at Charlotte Catholic for ten years. There's no dispute that he was a well liked teacher, Your Honor. But at the end of the day, Your Honor, Charlotte Catholic has a right to, again, create and maintain a community of individuals who are willing to live by Catholic teaching and has the right to not employ those folks if they decide, as Mr. Billard had a right to do, not to live in that manner.

And so for all those reasons, Your Honor, we would ask the Court to grant the diocese's summary judgment motion.

THE COURT: All right. Thank you all very much, and we will let you know where we go. This matter is concluded for today.

MR. DAVEY: Thank you, Your Honor.

MR. BLOCK: Thank you, Your Honor.

THE COURT: Normally I would come down and shake your hands, but...

1           MR. DAVEY:  Under the circumstances we can't do

2     that.

3           THE COURT:  Under the circumstances I'm staying away

4     and you probably are glad I'm staying away.

5           (End of proceedings at 11:01 AM.)

6                         *****

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 13th day of July 2022.

17

18

19                          s/Cheryl A. Nuccio

20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter

21

22

23

24

25