**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────────

**No. 22-1440**

─────────────────

LONNIE BILLARD,

Plaintiff - Appellee,

v.

CHARLOTTE CATHOLIC HIGH SCHOOL; MECKLENBURG AREA
CATHOLIC SCHOOLS; ROMAN CATHOLIC DIOCESE OF CHARLOTTE,

Defendants - Appellants.

-------------------------------

CHRISTIAN EDUCATIONAL MINISTRIES; THE  CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS; THE ETHICS & RELIGIOUS LIBERTY
COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; THE
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE
LUTHERAN CHURCH-MISSOURI SYNOD; THE  JEWISH COALITION FOR
RELIGIOUS LIBERTY; THE  ISLAM AND RELIGIOUS FREEDOM ACTION
TEAM OF THE RELIGIOUS FREEDOM INSTITUTE; ASSOCIATION OF
CLASSICAL CHRISTIAN SCHOOLS; ASSOCIATION FOR BIBLICAL
HIGHER EDUCATION; CARDINAL NEWMAN SOCIETY; CHRISTIAN
LEGAL SOCIETY; CRISTA MINISTRIES; THE  CHRISTIAN AND
MISSIONARY ALLIANCE; EVANGELICAL COUNCIL FOR FINANCIAL
ACCOUNTABILITY; CHRISTIAN CARE MINISTRY, INC.; THE
NAVIGATORS; CROSS CATHOLIC OUTREACH; TYNDALE HOUSE
MINISTRIES; SAMARITAN'S PURSE; REGENT UNIVERSITY; GRACE TO
YOU; FOCUS ON THE FAMILY; ECO, A Covenant Order of Evangelical
Presbyterians; INTERNATIONAL MISSIONS, INC., d/b/a Christar; SIM USA
INCORPORATED; OC INTERNATIONAL, INC., a/k/a One Challenge; THE
EVANGELICAL ALLIANCE MISSION, a/k/a Team; FAR EAST
BROADCASTING COMPANY, INC.; THE  CROWELL TRUST; THE
CHRISTIAN COMMUNITY FOUNDATION, INC., d/b/a WaterStone; THE

CATHOLIC DIOCESE OF COLORADO SPRINGS; CALVARY CHAPEL FORT LAUDERDALE; CHERRY HILLS COMMUNITY CHURCH; PROFESSOR ROBERT F. COCHRAN, JR.; PROFESSOR DAVID F. FORTE; PROFESSOR RICHARD GARNETT; PROFESSOR DOUGLAS LAYCOCK; PROFESSOR MICHAEL W. MCCONNELL; PROFESSOR MICHAEL P. MORELAND; PROFESSOR ROBERT J. PUSHAW; INSTITUTE FOR FREE SPEECH,

Amici Supporting Appellant.

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; MUSLIM ADVOCATES; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL WOMEN'S LAW CENTER AND FORTY-SEVEN ADDITIONAL ORGANIZATIONS; MASSACHUSETTS; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; DISTRICT OF COLUMBIA; HAWAII; ILLINOIS; MAINE; MARYLAND; MICHIGAN; MINNESOTA; NEW JERSEY; NEW MEXICO; NEW YORK; OREGON; RHODE ISLAND; WASHINGTON; NORTH CAROLINA COUNCIL OF CHURCHES; CHARLOTTE CLERGY COALITION FOR JUSTICE; CALDWELL PRESBYTERIAN CHURCH,

Amici Supporting Appellee.

--------

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:17-cv-00011-MOC-DCK)

--------

Argued: September 20, 2023                    Decided: May 8, 2024

Amended: May 9, 2024

--------

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

--------

Reversed by published opinion. Judge Harris wrote the majority opinion, in which Judge Niemeyer joined. Judge King wrote an opinion dissenting in part and concurring in the judgment.

--------

**ARGUED:** Luke W. Goodrich, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellants. Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellee. **ON BRIEF:** Joshua Daniel Davey, TROUTMAN PEPPER HAMILTON SANDERS LLP, Charlotte, North Carolina; Nicholas R. Reaves, Laura E. Wolk, THE BECKET FUND FOR RELIGIOUS

2

LIBERTY, Washington, D.C., for Appellants. S. Luke Largess, TIN FULTON WALKER AND OWEN PLLC, Charlotte, North Carolina; Kristi Graunke, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Appellee. Ian Speir, NUSSBAUM SPEIR GLEASON PLLC, Colorado Springs, Colorado, for Amici Christian Educational Ministries. Alexander Dushku, R. Shawn Gunnarson, Jarom Harrison, Emily Haws Wright, KIRTON | MCCONKIE, Salt Lake City, Utah, for Amici The Church of Jesus Christ of Latter-Day Saints; The Ethics & Religious Liberty Commission of the Southern Baptist Convention; The General Conference of Seventh-Day Adventists; The Lutheran Church-Missouri Synod; The Jewish Coalition for Religious Liberty; and the Islam and Religious Freedom Action Team of the Religious Freedom Institute. Johannes Widmalm-Delphonse, Lansdowne, Virginia, John J. Bursch, Rory T. Gray, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Amici Cardinal Newman Society, Association of Classical Christian Schools, and Association for Biblical Higher Education. Thomas C. Berg, Religious Liberty Appellate Clinic, UNIVERSITY OF ST. THOMAS SCHOOL OF LAW, Minneapolis, Minnesota; Kimberlee Wood Colby, Laura Nammo, Center for Law & Religious Freedom, CHRISTIAN LEGAL SOCIETY, Springfield, Virginia, for Amici Christian Legal Society and CRISTA Ministries. John Melcon, Stuart Lark, SHERMAN & HOWARD L.L.C., Colorado Springs, Colorado, for Amici The Christian and Missionary Alliance; Evangelical Council for Financial Accountability; Christian Care Ministry, Inc.; The Navigators; Cross Catholic Outreach; Tyndale House Ministries; Samaritan's Purse; Regent University; Grace to You; Focus on the Family; ECO: A Covenant Order of Evangelical Presbyterians; International Missions, Inc.; SIM USA, Incorporated; OC International, Inc.; The Evangelical Alliance Mission (TEAM); Far East Broadcasting Company, Inc.; The Crowell Trust; The Christian Community Foundation, Inc.; The Catholic Diocese of Colorado Springs; Calvary Chapel Fort Lauderdale; and Cherry Hills Community Church. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared M. Nelson, BOYDEN GRAY & ASSOCIATES, Washington, D.C., for Amici Professors Robert F. Cochran, Jr.; David F. Forte; Richard Garnett; Douglas Laycock; Michael W. McConnell; Michael P. Moreland; and Robert J. Pushaw. Miles Coleman, NELSON MULLINS RILEY & SCARBOROUGH LLP, Greenville, South Carolina, for Amicus Institute for Free Speech. Richard B. Katskee, Bradley Girard, Gabriela Hybel, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amici Americans United for Separation of Church and State, Muslim Advocates, and National Council of Jewish Women. Emily J. Martin, Sunu P. Chandy, Laura Narefsky, Phoebe Wolfe, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Courtney M. Dankworth, Harold W. Williford, Joshua N. Cohen, Frank Colleluori, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici National Women's Law Center and Forty-Seven Additional Organizations. Maura Healey, Attorney General, David C. Kravitz, Deputy State Solicitor, Adam M. Cambier, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, for Amicus Commonwealth of Massachusetts. Robert Bonta, Attorney General, OFFICE OF

3

THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Holly T. Shikada, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. J. Dickson Phillips, III, Erik R. Zimmerman, Chapel Hill, North Carolina, Julian H. Wright, Jr., Garrett A. Steadman, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Amici North Carolina Council of Churches, Charlotte Clergy Coalition for Justice, and Caldwell Presbyterian Church.

4

PAMELA HARRIS, Circuit Judge:

Lonnie Billard, a longtime teacher of English and drama at Charlotte Catholic High School (CCHS), sued for sex discrimination under Title VII after CCHS fired him for his plans to marry his same-sex partner. The parties each filed summary judgment motions, and CCHS raised several affirmative defenses, both statutory and constitutional. The district court denied CCHS's motion and granted Billard's. We conclude that because Billard played a vital role as a messenger of CCHS's faith, he falls under the ministerial exception to Title VII. Accordingly, we reverse the district court's order with instructions to enter judgment for CCHS.

## I.

### A.

CCHS operates within the Mecklenburg Area Catholic Schools system, a group of nine schools in and around Charlotte, North Carolina, operated by the Roman Catholic Diocese of Charlotte (the "Diocese"). The Diocese sees its schools as an integral part of its religious mission to "spread the Gospel of Jesus Christ"; indeed, canon law requires Catholic bishops to establish Catholic schools.

Although CCHS offers separate secular and religious classes, religion infuses daily life at the school. CCHS's mission statement describes the school as "an educational community centered in the Roman Catholic faith which teaches individuals to serve as Christians in our changing world." J.A. 407. Its statement of beliefs instructs that "individuals should model and integrate the teachings of Jesus in all areas of conduct in

5

order to nurture faith and inspire action," and that "prayer, worship and reflection are essential elements which foster spiritual and moral development of [CCHS's] students, faculty and staff." *Id.* The Diocese states its own mission as follows:

> We, the people of God
> in the Diocese of Charlotte,
> fortified in the Father,
> redeemed in the Son,
> empowered in the Spirit,
> are called to grow ever more perfectly
> into a community
> of praise, worship, and witness.
> We seek to become evermore enthusiastically
> a leaven of service and a sign of peace
> through love in Piedmont
> and Western North Carolina.

J.A. 463. And the school's motto, inscribed at its entrance, reads: "The soul of education is the education of the soul."

CCHS's teachers play a critical role in pursuing those missions. CCHS expects its teachers to begin each class with a short prayer, led either by the teacher or the students, though it does not dictate the content of the prayer. It requires its teachers to accompany students to all-school Mass, where they play a "supervisory," though not specifically religious, role. J.A. 182-83. And CCHS evaluates its teachers – including teachers of non-religious subjects – on the "catholicity" of their classroom environment, their ability to teach their subjects in a manner "agreeable with Catholic thought," their willingness to "[c]ontribut[e] by example to an atmosphere of faith commitment," and their aptitude in "implement[ing] the diocesan and school's mission statements." *See* J.A. 219-224, 413, 1048-53.

6

CCHS's expectations of its teachers extend beyond the classroom. It does not require all its employees to be Catholic. But, Catholic or not, it requires its employees to conform to Catholic teachings: CCHS prohibits employees from engaging in or advocating for conduct contrary to the moral tenets of the Catholic faith, including the Catholic Church's rejection of same-sex marriage.

Lonnie Billard began working at CCHS as a substitute teacher in the spring of 2001; he transitioned to full-time instruction the following year and then returned to substitute teaching in 2012. As a full-time teacher Billard mainly taught drama, and as a substitute, mainly English. He also occasionally – approximately three times after retiring from full-time teaching – substituted for teachers of religion classes.[1] His role as a substitute teacher called on him to work about half of each year's school days. Billard appears to have been an excellent and beloved teacher: He won the Inspirational Educator Award from North Carolina State University in 2011 and the Charlotte Catholic Teacher of the Year award in 2012.

As an English and drama teacher, Billard did not have a responsibility to educate his students explicitly in the Catholic faith. Indeed, when students asked questions about Catholic doctrine, he would – as CCHS preferred – direct them to religious authorities. But CCHS's commitment to integrating faith throughout its curriculum meant that Billard had

---

[1] The district court, citing the complaint, commented that Billard "only taught non-religious subjects during his time at Charlotte Catholic." *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *2 (W.D.N.C. Sept. 3, 2021). But our *de novo* review of the record reveals that Billard testified that he occasionally covered religion classes. J.A. 134-35.

7

to account for religion in his classes.  When he taught Shakespeare's *Romeo and Juliet*, for instance, Billard "work[ed] together" with religion teachers to ensure that he was "in tune" with their teachings.  J.A. 228-29.  Billard took this part of his job seriously:  In documents designed for teachers to set goals for self-improvement, Billard wrote that he aspired to "better incorporate" religion into his English classes, to "[d]evelop connection between drama and liturgy," and to "[p]romote religious expression" among his students.  J.A. 226, 233-35.

Billard is also gay.  He met his now-husband in 2000, and, in 2014 – shortly after same-sex marriage was legalized in North Carolina – he posted on Facebook that he and his partner were engaged to be married.  When CCHS learned of Billard's engagement, it opted not to invite him back as a teacher.  Billard's plans to marry a same-sex partner, CCHS concluded, violated the Diocese's policy against engaging in conduct contrary to the moral teachings of the Catholic faith.

**B.**

1.

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Billard filed this action against CCHS in 2017, invoking Title VII's prohibition against sex discrimination in employment.[2]  CCHS stipulated that it would not defend against Billard's claim under the First Amendment's "ministerial exception," which

---

[2] Billard also named as defendants the Diocese and Mecklenburg Area Catholic Schools.  For brevity's sake, we use "CCHS" as a shorthand for the defendants collectively while recounting the history of the litigation.

8

permits religious institutions, notwithstanding Title VII, to discriminate in their treatment of certain employees with vital religious duties. *See generally Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).

Following discovery, both parties moved for summary judgment. CCHS first contested Billard's claim that it had fired him because of his sex or sexual orientation, arguing that it fired him only because he engaged in "advocacy in favor of a position that is opposed to what the church teaches about marriage." J.A. 1330, 1338-42. And in any event, CCHS argued, its conduct was protected by four affirmative defenses, two statutory and two constitutional. Because CCHS advances the same defenses before us, we describe them in some detail here.

First and most prominently, CCHS pressed Title VII's religious exemption. Title VII bans employment discrimination "because of" an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). But it exempts certain religious organizations – including, the parties agree, CCHS – from its strictures "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a).[3] We have understood that exemption to operate as a defense only to claims of *religious* discrimination – allowing religious institutions to favor co-religionists in hiring – and not to claims of race

---

[3] A similar exemption provides that, for religious schools in particular, "it shall not be an unlawful employment practice . . . to hire and employ employees of a particular religion." 42 U.S.C. § 2000e-2(e)(2). The parties agree that CCHS qualifies for both exemptions, and that the exemptions operate similarly with respect to Billard's claims. We thus treat them together here, without addressing whether the provisions' different language might cause them to operate differently in some circumstances.

9

or sex discrimination. *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011).  But CCHS argued that if religion motivates an employment decision – even one that also discriminates based on sex, as alleged here – then Title VII no longer applies.

For its second statutory defense, CCHS relied on the Religious Freedom Restoration Act, or "RFRA," which prohibits the government from substantially burdening the exercise of religion unless the government can show that application of the burden is the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000bb-1.  Neither the Supreme Court nor this court has applied RFRA, which by its terms purports to limit government action, to a suit between private parties.  Nevertheless, CCHS contended that it was entitled to an exemption from Title VII under RFRA's brand of strict scrutiny.

Finally, CCHS "touched briefly" on two First Amendment-based defenses. According to CCHS, the "church autonomy" doctrine protects religious organizations against discrimination claims brought by certain employees who fall outside the scope of the traditional ministerial exception.  And in addition, the First Amendment freedom of association recognized in cases like *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), permits all organizations engaged in expressive activities – religious or not – to refrain from associating with employees whose presence would impede the transmission of their messages, as Billard's allegedly would here.  CCHS conceded that neither of its First Amendment theories had "been applied on facts like these."  J.A. 1348, 1351.

10

As noted above, CCHS had stipulated that it would not rely on the better-established First Amendment defense provided by the ministerial exception. At the summary judgment hearing, however, the district court noted that CCHS appeared to be "arguing the ministerial exception" in substance if not in name. J.A. 1350. In response, CCHS explained that its constitutional defenses swept further than the ministerial exception. *Id.* It also confirmed that it had waived the ministerial exception, as it did not think Billard would qualify as a ministerial employee "under the test articulated [by] the Supreme Court in *Hosanna-Tabor* a few years ago." *Id.*

2.

In a lengthy and thoughtful opinion, the district court granted Billard's motion for summary judgment and denied CCHS's. *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *1 (W.D.N.C. Sept. 3, 2021). First, the court resolved the parties' factual dispute in Billard's favor: Given the undisputed evidence in the summary judgment record, it was clear that CCHS had indeed fired Billard because of his plans to marry his same-sex partner – not, as CCHS posited, solely because Billard "engaged in 'advocacy' that went against the Catholic Church's beliefs." *Id.* at *6. And even if CCHS had fired Billard for advocacy, the court reasoned, Billard would still prevail "because he received a harsher punishment than if he had simply expressed positive views of same-sex marriage as a straight person." *Id.* at *7. This case, the court concluded, amounted to "a classic example of sex discrimination." *Id.* (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)).

11

The district court then turned to, and rejected, CCHS's multiple affirmative defenses. First, the court agreed with Billard that Title VII's religious exemption authorizes only discrimination based on religion, and not the sex discrimination at issue here. *Id.* at *7-11. That result, the district court concluded, was consistent with Fourth Circuit precedent describing the scope of the exemption, *see id.* at *9 (quoting *Kennedy*, 657 F.3d at 192) (exemption "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin"), and CCHS had been unable to cite a case from any federal court of appeals adopting its contrary view. *Id.* The court acknowledged that CCHS "would like to see the [Title VII] exemptions broadened to afford greater protections" to church-sponsored institutions. *Id.* at *10. But those protections, the court explained, would come at the expense of the "hundreds of thousands of employees" of all kinds working for such institutions, by "eras[ing their] protections against racial discrimination, sexism, gender discrimination, sexual orientation discrimination, and xenophobia." *Id.* Because Congress did not include such a sweeping exemption in Title VII, CCHS could not prevail on this affirmative defense. *Id.* at *11.

The district court likewise rejected CCHS's statutory defense under RFRA, holding, consistent with the great weight of court authority, that RFRA does not apply to suits between private parties. *Id.* at *15-22. And finally, the district court rejected both of CCHS's First Amendment defenses. When it comes to employment discrimination, the court held, the "church autonomy" doctrine is limited to and finds its "strongest expression" in the ministerial exception – which CCHS did not advance. *Id.* at *14. As

12

for CCHS's "novel theory regarding freedom of association," the court held, there is no precedent for privileging a right of expressive association over anti-discrimination laws in the commercial employment context – and even if there was, application of Title VII would be justified here by the government's compelling interest in protecting employees from sex discrimination.  *Id.* at *23.

Importantly, the court did not stop there.  Instead, it also ruled on the ministerial exception, despite CCHS's waiver of that defense.  *Id.* at *12-14.  Noting that several circuits have treated the ministerial exception as a non-waivable "structural limitation imposed on the government by the Religion Clauses," *id.* at *12 (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015)) (cleaned up), the court concluded that CCHS likely lacked the authority to bind a court with its waiver.  But the court held that CCHS could not prevail on a ministerial exception defense, either, primarily because Billard's role at CCHS did not satisfy the four factors laid out by the Supreme Court in *Hosanna-Tabor*.  *Id.* at *14.

Accordingly, the district court granted Billard's motion for summary judgment and denied CCHS's.  *Id.* at *25.  The parties stipulated to damages in lieu of trial, and the district court entered final judgment.  CCHS timely appealed.

## II.

We review *de novo* a district court's disposition of cross-motions for summary judgment.  *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021).

13

On appeal, CCHS does not contest the district court's conclusion that it fired Billard because he planned to marry his same-sex partner, or that the firing amounted to sex discrimination as Title VII defines it. *See Bostock*, 590 U.S. at 651-52. Instead, it presses the same four affirmative defenses it raised in the district court. As the district court recognized, endorsing any one of CCHS's preferred defenses would require us to step beyond existing precedent and significantly diminish Title VII's protections. But a settled doctrine tailored to facts like these – the ministerial exception – already immunizes CCHS's decision to fire Billard. Because we conclude that Billard's role at CCHS was "ministerial" for purposes of the ministerial exception, we resolve the case on that ground.

## A.

Before turning to the ministerial exception, two features of this case require us to explain why we address the exception at all. First, as noted, CCHS waived the ministerial exception in the district court, stipulating that it would "not invoke the 'ministerial exception' to Title VII as a defense in this [l]awsuit." J.A. 31. It asks us to relieve it of that waiver, and the ministerial exception's structural underpinnings persuade us that we have discretion to do so and should exercise it here. Second, prudential canons encourage us to resolve statutory defenses before constitutional ones. We reverse that order here for much the same reason we relieve CCHS of its waiver, and because of the relative breadth and novelty of CCHS's statutory defenses.

### 1.

When CCHS stipulated not to press the ministerial exception, it waived the argument. *See Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012). Unlike a forfeited

14

argument, we generally lack discretion to reach a waived one. *Id.* at 471 n.5; *Stokes v. Stirling*, 64 F.4th 131, 136 n.3 (4th Cir. 2023). As Billard recognizes, however, that general rule can yield in cases involving "structural concerns regarding separation of powers." *Ciena Corp. v. Oyster Optics, LLC*, 958 F.3d 1157, 1160 (Fed. Cir. 2020) (citing *Freytag v. Comm'r*, 501 U.S. 868, 872-93 (1991)). As the district court observed, several courts of appeals have placed the ministerial exception in this category. *See Billard*, 2021 WL 4037431, at *12 (first citing *Conlon*, 777 F.3d at 836; and then citing *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006)). We agree, and conclude that because the ministerial exception "implicate[s] important institutional interests of the court," we retain discretion to raise and consider it *sua sponte* – even if waived. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 654-55 (4th Cir. 2006) (applying same principles to statute of limitations defense); *cf. Clodfelter v. Republic of Sudan*, 720 F.3d 199, 208 (4th Cir. 2013).

When the ministerial exception emerged in the second half of the twentieth century, the courts of appeals that crafted it – ours prominently included – grounded it in constitutional structure. The ministerial exception does not protect the church alone; it also confines the state and its civil courts to their proper roles. *See Rayburn*, 772 F.2d at 1171. The exception operates structurally, in other words, to "categorically prohibit[] federal and state governments from becoming involved in religious leadership disputes." *Conlon*, 777 F.3d at 836. And critically, by exempting from legal process "decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance," the ministerial exception prohibits the adjudication of disputes

15

that are "beyond the ken of civil courts." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997); *see also*, *e.g.*, *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (describing exception as "rooted in constitutional limits on judicial authority").

The Supreme Court adopted the ministerial exception in 2012 and reaffirmed its commitment to the exception in 2020. *See Hosanna-Tabor*, 565 U.S. 171; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). And although *Hosanna-Tabor* clarified that the exception is a non-jurisdictional affirmative defense, 565 U.S. at 195 n.4, neither case cast doubt on the exception's structural basis, or its importance in partitioning civil authorities from religious ones. Indeed, in both decisions, the Supreme Court plainly adopted the structural understanding of the ministerial exception: The First Amendment's Religion Clauses, the Court explained, "bar the government from interfering" with ministerial employment decisions or involving itself in ecclesiastical matters. *Hosanna-Tabor*, 565 U.S. at 181, 189. That means civil courts like ours are "bound to stay out" of employment disputes involving ministers – those "holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.[4]

---

[4] The term "minister" is shorthand for somebody who qualifies for the ministerial exception. We are mindful that the title of the exception made it into the case law only "because the individuals involved in pioneering cases were described as 'ministers,'" and not because the title – with its independent religious significance – governs the legal analysis. *Our Lady of Guadalupe*, 140 S. Ct. at 2060; *see also Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., concurring); *E.E.O.C. v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000).

16

Relying on its structural nature, some courts consider the ministerial exception categorically non-waivable. *See Conlon*, 777 F.3d at 836; *Tomic*, 442 F.3d at 1042; *see also Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1052 (10th Cir. 2022) (Bacharach, J., dissenting). We need not go so far today.[5] It is enough to hold – as both parties agree – that these same considerations may make it appropriate for a court, in an exercise of its discretion, to consider the ministerial exception *sua sponte. See Lee*, 903 F.3d at 118 n.4. We need not preclude waiver outright, in other words, to conclude that we ought to forgive it here. The ministerial exception plays an important role in limiting courts to their proper sphere. Given a choice between enforcing a waiver and thus exceeding our authority, on the one hand, and forgiving a waiver and staying in our proper lane, on the other, we choose the latter.

Other, more quotidian considerations also make it appropriate to forgive CCHS's waiver. First, as counsel for CCHS pointed out at oral argument, CCHS stipulated away the defense under *Hosanna-Tabor*, before the Supreme Court broadened the exception's scope in *Our Lady of Guadalupe. See* 140 S. Ct. at 2063 (clarifying that factors applied in *Hosanna-Tabor* need not be met in all cases). We express no view as to whether a

---

[5] We note that a categorical rule prohibiting courts from enforcing a waiver may sit somewhat uncomfortably with *Hosanna-Tabor*'s clarification that the ministerial exception is non-jurisdictional in nature, *see* 565 U.S. at 195 n.4, as such defenses are generally "subject to ordinary principles of waiver and forfeiture," *Edd Potter Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 39 F.4th 202, 207 (4th Cir. 2022) (internal quotation marks omitted). Indeed, it is not entirely clear that the Seventh Circuit's decision in *Tomic*, cited above, which reasoned in part that the ministerial exception is jurisdictional, survives *Hosanna-Tabor*.

17

ministerial exception defense would have prevailed at the time of CCHS's stipulation, but the subsequent decision in *Our Lady of Guadalupe* certainly adds to the defense's strength. *Cf. Clark v. Newman Univ., Inc.*, No. 19-1033-JWB, 2021 WL 2024891, at *5 (D. Kan. May 21, 2021) (treating *Our Lady of Guadalupe* as a change in the law amounting to good cause to add the ministerial exception as an affirmative defense after pleadings deadline had passed). Indeed, Billard falls in precisely the category of people whose ministerial status *Our Lady of Guadalupe* seems most likely to affect: educators in religious schools who primarily teach secular subjects. *See Our Lady of Guadalupe*, 140 S. Ct. at 2072, 2075 (Sotomayor, J., dissenting).

Second, the district court ruled on the question, concluding that Billard did not satisfy the criteria for the ministerial exception. *Billard*, 2021 WL 4037431, at *13-14. That alone weighs in favor of reaching the matter here, as we may review "an issue not pressed below so long as it has been passed upon." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 330 (2010) (cleaned up) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)); *see also United States v. Pratt*, 915 F.3d 266, 271 n.4 (4th Cir. 2019).

Finally, the waiver has imposed no practical obstacle to our deciding the case on ministerial exception grounds. Both parties briefed the issue, if not extensively, and – as demonstrated by the district court's comfort addressing the question – "the present record 'readily permit[s] evaluation'" of the ministerial exception's applicability. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc) (quoting *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013)).

18

2.

The ministerial exception is a constitutional defense, and ordinarily, of course, we do not "pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 68 (4th Cir. 2023) (avoiding ministerial exception by rejecting employment discrimination claim on the merits). But the general rule instructing us to prefer statutory over constitutional grounds is just that: a general rule of judicial prudence. *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7-8 (1993). It admits of exceptions, and we are convinced that we should make one here.

First, the breadth and novelty of CCHS's statutory defenses makes this the unusual case in which we decide less by starting and finishing with a constitutional defense. The constitutional avoidance canon is designed to promote judicial restraint. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). But here, restraint points in the other direction. As we will explain, the ministerial exception is narrowly tailored to Billard's case and circumstances. By contrast, adopting either of CCHS's statutory defenses – the only course that would allow us to skirt a constitutional ruling – would carry "wide-ranging and unpredictable consequences." *See Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 352 (4th Cir. 2018) (en banc) (Harris, J., concurring), *cert. granted, vacated, and remanded on other grounds*, 138 S. Ct. 2710 (2018).

As the district court recognized, CCHS's interpretation of Title VII's religious exemption would be wide-ranging indeed. *Billard*, 2021 WL 4037431, at \*10. As counsel for CCHS confirmed at oral argument, that exemption would apply equally to all employees of qualifying religious institutions – not only the relatively small number of employees with a claim to ministerial status, but also the hundreds of thousands of groundskeepers, custodians, administrative personnel, and the like that all agree fall outside the ministerial exception. *Id.*; *see E.E.O.C. v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000). And it would deprive those employees not only of Title VII's protections against religious discrimination, but also Title VII's protections against sex discrimination and, at least presumptively, those against race and national-origin discrimination, as well. *Billard*, 2021 WL 4037431, at \*10. A prudential doctrine resting in part on avoiding a constitutional ruling's "consequences for others" does not demand such a sweeping result. *Rescue Army v. Mun. Ct. of L.A.*, 331 U.S. 549, 571 (1947).[6]

Equally important, the ministerial exception is a "well-settled" doctrine, *Diocese of Raleigh*, 213 F.3d at 800, and we break no new ground in applying it. By contrast, CCHS's

---

[6] Our dissenting colleague believes that it does, emphasizing that in *Palmer* we rejected an age discrimination claim on statutory grounds instead of reaching the ministerial exception defense. *See Palmer*, 72 F.4th at 68. But the statutory route we took in *Palmer* entailed only a fact-specific holding that the claimant had not made out a claim under the ADEA. *Id.* at 67. Here, by contrast, the statutory holding embraced by the dissent would entail a reworking of Fourth Circuit precedent to leave all employees of religious institutions subject to forms of discrimination previously – and in every other circuit – prohibited by Title VII. *Billard*, 2021 WL 4037431, at \*9-10 (citing *Kennedy*, 657 F.3d at 192). Whatever its merits, such a holding bears little resemblance to our minimalist decision in *Palmer*.

20

statutory defenses would require us to resolve "novel and complex statutory" questions. *Kennedy*, 657 F.3d at 196 (King, J., dissenting). No federal appellate court in the country has embraced the school's argument that Title VII permits religiously motivated sex discrimination by religious organizations. But that does not mean that the claim is easily dismissed, as demonstrated by separate writings from judges who would adopt it and its endorsement by our dissenting colleague today. *See Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534-35 (7th Cir. 2023) (Brennan, J., concurring). Similarly, only one federal court of appeals has held that RFRA applies to a lawsuit between private parties, while all others to consider the question disagree. *Compare Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) *with Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015) (collecting case law).[7] As a result, what exactly it would mean to expand RFRA's scope so dramatically is largely untested and difficult to anticipate. In short, we think this is "'one of those rare occasions' where we may reverse our usual order of operations because 'the constitutional issue is [more] straightforward' than the statutory issues presented." *Int'l Refugee Assistance Project*, 883 F.3d at 352 (Harris, J., concurring) (quoting *Klinger v. Dir., Dep't of Revenue*, 366 F.3d 614, 616 (8th Cir. 2004)); *see also Trump v. Hawaii*, 585 U.S. 667, 729 (2018) (Sotomayor, J., dissenting) (the "rule of thumb" of constitutional avoidance "has limited

---

[7] *Hankins* has proven controversial even within its own court; it issued over a dissent from then-Judge Sotomayor, *see* 441 F.3d at 109, and a later panel expressed "doubts" about its holding on this front, *see Rweyemamu v. Cote*, 520 F.3d 198, 203 (2d Cir. 2008).

application where, as here, the constitutional question proves far simpler than the statutory one").

Second, while avoiding the ministerial exception would do little to advance the purposes of the *Ashwander* doctrine, it would do much to undermine those of the ministerial exception itself. The point of the ministerial exception, as we have explained, is to "shelter[] certain employment decisions from the scrutiny of civil authorities." *Diocese of Raleigh*, 213 F.3d at 801. The "very process of [judicial] inquiry" subjects those decisions to invasive scrutiny, *Rayburn*, 772 F.2d at 1171 (quoting *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979)), and takes a civil court outside its proper role, *see Our Lady of Guadalupe*, 140 S. Ct. at 2060. So here, "[s]werving around" the ministerial exception would "veer[] us too close to the very interests that the First Amendment protects." *Palmer*, 72 F.4th at 76 (Richardson, J., concurring in the judgment).

One final note. Title VII's religious exemptions, though statutory, are also constitutionally inspired, implementing the First Amendment's command to avoid "intrusive inquiry into religious belief." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987); *see Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004) (describing Title VII's religious exemption as "based on constitutional principles"). The same is true of RFRA, which Congress passed in response to Supreme Court rulings on the scope of the First Amendment protection for religious exercise. *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Where a statute rests on constitutional principles, constitutional avoidance becomes more illusory than real.

To be clear, we do not hold that these concerns *compel* us to prioritize the ministerial exception, or that courts should do so in every case.  But the considerations that motivate the ministerial exception as a constitutional matter also shape our discretion as a prudential matter.  *Cf. Palmer*, 72 F.4th at 78 (Richardson, J., concurring in the judgment) ("I need not say that a court's inquiry into a minister's employment is *unconstitutional* in order to say that it is – as a prudential matter – a bad idea for us to become so entangled.").  And we note that we are far from alone.  If courts had an obligation to exhaust all sub-constitutional possibilities before applying the ministerial exception, *every* employment discrimination case against a religious employer would first interrogate the claim's merits – and turn to the exception only after concluding that the religious institution had run afoul of federal law.  That is not how most of these cases go.  In fact, "starting with a constitutional question" – the ministerial exception – "rather than with the statute" has become "the norm in cases of this kind."  *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring).[8]  In this case, we follow the norm.

## B.

We turn, finally, to our consideration of the ministerial exception.  In applying that exception, our focus is on "the function of [Billard's] position" and its importance to

---

[8] *See, e.g.*, *Starkey*, 41 F.4th at 938, 945 (affirming district court's resolution of similar case on ministerial exception grounds "without reaching" Title VII's religious exemption); *Fitzgerald*, 73 F.4th at 531 (explaining that its analysis "begins and ends" with the ministerial exception despite the presence of multiple statutory defenses, including Title VII's religious exemption); *Orr v. Christian Bros. High Sch., Inc.*, No. 21-15109, 2021 WL 5493416, at *1 (9th Cir. Nov. 23, 2021); *Shaliehsabou*, 363 F.3d at 304 n.5

23

CCHS's "spiritual and pastoral mission." *Diocese of Raleigh*, 213 F.3d at 801 (internal quotation marks omitted). We conclude that the school entrusted Billard with "vital religious duties," making him a "messenger" of its faith and placing him within the ministerial exception. *Our Lady of Guadalupe*, 140 S. Ct. at 2063, 2066.

### 1.

We start with the guidance of the Supreme Court in its two ministerial exception cases – both of which, helpfully, involved teachers at religious schools. In the first, *Hosanna-Tabor*, the Court considered the ministerial status of a "called" teacher – one selected by a congregation and with extensive theological training – at a Lutheran school offering a "Christ-centered education." 565 U.S. at 177. That teacher, the Court concluded, was covered by the ministerial exception, requiring dismissal of her employment discrimination suit against the school. *Id.* at 194.

*Hosanna-Tabor* declined to adopt a "rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. The Court did, however, emphasize four factors. The first three involved the teacher's ministerial title and training. *Id.* at 191. But the Court also paid careful attention to the teacher's "job duties" – which included teaching religious as well as secular classes, escorting her students to and occasionally leading a weekly school-wide chapel service, and leading her students in brief devotional exercises each day. *Id.* at 192. Those duties, the Court concluded, reflected an important role in "conveying

("[b]ecause we decide the case on the application of the ministerial exception, we do not consider" the proffered statutory defenses).

24

the Church's message and carrying out its mission" that directly implicated the ministerial exception.  *Id.*

Justice Alito, joined by Justice Kagan, concurred, urging function over form. Religious titles like "minister," in the concurrence's view, were neither necessary nor sufficient to bring an employee under the ministerial exception.  *Id.* at 202.   The concurrence focused instead on the majority's fourth factor – job duties – and concluded that what mattered was that the teacher "played a substantial role in conveying the Church's message and carrying out its mission."  *Id.* at 204 (internal quotation marks omitted).

That concurrence proved influential in *Our Lady of Guadalupe*, the Court's more recent encounter with the ministerial exception.  The teachers there did not satisfy the first three factors considered in *Hosanna-Tabor*, in that they were not given the title of "minister," did not hold themselves out as ministers, and had received relatively little religious training.   140 S. Ct. at 2055, 2066.   Instead, both were "lay teachers," denominated as such by the Catholic elementary schools at which they worked, which did not require (though they preferred) that such teachers be Catholic.  *Id.* at 2056 & nn. 2, 4; *see id.* at 2077-79 (Sotomayor, J., dissenting).  But that lay status was not dispositive, the Court explained, and the factors laid out in *Hosanna-Tabor* were not necessary, or even necessarily important, to the inquiry.  *Id.* at 2063-64.  Instead, "[w]hat matters, at bottom, is what an employee does," and how those functions and duties interact with the mission of a religious school.  *Id.* at 2064.  Because the teachers in *Our Lady of Guadalupe* performed "vital religious duties" in connection with the school's religious mission, they fell within the ministerial exception.  *Id.* at 2066.

25

The Court began with the "core of the mission" of the schools in question: "[e]ducating and forming students in the Catholic faith." *Id.* Given that all-encompassing mission, the fact that the lay teachers primarily taught secular subjects did not take them outside the ministerial exception: "[T]hrough all subject areas," the schools expected their teachers to "model and promote Catholic faith and morals." *Id.* at 2056-57 (internal quotation marks omitted). The schools made clear that all teachers would be evaluated for fulfillment of that responsibility. *Id.* at 2066. They also expected teachers to pray with their students, and teachers attended Mass with their students, as well. *Id.* at 2057, 2066. And finally, while both teachers taught a full range of elementary school subjects, both also provided explicitly religious instruction. *Id.* at 2056-57, 2059; *see also id.* at 2077-79 (Sotomayor, J., dissenting). Together, that "abundant record evidence" demonstrated that the teachers "performed vital religious duties" and qualified for the ministerial exception. *Id.* at 2066.

### 2.

We are mindful not to treat the Supreme Court's two ministerial exception cases as a "checklist." *Id*. at 2067. But it strikes us that the relationship between Billard and CCHS mirrors that between the lay teachers and their schools in *Our Lady of Guadalupe* in most – though not all – respects. We conclude that the resemblance, accounting for "all relevant circumstances," is close enough that Billard, too, qualifies for the ministerial exception. *Id.*

Like the schools in *Our Lady of Guadalupe*, CCHS's educational mission is driven by the Catholic faith. CCHS is "an educational community centered in the Roman Catholic

faith which teaches individuals to serve as Christians in our changing world," and its statement of beliefs calls on all community members to "model and integrate the teachings of Jesus in all areas of conduct." J.A. 407.

Accordingly, and again like the schools in *Our Lady of Guadalupe*, CCHS expected its teachers to model faith in the teaching of all subjects, including the non-religious subjects taught by Billard. Indeed, Billard, like the teachers in *Our Lady of Guadalupe*, was evaluated based on the degree to which he integrated faith throughout his classes, including his ability to teach his subjects in a way "agreeable with Catholic thought" and the "catholicity" of his classroom environment. J.A. 219-24.[9] Consistent with the accolades for his teaching, Billard went out of his way to meet these expectations, coordinating with teachers of religion to ensure they were "in tune." J.A. 228-29. And Billard was expected to – and did – begin each class with prayer and attend Mass with his students, where he regularly opted to receive communion. All of this indicates the performance of "vital religious duties" that implicate the ministerial exception. *See Our Lady of Guadalupe*, 140 S. Ct. at 2066.

We recognize one important distinction between Billard and the teachers in *Our Lady of Guadalupe*: As a teacher of English and drama, Billard was not regularly tasked

---

[9] Billard received formal evaluations and worked under an employment contract laying out religious expectations only as a full-time teacher, and not once he transitioned to part-time work. But employment contracts and evaluations are relevant to the ministerial exception not because they impose a contractual duty to perform but because they articulate the religious institution's expectations for the role, *Our Lady of Guadalupe*, 140 S. Ct. at 2057, 2066, and there is no suggestion that CCHS's religious expectations of Billard changed when he retired from full-time teaching.

27

with providing specifically religious instruction, even – as in *Our Lady of Guadalupe* – as a small part of his overall teaching day. Under a standard that disclaims "rigid formula[s]" and instructs consideration of all relevant circumstances, *id.* at 2067, that distinction undoubtedly matters. But by the same token, and weighed against all relevant similarities, we do not think it can be dispositive here.

Most important, as noted above, faith infused CCHS's classes – and not only the expressly religious ones. Even as a teacher of English and drama, Billard's duties included conforming his instruction to Christian thought and providing a classroom environment consistent with Catholicism. Billard may have been teaching *Romeo and Juliet*, but he was doing so after consultation with religious teachers to ensure that he was teaching through a faith-based lens. *Cf. Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 954-56 (2022) (Alito, J., statement respecting the denial of certiorari) (describing "[f]aith-infused instruction" of secular subjects by positing that "an English professor at a secular college might see nihilism and skepticism in Shakespeare's King Lear, while a professor at a Catholic school might present it as a pilgrimage to redemption"). The record makes clear that CCHS considered it "vital" to its religious mission that its teachers bring a Catholic perspective to bear on Shakespeare as well as on the Bible.

Moreover, we note that Billard did – on rare occasions – fill in for teachers of religion classes. The handful of days on which Billard was asked to teach religion is not equivalent, of course, to the regular basis on which the *Our Lady of Guadalupe* teachers were engaged in specifically religious instruction. But CCHS's apparent expectation that

28

Billard be ready to instruct in religion as needed is another "relevant circumstance" indicating the importance of Billard's role to the school's religious mission.

Our court has recognized before that seemingly secular tasks like the teaching of English and drama may be so imbued with religious significance that they implicate the ministerial exception. In *Shaliehsabou*, for instance, we considered the case of a "mashgiach," or a guardian of Jewish dietary laws, charged with ensuring that meals served at a Jewish home for the aged were kosher. 363 F.3d at 301. The mashgiach's "primary duties" were on their face secular – inspecting deliveries, monitoring kitchen operations, and cleaning kitchen utensils – and he referred "difficult questions of Jewish law" to a rabbi. *Id.* at 303. Nevertheless, we concluded, he qualified as a "minister" for purposes of the ministerial exception – not because of the substance of his day-to-day work, but because of "the importance of dietary laws to the Jewish religion." *Id.* at 309. And we relied for support on an earlier decision of our court in *Diocese of Raleigh*, in which we found that a part-time music teacher and Director of Music Ministry at a Catholic cathedral qualified as a "minister" largely because of the importance of music to the "spiritual and pastoral mission of the church." *Id.* at 308 (quoting *Diocese of Raleigh*, 213 F.3d at 802). Billard taught works of literature rather than supervising food preparation or training people to sing, but we think the principle carries through: The ministerial exception protects religious institutions in their dealings with individuals who perform tasks so central to their religious missions – even if the tasks themselves do not advertise their religious nature.

Finally, there is the fact that we deal here with a teacher. Some religious institutions may ask all employees, whatever their roles, to model religious values, and we do not

29

suggest that such an expectation would bring all such employees within the ministerial exception. But as the Supreme Court instructs, teachers are different. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school" like CCHS. *Our Lady of Guadalupe*, 140 S. Ct. at 2064. Under all the relevant circumstances here, we think this teacher falls within the narrow category of employees who "serve as a messenger or teacher of the faith" covered by the ministerial exception. *Id.* (cleaned up).

Though *Our Lady of Guadalupe* remains a recent decision, our conclusion today accords with other cases applying it. In *Butler v. St. Stanislaus Kostka Catholic Academy*, for instance, the court held that the ministerial exception applied to a teacher of English and social studies at a Catholic school because, much like Billard, he was expected to teach his secular subjects consistent with church teachings and act at all times as a "role model of the Catholic Faith" to his students, in part by accompanying them to morning prayer and Mass. 609 F. Supp. 3d 184, 194, 196-97 (E.D.N.Y. 2022). The court recognized as a "prominent" distinction from *Our Lady of Guadalupe* that this teacher taught only secular subjects. *Id.* at 196. But that was not dispositive, the court reasoned, given *Our Lady of Guadalupe*'s instruction that "no single prerequisite controls." *Id.* at 197. And while the Supreme Judicial Court of Massachusetts rejected a ministerial exception defense in the case of a professor of social work at a religious college who, like Billard, was expected to "integrate the Christian faith into her teaching" of secular subjects, that court emphasized as a "significant difference" from *Our Lady of Guadalupe* that the professor, unlike Billard, did not "pray with her students, participate in or lead religious services," or "take her

30

students to chapel services." *DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1012, 1017 (Mass. 2021).

Ministerial exception cases are, as the Supreme Court instructs, highly fact-intensive, turning on consideration of a "variety of factors" and "all relevant circumstances" rather than a bright-line rule or even a "rigid formula." *Our Lady of Guadalupe*, 140 S. Ct. at 2063, 2067. The ministerial exception remains just that – an exception – and each case must be judged on its own facts to determine whether a "particular position" falls within the exception's scope. *Id.* at 2067. But when the exception does apply, it unambiguously commands that we "stay out." *Id.* at 2060. Because the ministerial exception applies here, we must reverse the judgment of the district court and remand with instructions to enter judgment for CCHS.

## III.

For the foregoing reasons, the judgment of the district court is reversed.

*REVERSED*

31

KING, Circuit Judge, dissenting in part and concurring in the judgment:

I write separately to explain that I would neither reach nor resolve the First Amendment ministerial exception issue on which the majority relies. I would decide this appeal solely on Title VII statutory grounds, that is, § 702 of Title VII, as codified in § 2000e-1(a) of Title 42. As explained herein, my good friends of the panel majority have unnecessarily resolved the appeal on the First Amendment constitutional issue. In so ruling, they have strayed from settled principles of the constitutional avoidance doctrine and our Court's precedent. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936); *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52 (4th Cir. 2023), *cert. denied sub nom. Liberty Univ., Inc. v. Bowes*, No. 23-703, 2024 WL 899230 (U.S. Mar. 4, 2024). Because I would abide by *Ashwander* and our precedent, I dissent in part and concur only in the judgment.

I.

A.

As the Supreme Court has mandated, "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *See Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) (Frankfurter, J.); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985) (White, J.) (cautioning the federal courts "never to anticipate a question of constitutional law in advance of the necessity of deciding it"); *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring). In his *Ashwander* concurrence, Justice Brandeis emphasized for the ages that, "if a case can be

32

decided on either of two grounds, one involving a constitutional question, the other a question of . . . general law, the Court will decide only the latter." *See* 297 U.S. at 347.

Adhering to *Ashwander*, the Supreme Court and our Circuit have consistently applied the constitutional avoidance doctrine. *See, e.g.*, *Bond v. United States*, 572 U.S. 844 (2014) (applying constitutional avoidance doctrine and declining to decide constitutional question); *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 706 (4th Cir. 2019) (same); *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 148-49 (4th Cir. 2023) (same). Pursuant to *Ashwander*'s constitutional avoidance principle, we should resolve this appeal on nonconstitutional grounds.

Notably, our Court applied *Ashwander*, less than a year ago, in an appeal that is "on all fours" with this one. *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52 (4th Cir. 2023).[10] In *Palmer*, a former art professor alleged that Liberty University's decision not to renew her employment contract was a pretext for age-based discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"). The University defended against that allegation by relying on both the First Amendment's ministerial exception and on the ADEA. In resolving *Palmer*, the district court first granted summary judgment to the art professor on the University's constitutional contention, explicitly ruling that she was not a "minister" for purposes of the First Amendment's ministerial exception. Second, in awarding summary judgment to the University on the professor's ADEA statutory claim,

---

[10] "On all fours" generally refers to a prior decision that is "squarely on point" with the case being considered. *See*, <u>On all fours</u>, Black's Law Dictionary (11th ed. 2019).

the court ruled that she lacked sufficient evidence of age-based discrimination to defeat the University's motion. Otherwise stated, the district court made two explicit rulings. First, it made a constitutional ruling in favor of the professor on the First Amendment's ministerial exception. Second, it rendered a statutory ruling in favor of the University on the ADEA statutory claim.

Faced with cross-appeals of the district court's statutory and constitutional rulings in *Palmer*, we applied *Ashwander*'s constitutional avoidance principles and resolved both appeals by addressing only the ADEA statutory issue. That is, relying on *Ashwander*, we did not "deviate from the strictures of the constitutional avoidance doctrine," because the ministerial exception is "not a jurisdictional bar," nor is there "controlling authority to otherwise suggest that such an issue should be resolved in the first instance." *See Palmer*, 72 F.4th at 68. Specific to the ADEA claim, we affirmed the court's judgment in favor of the University on the ADEA statutory ground, because the professor had failed to present sufficient evidence of age-related discrimination to defeat a summary judgment award.[11]

---

[11] The issues relating to *Ashwander* and the constitutional avoidance doctrine were strongly contested and well explained in *Palmer*. Each of the panelists authored an opinion thereon. *Compare Palmer*, 72 F.4th at 56 (King, J.) ("[P]ursuant to the constitutional avoidance doctrine — we refrain from resolving whether Palmer was a minister for purposes of the First Amendment's ministerial exception"), *and id.* at 75 (Motz, J., concurring) (explaining that it was "unnecessary for the district court to confront" the ministerial exception), *with id.* at 79 (Richardson, J., concurring in the judgment) (maintaining that the ministerial exception should be first addressed "as a matter of prudence").

34

B.

To remain faithful to *Ashwander* and *Palmer* in this appeal, we should be deciding Billard's sex discrimination claim solely on nonconstitutional grounds. Put simply, I would dispose of Charlotte Catholic's appeal by ruling only on Title VII's religious exemption, in that a "straightforward reading" of § 702 of Title VII bars Billard's discrimination claim. *See Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) (reasoning in very similar dispute to apply constitutional avoidance doctrine and rule that Catholic high school was exempt under § 702 from guidance counselor's sex discrimination claim under Title VII). Although I am dissenting because our panel majority has reached and resolved the constitutional issue, I would also reverse the district court.

Rather than recognizing that Billard's claim is statutorily barred, my friends turn immediately to the constitutional question — addressing only the ministerial exception of the First Amendment. Relying on the Supreme Court's decision in *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7-8 (1993), the majority relegates the Court's long-standing *Ashwander* mandate to "a general rule of judicial prudence" that "admits of exceptions." *See ante* at 19. Although a deviation from the constitutional avoidance doctrine may be warranted in some rare circumstance, it is certainly not warranted in this situation, in that Charlotte Catholic and its lawyers have explicitly waived the ministerial exception. *See* J.A. 31.

Pursuant to the constitutional avoidance doctrine, a reviewing court should "not pass upon a constitutional question although properly presented by the record, if there is also

35

present some other ground upon which the case may be disposed of." *See Ashwander*, 297 U.S. at 347. Otherwise stated, the constitutional avoidance doctrine and our Circuit's precedent require a reviewing court presented with both constitutional and statutory grounds for relief to resolve an appeal solely on the statutory grounds.

Although the majority relies on a Supreme Court dissent for its proposition that the constitutional avoidance doctrine may be bypassed when the "constitutional question proves far simpler than the statutory one," *see ante* at 22 (quoting *Trump v. Hawaii*, 585 U.S. 667, 729 (2018) (Sotomayor, J., dissenting)), such simplicity is sorely lacking in this situation. Resolving Billard's sex discrimination claim by invoking the ministerial exception requires the panel majority to relieve Charlotte Catholic of its explicit waiver — by a stipulation of counsel placed in this record — of that constitutional defense. *See* J.A. 31. And as the majority recognizes, the ministerial exception is not exempt from "ordinary principles of waiver." *See ante* at 17 n.5 (quoting *Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Programs*, 39 F.4th 202, 207 (4th Cir. 2022)).

The majority also posits that a resolution of this appeal on the nonconstitutional Title VII basis, as *Ashwander* mandates, would undermine the ministerial exception and might authorize a judicial inquiry into ecclesiastical decisions. We considered such concerns of entanglement in our *Palmer* case, however, and rejected them. *See Palmer*, 72 F.4th at 75 (Motz, J., concurring) ("[Our majority opinion] has more than capably explained why the constitutional avoidance doctrine cautions against reaching the ministerial exception issue in this case.").

36

Adhering to the constitutional avoidance doctrine and the *Ashwander* mandate, we disposed of the *Palmer* case by ruling only on the ADEA claim.  And there is no reason to deviate from *Palmer* and *Ashwander* today, when a Title VII ruling alone will readily suffice.  My good friends say, however, that by applying *Ashwander* we would be requiring that, in "*every* employment discrimination case against a religious employer," the court would be obliged to turn to "sub-constitutional possibilities" before reaching the First Amendment's ministerial exception.  *See ante* at 23 (emphasis in original).  Again, that is the essence of *Ashwander* and its constitutional avoidance doctrine.  And it is exactly what we are obliged to do.

## II.

Because we should adhere to *Ashwander* and *Palmer* and decide this appeal on nonconstitutional grounds, I would rule only on the Title VII issue.  I therefore dissent in part and concur in the judgment.

37